1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership
2    Including Professional Corporations
   SASCHA HENRY, Cal. Bar No. 191914
3  PAUL SEELEY, Cal. Bar No. 252315
   333 South Hope Street, 43rd Floor
4  Los Angeles, California 90071-1422
   Telephone:  213.620.1780
5  Facsimile:  213.620.1398
   Email:      shenry@sheppardmullin.com
6              pseeley@sheppardmullin.com

7  Attorneys for Defendant
   The Elations Company, LLC

8

9              UNITED STATES DISTRICT COURT

10    CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

11       ED  CV  13  -  00242 JGB (OPx)

12  ROBERT MCCRARY, individually        Case No.
    and on behalf of all others similarly
13  situated,                           State Court Case No.: CIVDS 1213489
                                        Complaint Filed:  December 31, 2012
14            Plaintiff,

15       v.                             **NOTICE OF REMOVAL OF
                                        ACTION PURSUANT TO 28 U.S.C.
16  THE ELATIONS COMPANY, LLC, a        §§ 1332(d), 1441, and 1453**
    Delaware limited liability company; and
17  DOES 1 through 100, inclusive,

18            Defendants.               *Certification of Interested Parties
                                        Pursuant to  Local Rule 7.1-1, Notice of
19                                      Related Cases Pursuant to Local Rule
                                        83-1.3.1, Corporate Disclosure
20                                      Statement, and Declaration of Ed Klene
                                        Filed Concurrently Herewith*
21

22

23

24

25

26

27

28

SMRH:407977902.1                              NOTICE OF REMOVAL OF ACTION

1    **TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR**

2    **THE CENTRAL DISTRICT OF CALIFORNIA:**

3        **PLEASE TAKE NOTICE** that Defendant The Elations Company, LLC

4    ("Defendant") hereby removes the action entitled <u>Robert McCrary v. The Elations</u>

5    <u>Company, LLC</u>, San Bernardino County Superior Court Case No. CIVDS 1213489,

6    to the United States District Court for the Central District of California, on the

7    grounds set forth below:

8                                    **I.**

9                    **STATEMENT OF JURISDICTION:  CAFA**

10        1.      This Court's removal jurisdiction is invoked pursuant to

11   28 U.S.C. § 1441 and the Class Action Fairness Act ("CAFA"), 28 U.S.C.

12   §§ 1332(d) and 1453.  CAFA provides that a class action may be removed in

13   accordance with 28 U.S.C. § 1446 if:  (1) membership in the putative class is not

14   less than one hundred (100) members; (2) any member of the proposed plaintiff

15   class is a citizen of a state different from any defendant; and (3) the aggregate

16   amount in controversy exceeds five million dollars ($5,000,000). <u>See</u> 28 U.S.C. §§

17   1332(d), 1453(b).  As set forth below, this case satisfies the elements for removal

18   under CAFA.

19   **A.    <u>Plaintiff Alleges A Class Size Of Not Less Than 100 Putative Members</u>**

20        2.      CAFA's first requirement – that putative class membership must

21   be no less than one hundred (100) members – is satisfied. <u>See</u> 28 U.S.C. §

22   1332(d)(5)(B).

23        3.      Plaintiff alleges a class defined as "All persons residing in the

24   State of California who purchased Elations for personal use and not for resale since

25   December 28, 2008."  Complaint ¶ 19.  Plaintiff further alleges that "The Class

26   comprises many thousands of persons throughout the State of California."

27   Complaint ¶ 20.

28

SMRH:407977902.1                                         NOTICE OF REMOVAL OF ACTION

**B.**   **Minimum Diversity Exists Between Defendant And The Putative Class**

4.   CAFA's diversity requirement is satisfied when any member of the putative class is a citizen of a state different from any defendant. See 28 U.S.C. § 1332(d).

5.   As alleged in the Complaint, Plaintiff is a California resident. Complaint ¶¶ 11, 13. The putative class members are "All persons residing in the State of California who purchased Elations for personal use and not for resale since December 28, 2008." Complaint ¶ 19. Because the putative class is limited to persons residing in California, Defendant asserts and affirmatively alleges that the members of this putative class are all California citizens and/or residents. See 28 U.S.C. § 1332(a)(1) (an individual is a citizen of the state in which he or she is domiciled); State Farm Mut. Auto. Ins. Co. v. Dyer, 19 F.3d 514, 520 (10th Cir. 1994) (residence is *prima facie* evidence of domicile for purposes of determining citizenship). Thus, for purposes of 28 U.S.C. § 1332(d), Plaintiff and the putative class members are California citizens.

6.   Defendant is a limited liability company. Complaint ¶ 14. For purposes of determining the citizenship of a limited liability company under CAFA, a limited liability company is deemed to be a citizen of the state where it has its principal place of business and the state under whose laws it is organized. See 28 U.S.C. § 1332(d)(10); Ferrell v. Express Check Advance of South Carolina, LLC, 591 F.3d 698, 705 (4th Cir. 2010) (under CAFA, a limited liability company is an "unincorporated association."); Marroquin v. Fargo, 2011 U.S. Dist. LEXIS 10510 (S.D. Cal. Feb. 3, 2011) (Delaware LLC with principal place of business in California was deemed citizen of both Delaware and California for purposes of CAFA); Feinstein v. Ocwen Loan Servicing, LLC, 2012 U.S. Dist. LEXIS 41894 (C.D. Cal. Mar. 27, 2012); Rutter Guide: California Practice Guide: Federal Civil Procedure Before Trial, § 2:1425 (2012). The definition of the citizenship of "unincorporated associations" under CAFA was intended replace the traditional

-2-

1  member-determined rule for citizenship and to broaden the availability of federal

2  diversity jurisdiction in class actions.  Rutter Guide: California Practice Guide:

3  Federal Civil Procedure Before Trial, § 2:1362 (2012); accord Ferrell, 591 F.3d at

4  702-705 (Congress enacted 28 U.S.C. § 1332(d)(10) to replace the traditional rule of

5  member-determined citizenship for unincorporated entities).  Accordingly, the

6  citizenship of Defendant's members is irrelevant for purposes of determining

7  citizenship under CAFA; the only relevant factors are Defendant's principal place of

8  business and the state under whose laws it is organized.  Rutter Guide: California

9  Practice Guide: Federal Civil Procedure Before Trial, § 2:1425 (2012);  accord

10  Ferrell, 591 F.3d at 702.

11          7.      Defendant is organized under the laws of Delaware. Complaint

12  ¶ 14; Declaration of Ed Klene ("Klene Decl.") ¶ 3.  Defendant's principal place of

13  business is Cincinnati, Ohio.  Complaint ¶ 14; Klene Decl. ¶ 4.  Its center of

14  direction, control and coordination of business and administrative functions is in

15  Cincinnati, Ohio.  Klene Decl. ¶ 4.  Therefore, for purposes of diversity jurisdiction

16  under CAFA, Defendant is a citizen of Delaware and Ohio, not California.  See 28

17  U.S.C. § 1332(d)(10). .

18          8.      As alleged in the Complaint, "defendants" designated as DOES 1

19  through 100 are fictitious defendants, are not parties to this action, have not been

20  named or served, and are to be disregarded for the purpose of this removal.  28

21  U.S.C. § 1441(a); McCabe v. General Foods Corp., 811 F.2d 1336, 1339 (9th Cir.

22  1987).  Pursuant to 28 U.S.C. § 1441, the citizenship of defendants sued under

23  fictitious names must be disregarded for the purpose of determining diversity

24  jurisdiction and cannot destroy the diversity of citizenship between the parties in this

25  action.  Newcombe v. Adolf Coors Co., 157 F.3d 686, 690-91 (9th Cir. 1998).  The

26  Doe defendants, therefore, need not consent to this removal.

27          9.      Under CAFA, Defendant is a citizen of Delaware and Ohio.

28  Plaintiff and the putative class members are citizens of California.  Based on the

1  foregoing, for purposes of removal jurisdiction under CAFA and 28 U.S.C. 1332(d),
2  diversity is satisfied.

3  **C.     The Amount In Controversy Exceeds $5,000,000**

4          10.    Jurisdiction under CAFA exists when the amount in controversy
5  exceeds $5,000,000.00, exclusive of interest and costs. 28 U.S.C. § 1332(d)(6).  To
6  determine the amount in controversy under CAFA, the Court must aggregate the
7  claims of all class members.  Id.  Where, as here, the Complaint fails to plead a
8  specific amount of damages, the defendant seeking removal only needs to prove that
9  the amount in controversy requirement has been met "by a preponderance of the
10  evidence."  Abrego Abrego v. The Dow Chemical Co., 443 F.3d 676, 683 (9th Cir.
11  2006).

12          11.    Defendant denies that it owes any amount to Plaintiff or the
13  putative class.  As set forth herein, however, the amount in controversy exceeds the
14  jurisdictional amount necessary to support removal jurisdiction under CAFA.
15  Accordingly, removal is proper.  28 U.S.C. § 1332(d).

16          12.    The damages Plaintiff seeks include, but are not limited to,
17  restitution, penalties, punitive damages, and attorneys' fees.  Complaint ¶ 127 and
18  Prayer ¶¶ A-I.

19          13.    Plaintiff seeks restitution pursuant to California Business and
20  Professions Code sections 17203 and 17535.  Complaint ¶¶ 91, 100, 113 and Prayer
21  ¶ C.  Restitution is the return of money to those persons from whom it was taken or
22  who had an ownership interest in it.  Madrid v. Perot Systems Corp., 130
23  Cal.App.4th 440, 455.  The Complaint alleges that Defendant has "reaped millions
24  of dollars in ill-gotten gains."  Complaint ¶ 8.  More specifically, Elations has
25  shipped to California distribution centers the Elations product with a total retail sales
26  value of approximately $4,234,645 since December 31, 2008.  Klene Decl. ¶¶ 5-7.

27          14.    Plaintiff also seeks to recover a $5,000 civil penalty for "each
28  class member" pursuant to California Civil Code section 1780(b) because

-4-

1   Defendant's conduct was allegedly "directed at a class of persons who are senior

2   citizens and/or disabled." Complaint ¶ 127. Although California Civil Code section

3   1780(b) permits the award of a penalty "up to" $5,000, a court must use the

4   maximum statutory amount recoverable when determining whether the jurisdictional

5   requirements of CAFA have been met. Korn v. Polo Ralph Lauren Corporation, 536

6   F. Supp. 2d 1199, 1205 (E.D. Cal. 2008), citing Saulic v. Symantec Corp., 596 F.

7   Supp. 2d 1323 (C.D. Cal. 2009) (holding that where plaintiff pled that damages

8   could be up to the statutory maximum under California Civil Code section 1748.08

9   ($1,000), defendants must simply show that there are at least 5,001 putative class

10   claims to meet the CAFA jurisdiction requirements) and Romeo v. Home Depot

11   U.S.A., Inc., No. 06-cv-1505, 2006 U.S. Dist. LEXIS 79881 (S.D. Cal. Oct. 30,

12   2006 ("Plaintiffs cannot avoid satisfaction of the amount in controversy by alleging

13   it would be 'far from reasonable to infer that a court of jury' would award the

14   statutory maximum").

15       Here, Plaintiff alleges that the Court may award a penalty of up to

16   $5,000 to each class member. Complaint ¶ 127. The Complaint alleges that there

17   are "thousands" of putative class members, resulting in potential penalties exceeding

18   $10,000,000. Complaint ¶ 20.[1]

19       More precisely, during the putative class period (and not including the

20   time period from January 1, 2013 to present), Defendant has shipped 595,104 units

21   (either six-pack or cases, as appropriate) of the Elations product to distribution

22   centers within California. Klene Decl. ¶ 7. Therefore, if only 0.2% of the purchases

23   of those packs were made by putative class members who are eligible for the

24   penalty, the amount in controversy requirement is met solely by virtue of the alleged

25   penalty.[2] According to the Complaint, Plaintiff alleges that far more than 0.2% of

26

27   [1] 2,000 persons x $5,000 penalty = $10,000,000.

28   [2] 595,104 cases x 0.2% = 1,190.  1,190 x $5,000 penalty = $5,950,000.

-5-

NOTICE OF REMOVAL OF ACTION

1   the purchasers will be eligible for the penalty because it asserts that "Defendant's
2   conduct is clearly directed at senior citizens (the primary demographic afflicted with
3   arthritis) and the disabled (i.e. those diagnosed with arthritis), as Elations is intended
4   to treat and/or prevent arthritis." Complaint ¶127. Regardless, Plaintiff alleges that
5   "thousands" of putative class members are entitled to the penalty. Complaint ¶¶ 20,
6   127.

7        15.   Plaintiff requests an award of punitive damages, which also must
8   be considered in determining the amount in controversy. Complaint Prayer ¶ E;
9   Frederico v. Home Depot, 507 F.3d 188, 198-99 (3d Cir. 2007). The United States
10  Supreme Court has held that "few awards exceeding a single-digit ratio between
11  punitive and compensatory damages, to a significant degree, will satisfy due
12  process." State Farm Mut. Automobile Ins. Co. v. Campbell, 538 U.S. 408, 425
13  (2003). Even assuming the court applied a one-to-one ratio (the lowest end of the
14  single-digit spectrum), restitution and penalties would only need to be $2,500,001 to
15  meet the CAFA jurisdictional requirement. As set forth above, the amount in
16  controversy with respect to Plaintiff's restitution claim exceeds $4.23 million and
17  the amount in controversy with respect to Plaintiff's claim for penalties exceeds $10
18  million.

19       16.   Plaintiff also prays for reasonable attorneys' fees, which must be
20  included in the amount in controversy to reach CAFA's jurisdictional requirement.
21  Complaint Prayer ¶ G; Frederico v. Home Depot, supra, 507 F.3d at 199; Gibson v.
22  Chrysler Corp., 261 F.3d 927, 942-43 (9th Cir. 2001). A reasonable amount
23  assigned to attorneys' fees for purposes of meeting the CAFA jurisdictional
24  requirement is 27-30 percent of the potential judgment. In re Rite Aid Corp.
25  Securities Litigation, 396 F.3d 294, 303 (3d Cir. 2005) (noting a study done by the
26  Federal Judicial Center that found a median percentage recovery range of 27-30
27  percent for all class actions resolved or settled over a four-year period). If the Court
28  were to allocate 27 percent of the judgment to attorneys' fees, Plaintiff and the

-6-

1  putative class' recovery would only need to be $3,937,008 in order for CAFA's
2  jurisdictional requirement to be met.[3]

3            Thus, the value of Plaintiff and the putative class' claimed relief,
4  excluding interest and costs, substantially exceeds $5,000,000.

5                                        II.

6        **THE NOTICE OF REMOVAL IS PROCEDURALLY CORRECT**

7  A.    **The Removal Venue Is Proper**

8            17.    Pursuant to 28 U.S.C. § 1446(a), Defendant files this Notice of
9  Removal in the U.S. District Court for the Central District of California.  This venue
10 is proper because the state court action is pending in the California Superior Court
11 for the County of San Bernardino.

12 B.    **The Removal Is Timely**

13           18.    Plaintiff filed this action on December 31, 2012.

14           19.    Plaintiff served Defendant's registered agent for service of
15 process, The Corporation Trust Company, with the Summons and Complaint by
16 process server on January 8, 2013.

17           20.    Defendant files this Notice of Removal within thirty days of the
18 service of the Summons and Complaint. See Murphy Bros., Inc. v. Michetti Pipe
19 Stringing, Inc., 526 U.S. 344, 354 (1999); 28 U.S.C. § 1446(b).

20 C.    **Status Of The Pleadings In State Court**

21           21.    On December 31, 2012, Plaintiff filed his Complaint with the
22 Superior Court of the State of California for the County of San Bernardino.  The
23 Complaint purports to allege causes of action for: (1) Violation of California
24 Business & Professions Code § 17200, et seq. (Unfair and Fraudulent Prongs); (2)
25 Violation of California Business & Professions Code § 17200, et seq. (Unlawful
26 Prong); (3) Violation of California Business & Professions Code § 17500, et seq.;

27 _____

28 [3] $3,937,008 x 1.27 = $5,000,000.16

                                        -7-

1  and (4) Violation of California Civil Code § 1750 et seq. (Consumer Legal

2  Remedies Act).  Attached hereto as Exhibit "A" is a true and correct copy of the

3  Summons, Complaint (and exhibits A-C thereto), and Civil Case Cover Sheet.

4  Plaintiff also served Defendant with the Declaration of Gillian L. Wade Regarding

5  Venue.  Attached hereto as Exhibit "B" is a true and correct copy of Ms. Wade's

6  declaration.  Plaintiff served Defendant with a one-page document entitled "Notice

7  of Case Assignment For All Purposes, Notice of OSC : Service of Summons and

8  Complaint; Notice of Case Management Conference" (the "Notice").  Attached

9  hereto as Exhibit "C" is a true and correct copy of the Notice.  Additionally, the

10  Court's docket reveals that Plaintiff filed a document entitled "Plaintiff's Notice of

11  Proof of Personal Service of Summons to Defendant the Elations Company, LLC."

12  Attached hereto as Exhibit "D" is a true and correct copy of this Notice of Proof of

13  Service.  Defendant believes that these documents constitute all of the pleadings and

14  documents on file in the State Court Action to date.

## III.

## CONCLUSION

17        For all of the forgoing reasons, Defendant respectfully requests that this

18  Court proceed with this matter as if the Complaint had been originally filed in the

19  U.S. District Court for the Central District of California.  A copy of this Notice of

20  Removal will also be filed with the San Bernardino Superior Court and served upon

21  counsel for Plaintiff.

22

23

24

25

26

27

28

SMRH:407977902.1                                          NOTICE OF REMOVAL OF ACTION

Dated:  February 7, 2013

SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP

By _____
        SASCHA HENRY
        PAUL SEELEY
        Attorneys for Defendant
        The Elations Company, LLC

-9-

SMRH:407977902.1

NOTICE OF REMOVAL OF ACTION

# EXHIBIT "A"



COPY

1  MILSTEIN ADELMAN LLP
   Gillian L. Wade, State Bar No. 229124
2  gwade@milsteinadelman.com
   M. Isaac Miller, State Bar No. 266459
3  imiller@milsteinadelman.com
   2800 Donald Douglas Loop North
4  Santa Monica, California 90405
   Telephone:  (310) 396-9600
5  Fax:         (310) 396-9635

6  Attorneys for Plaintiff
   Robert McCrary and the Proposed Class

7

8

9            SUPERIOR COURT FOR THE STATE OF CALIFORNIA

10              FOR THE COUNTY OF SAN BERNARDINO

11  ROBERT MCCRARY, individually and on        CASE NO.: CIVDS 1215489
    behalf of all others similarly situated,
12                                             CLASS ACTION
                        Plaintiff,             COMPLAINT
13
14                                             1.  VIOLATION OF BUSINESS &
                                                   PROFESSIONS CODE §17200, et seq.
15  THE ELATIONS COMPANY, LLC, a Delaware          (UNFAIR AND FRAUDULENT
    limited liability company; and DOES 1 through  PRONGS)
16  100, inclusive,                            2.  VIOLATION OF BUSINESS &
                                                   PROFESSIONS CODE §17200, et seq.
17                      Defendants.                (UNLAWFUL PRONG)
                                               3.  VIOLATION OF BUSINESS &
18                                                 PROFESSIONS CODE § 17500, et seq.
                                               4.  VIOLATION OF CALIFORNIA CIVIL
19                                                 CODE § 1750, et seq. (Consumer Legal
                                                   Remedies Act)
20

21                                             DEMAND FOR JURY TRIAL

22

23       Plaintiff Robert McCrary ("Plaintiff"), individually and on behalf of all other similarly

24  situated purchasers of the Elations dietary supplement beverage (the "Class"), brings this complaint

25  against The Elations Company, LLC ("Defendant"). Plaintiff seeks certification of this matter as a

26  class action. Plaintiff, by and through his attorney, submits this Class Action Complaint (the

27  "Complaint") against Defendant, and alleges as follows:

28

                            CLASS ACTION COMPLAINT

FILED
SUPERIOR COURT
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

DEC 1 1 2012

By _____
            Deputy

BY FAX

0010

Millstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

## SUMMARY OF COMPLAINT

1.     Defendant markets, distributes and sells the Elations dietary supplement beverage ("Elations"). In its marketing and advertising for Elations, including internet advertisements, Defendant made and continues to make numerous false and misleading claims regarding the uses and benefits of the product.

2.     In particular, Defendant claims the "clinically-proven combination" of ingredients in Elations improves "joint comfort" and "joint flexibility," thereby producing "healthier joints." The product, however, does not work as advertised.

3.     Defendant deceives and misleads consumers by producing and selling a worthless product. The marketing scheme executed by Defendant deceives consumers by making outrageous and false claims about the uses and benefits of Elations in order to drive sales of the product.   In reality, Elations does not have the ability to improve "joint comfort" and "joint flexibility," and does nothing to enhance the health of a consumer's joints.

4.     Plaintiff is informed and believes that the foundation of Defendant's marketing scheme consists of at least one website that is owned and controlled by Defendant.  This principle website is elations.com.

5.     The false and misleading claims that characterize the marketing and advertising for Elations include the following:

- "Healthier Joints"
- "Improves Joint Comfort"
- "Improves Joint Flexibility"
- "Elations Clinically-Proven Combination"
- "Proven levels of Glucosamine and Chondroitin"
- "Improves Joint Comfort in 6 Days!"
- "Research indicates that taking 1,500 mg of glucosamine and 1,200 mg of chondroitin daily can help improve joint function and give joints what they need to stay healthy."

1

CLASS ACTION COMPLAINT

0011

"Glucosamine thickens the synovial fluid in your joints so that it can absorb more friction and cushion the joints, meaning more lubrication and less discomfort. Over time, the amount of Glucosamine in your body decreases to the point where the amount your body synthesizes is far less than the amount it needs for joint health."

"While Glucosamine acts to thicken synovial fluid and cushion joints, Chondroitin is a major component of cartilage and helps maintain its structural integrity."

These claims constitute false and deceptive advertising.

6.    In the course of manufacturing, marketing, distributing, and selling Elations, Defendant has committed and continues to commit illicit business practices in direct violation of: (1) California's Unfair Competition Law ("UCL"), *Business & Professions Code* § 17200, *et seq.*; (2) California's False Advertising Law ("FAL"), *Business & Professions Code* § 17500, *et seq.*; and (3) California's Consumer Legal Remedies Act ("CLRA"), *Civil Code* § 1750, *et seq.*

7.    By utilizing misrepresentations in the marketing and advertising for Elations, Defendant has violated applicable California consumer protection statutes, including but not limited to the UCL, FAL, and CLRA.

8.    Through such false and misleading claims about the purported uses and benefits of Elations, Defendant has wrongfully induced thousands of California consumers to purchase Elations. In doing so, Defendant has reaped millions of dollars in ill-gotten gains.

9.    This action seeks to put an end to Defendant's unfair, fraudulent and unlawful business practices.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over all causes of action asserted herein pursuant to the California Constitution, Article VI, § 10, because this case is a cause not given by statute to other trial courts. Plaintiff has standing to bring this action pursuant to *Business & Professions Code* § 17200, *et seq.*

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

2
CLASS ACTION COMPLAINT

11.     Venue is proper in this Court because Plaintiff resides in San Bernardino County. Additionally, Defendant receives substantial compensation from sales in San Bernardino County, and made numerous misrepresentations which had a substantial effect in San Bernardino County, including, but not limited to, internet advertisements, and on the Elations packaging.

12.     Defendant and other out-of-state participants can be brought before this Court pursuant to the provisions of *Civil Code § 395.5*.

## PARTIES

13.     Plaintiff is, and at all times relevant hereto was, an individual residing in San Bernardino County, California. Plaintiff, who has been diagnosed with Osteoarthritis, purchased Elations from CVS. In doing so, he relied upon the advertising and other promotional material which were prepared and approved by Defendant and its agents and disseminated through its packaging, labeling and national advertising media, containing the misrepresentations alleged herein.

14.     Defendant The Elations Company, LLC ("Defendant") is a limited liability company organized and existing under the laws of the State of Delaware, with its principle place of business located at 6000 Creek Road, Cincinnati, OH 45242. Defendant, directly and through its agents, has substantial contacts with and receives substantial benefits and income from and through the State of California. Defendant is the registered trademark owner and distributor of Elations, and is the company that created and/or authorized the false, misleading and deceptive advertisements and packaging for Elations.

15.     The true names and capacities, whether individual, corporate, associate or otherwise of certain manufacturers, distributors and/or their alter egos sued herein as DOES 1 through 100 inclusive are presently unknown to Plaintiff who therefore sue these Defendants by fictitious names. Plaintiff will seek leave of this Court to amend the Complaint to show their true names and capacities when the same have been ascertained. Plaintiff is informed and believes and based thereon alleges that DOES 1 through 100 were authorized to do and did business in San Bernardino County. Plaintiff is further informed and believes and based thereon alleges that DOES 1 through

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

---

3

0013

1   100 were and/or are, in some manner or way, responsible for and liable to Plaintiff for the events,

2   happenings, and damages hereinafter set forth below.

3       16.   Plaintiff is informed and believes and based thereon alleges that at all times relevant

4   herein each of the Defendants was the agent, servant, employee, subsidiary, affiliate, partner,

5   assignee, successor-in-interest, alter ego or other representative of each of the remaining Defendants

6   and was acting in such capacity in doing the things herein complained of and alleged.

7       17.   In committing the wrongful acts alleged herein, Defendants planned and participated

8   in and furthered a common scheme by means of false, misleading, deceptive and fraudulent

9   representations to induce members of the public to purchase Elations.

10      18.   Defendant, upon becoming involved with the manufacture, distribution, advertising,

11  marketing and sale of Elations knew or should have known that the claims about Elations and, in

12  particular, the claims that Elations contains a "clinically-proven combination" which improves

13  "joint comfort" and "joint flexibility," were false, deceptive and misleading. Defendant

14  affirmatively misrepresented, and continues to misrepresent, the uses and benefits of Elations in

15  order to convince the public to purchase and use the product, resulting in millions of dollars in

16  profits to Defendant, and significant detriment to the consuming public.

                                      **CLASS ACTION ALLEGATIONS**

18      19.   Plaintiff brings this action on his own behalf and on behalf of all other persons

19  similarly situated.  The Class which Plaintiff seeks to represent comprises:

20      All persons residing in the State of California who purchased Elations for

21      personal use and not for resale since December 28, 2008.

22      Excluded from the Class are governmental entities, Defendants, any entity in

23      which Defendants have a controlling interest, and Defendants' officers,
    directors, affiliates, legal representatives, employees, co-conspirators,

24      successors, subsidiaries, and assigns. Also excluded from the Class is any
    judge, justice, or judicial officer presiding over this matter and the members of

25      their immediate families and judicial staff.

26      20.   The Class comprises many thousands of persons throughout the State of California.

27  The class is so numerous, that joinder of all members is impracticable, and the disposition of their

28  claims in a Class Action will benefit the parties and the Court.

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

4
CLASS ACTION COMPLAINT

21.    There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. The questions of law and fact common to the Class predominate over questions which may affect individual Class members. Common questions of law and fact include, but are not limited to, the following:

  a. Whether Defendant's conduct is an unfair business act or practice within the meaning of *Business & Professions Code* § 17200, *et seq.*;

  b. Whether Defendant's conduct is an unlawful business act or practice within the meaning of *Business & Professions Code* § 17200, *et seq.*

  c. Whether Defendant's conduct is a fraudulent business act or practice within the meaning of *Business & Professions Code* § 17200, *et seq.*;

  d. Whether Defendant's advertising is untrue or misleading within the meaning of *Business & Professions Code* § 17500, *et seq.*;

  e. Whether Defendant made false and misleading representations in its advertising for Elations;

  f. Whether Defendant knew or should have known that the representations were false;

  g. Whether Defendant represented that Elations has characteristics, benefits, uses or quantities which it does not have;

  h. Whether Defendant represented that Elations is of a particular standard, quality, or grade, when it is of another; and

  i. Whether Defendant advertised Elations with intent not to sell it as advertised.

22.    Plaintiff's claims are typical of the claims of the proposed Class, as the representations made by Defendant are consistent and uniform and are contained in advertisements that were seen and relied on by all members of the Class. Thus, there exists a presumption that all Class members relied upon said uniform and consistent advertising and representations to their detriment. Plaintiff will fairly and adequately represent and protect the interests of the proposed Class. Plaintiff has retained competent and experienced counsel in class action and other complex litigation.

23.    Plaintiff and the Class have suffered injury in fact and have lost money as a result of

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

5

CLASS ACTION COMPLAINT

0015

1  Defendant's false, deceptive and misleading representations.

2      24.    The Class is identifiable and readily ascertainable. The names and addresses of

3  many of the class members are available through business or public records. Notice can be

4  provided to such purchasers via first class mail using techniques and a form of notice similar to

5  those customarily used in class actions, and notice can also be accomplished by internet

6  publication, radio, newspapers, and magazines.

7      25.    A class action is superior to other available methods for fair and efficient

8  adjudication of this controversy. The expense and burden of individual litigation would make it

9  impracticable or impossible for proposed members of the Class to prosecute their claims

10  individually.

11      26.    The trial and the litigation of Plaintiff's claims are manageable.

12      27.    Defendant has acted on grounds generally applicable to the entire Class, thereby

13  making final injunctive relief and/or corresponding declaratory relief appropriate with respect to

14  the Class as a whole. The prosecution of separate actions by individual Class members would

15  create the risk of inconsistent or varying adjudications with respect to individual member of the

16  Class that would establish incompatible standards of conduct for Defendant.

17      28.    Absent a class action, Defendant will likely retain the benefits of its wrongdoing.

18  Because of the small size of the individual Class members' claims, few, if any, Class members

19  could afford to seek legal redress for the wrongs complained of herein. Absent a representative

20  action, the Class members will continue to suffer losses and Defendant will be allowed to continue

21  these violations of law and to retain the proceeds of its ill-gotten gains.

22                          FACTUAL ALLEGATIONS

23      A.    Overview Of The Causes, Symptoms, And Treatments Of Osteoarthritis

24      29.    A joint is the point where two or more bones are connected. With a few exceptions

25  (in the skull and pelvis, for example), joints are designed to allow movement between the bones

26  and to absorb shock from movements like walking or repetitive motions. These movable joints are

27  made up of the following parts: cartilage (the hard, but slippery tissue that covers the ends of bones

28  where they meet to form a joint); joint capsule; synovium; synovial fluid (a fluid that lubricates the

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

6
CLASS ACTION COMPLAINT

0016

1  joint and keeps the cartilage smooth and healthy); and soft tissue (i.e. ligaments, tendons and

2  muscles) that surrounds the bones and joints, and allow the joints to bend.

3      30.    In a healthy joint, the ends of the bones are encased in smooth cartilage. Together,

4  they are protected by a joint capsule lined with a synovial membrane that produces synovial fluid.

5  The capsule and fluid protect the cartilage, muscles, and connective tissues.

6      31.    Osteoarthritis ("OA") – the most common type of arthritis, impacting an estimated

7  27 million adults in the United States – primarily affects the cartilage, causing it to break down and

8  wear away. This destruction of the cartilage allows the bones underneath to rub together, which

9  inflames the surrounding soft tissue and leads to joint pain and stiffness.

10      32.    There is no cure for OA, but there are a number of treatments for the disease that

11  have varying levels of success depending on the patient. Most successful treatment programs

12  involve a combination of treatments tailored to the patient's needs, lifestyle, and health, and

13  include ways to manage pain and improve function. The treatments range from exercise and

14  weight control, to non-drug therapies, to medications to control the pain (including acetaminophen,

15  nonsteroidal anti-inflammatory drugs or NSAIDs, and injections), and even surgery.

16      B.    Promotion Of Glucosamine And Chondroitin In The Treatment Of

17            Osteoarthritis

18      33.    Glucosamine and chondroitin have been widely promoted as a treatment for OA.

19  Glucosamine, an amino sugar, was thought to promote the formation and repair of cartilage.[1]

20  Chondroitin, a carbohydrate, is a cartilage component that is thought to promote water retention

21  and elasticity and to inhibit the enzymes that break down cartilage.

22      34.    Since 1997, the use of glucosamine and chondroitin has exploded. The country's

23  best-selling dietary supplements, which come from animal sources such as crab shells and cow, pig

24  or chicken cartilage, were thought to relieve knee pain and perhaps repair the cells that line the

25

26  [1] This theory that glucosamine could build and repair cartilage was based on the hypothesis that glucosamine supplementation provides the building blocks necessary to promote the formation of healthy cartilage. However, this

27  "over-simplified" hypothesis does not adequately explain the purported mechanism of action of glucosamine, which remains unknown. *See* Herrero-Beaumont, *et al.*, Use of crystalline glucosamine sulfate in osteoarthritis, *Future*

28  *Rheumatol.* 2006, 1(4): 397-414. As such, at present there is no bonafide medical treatment capable of rebuilding cartilage. The only way to repair damaged cartilage is to surgically remove it and replace it with healthy cartilage.

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

**CLASS ACTION COMPLAINT**

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

1    joint, revitalizing worn cartilage.

2        35.    Despite its explosion on the national marketplace, the use of glucosamine in the

3    management of OA remains controversial, and its purported mechanism of action in OA pain and

4    function modification are still unclear. As a result, the American College of Rheumatology

5    ("ACR")[2] and the UK National Institute for Health and Clinical Excellence (NICE) have not

6    recommended glucosamine in the management of OA.[3] While at least one source has

7    recommended *glucosamine sulfate* for the management of hip and knee OA,[4] none of the current

8    guidelines have recommended the use of glucosamine hydrochloride (the ingredient in Elations).

9        36.    Nevertheless, seeking to cash in on the ever-increasing popularity of glucosamine

10    and chondroitin, Defendant introduced Elations, asserting that the product improves "joint

11    comfort" and "joint flexibility," and, in turn, produces "healthier joints." This could not be further

12    from the truth.

13        C.    Overview Of Elations' Marketing And Advertising

14        37.    Targeting consumers in desperate need of joint pain relief, including those suffering

15    from arthritis and the elderly, Defendant promises that the "clinically-proven combination" of

16    glucosamine and chondroitin in Elations improves "joint comfort" and "joint flexibility."

17        38.    Under the "News & Events" tab on elations.com, Defendant links to a press release

18    in the August 2006 edition of Medical News, which states that: "Elations promises 'joint

19    flexibility' and contains the nutritional supplements glucosamine, which is believed to play a role

20

21    [2] American College of Rheumatology Subcommittee on Osteoarthritis: Recommendations for the medical management of osteoarthritis of the hip and knee: 2000 update. *Arthritis Rheum* 2000, 43:1905-1915.

22    [3] NICE Clinical Guidelines: The care and management of osteoarthritis in adults, *National Institute for Health and Clinical Evidence* 2008.

23    [4] *See* W. Zhang, *et al.*, EULAR evidence based recommendations for the management of hip osteoarthritis: Report of a Task Force of the Standing Committee for International Clinical Studies Including Therapeutic Trials (ESCISIT). *Ann*

24    *Rheum Dis* 2005, 64: 669-681; W. Zhang, *et al.*, EULAR Recommendations 2003: an evidence based approach to the management of knee osteoarthritis: Report of a Task Force of the Standing Committee for International Clinical Studies

25    Including Therapeutic Trials (ESCISIT). *Ann Rheum Dis* 2003, 62: 1145-1155. Another organization, the Osteoarthritis Research Society International ("OARSI"), originally recommended the use of glucosamine sulfate for the management

26    of knee OA. *See* W. Zhang, *et al.*, OARSI recommendations for the management of hip and knee osteoarthritis, Part I: Critical appraisal of existing treatment guidelines and systematic review of current research evidence. *Osteoarthritis*

27    *Cartilage* 2010, 18:476-499. However, glucosamine sulfate is no longer recommended in the most recent OARSI guidelines. *See* W. Zhang, *et al.*, OARSI recommendations for the management of hip and knee osteoarthritis: Part III:

28    changes in evidence following systematic cumulative update of research published through January 2009. *Osteoarthritis Cartilage* 2010, 18:476-499.

0018

in cartilage formation and repair, and chondroitin, a natural component of cartilage that is thought
to help with elasticity." Rick Zimmerman, Defendant's Senior Vice President of Marketing and
Innovation and General Manager, is then quoted as saying "[t]he ingredients in Elations are known
to actually help renew joint cartilage, cushion joints, and improve joint flexibility."

39.    Seeking to distance itself from competitors in this growing industry, Defendant
provides a "Know Your Supplements" chart, comparing Elations to Osteo Bi-Flex, Joint Juice,
Move Free, Flex-a-min and Triple Flex.  As Defendant explains, its "helpful chart... compares the
ingredients in Elations and some other joint health supplements, so you can be sure you're getting
what your joints need."

40.    Moreover, Defendant makes bold speed-of-action claims regarding Elations'
effectiveness. To this end, Defendant claims Elations "improves joint comfort in 6 days."

41.    Finally, in an effort to add legitimacy to its brand, under the "Live Elated" tab on its
official website, Defendant offers "Testimonials" and alleges that: "We have heard from a number
of individuals who have felt the positive effects of Elations supplement.  Here are just a few
inspiring testimonials that demonstrate the impact of our product."

D.    "Health Claims" On Elations' Labeling

42.    Defendant markets and advertises Elations as a dietary supplement.  Unlike drugs,
dietary supplements are not pre-approved by the government for safety or effectiveness before
marketing.  Supplements are not intended to treat, diagnose, prevent, or cure diseases, and, thus,
under California's Sherman Food, Drug, and Cosmetic Law, *Cal. Health & Safety Code* § 109875,
*et seq.* ("Sherman Law"), dietary supplements are not permitted to make "health claims" regarding
a disease or health-related condition.

43.    The Sherman Law adopts all federal food labeling regulations as the food labeling
regulations for the state of California.[5]  Moreover, the Sherman Law creates an independent state
requirement regarding labeling standards for health claims that completely adopts the federal
standards set forth in 21 U.S.C. § 343(r): "Any food is misbranded if its labeling does not conform

---

[5] *See Cal. Health & Safety Code* § 110100(a) ("All food labeling regulations and any amendments to those regulations
adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food
labeling regulations of this state.").

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

9

CLASS ACTION COMPLAINT

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

with the requirements for nutrient content or health claims as set forth in Section 403(r) (21 U.S.C. § 343(r)) of the federal act and the regulations adopted pursuant thereto."[6]

44.    Pursuant to 21 U.S.C. § 343(r)(1)(B) and 21 C.F.R. § 101.14(d), a dietary supplement containing express or implied "health claims" on its label or labeling which "characterize the relationship" between consuming the supplement and "a disease or health-related condition" is misbranded, and, thus, cannot lawfully be marketed unless the FDA has issued a prior regulation authorizing use of such claims.

45.    As explained in recent FDA guidelines,[7] a health claim may be implicit: "For example, a statement may not mention a disease but may refer to identifiable characteristic signs or symptoms of a disease such that the intended use of the product to treat or prevent the disease may be inferred.... [T]he context of the statement, decided from information on the label and in other labeling, will determine if the statement is considered to be a disease claim." The guide goes on to explain that "[a] statement is also a disease claim if it implies that it has an effect on a specific disease or class of diseases by using descriptions of the disease state. Examples of disease claims are... 'improves joint mobility and reduces inflammation (rheumatoid arthritis)."'

46.    A good illustration of this type of unapproved health claim can be found in the April 18, 2005 Warning Letter sent by the U.S. Food and Drug Administration ("FDA") to Great American Products, Inc. ("GAP").[8] GAP manufactured and distributed a dietary supplement called Arthritis Assist. In the warning letter, the FDA determined GAP's labeling for Arthritis Assist included disease claims that caused the product to be an unapproved drug. The following was given as an example of a disease claim found in the advertising for Arthritis Assist: "The exclusive formulation of Arthritis Assist[TM] contains a unique blend of three ingredients that alleviate pain, swelling and overall discomfort in your joints. They also support your body to rebuild cartilage, helping you to prevent the onset of arthritis symptoms before they begin!"

---

[6] Cal. Health & Safety Code § 110670.
[7] See FDA, "Guidance for Industry: Structure/Function Claims, Small Entity Compliance Guide" (available at: http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/DietarySupplements/ucm103340.htm).
[8] Available at http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2005/ucm075374.htm.

47.    Defendant makes similar claims throughout its marketing and advertising. Indeed, just as Arthritis Assist claimed to "alleviate pain, swelling and overall discomfort in your joints," Defendant displays images of a bent knee and promises Elations will improve "joint comfort" and "joint flexibility" in as little as 6 days.

48.    Although Defendant does not specifically reference arthritis in its marketing and advertising, Defendant clearly refers to the primary symptoms of OA (i.e. breakdown of cartilage leading to joint pain and stiffness) and creates the inference that daily use of Elations can effectively treat the causes and symptoms of the disease.

49.    At a minimum, Defendant's claims (and the context in which they appear) constitute implied health claims, thereby rendering the product misbranded under the Sherman Law.[9]

E.    Defendant's Purported "Clinical Proof" Relies On Clinical Trials Of An Ingredient Which Is NOT Contained In Elations

50.    According to Defendant's marketing and advertising, the two primary ingredients in Elations are "glucosamine" and "chondroitin." Defendant is careful to disclose the form of "glucosamine" used in the product -- glucosamine hydrochloride ("GH") -- only as required in the nutrition facts on the label.

51.    This is not merely an oversight on Defendant's part, but, rather, a calculated move intended to deceive the public. Indeed, Defendant does not want the consuming public to realize that that the clinical studies it relies upon in support of its bold claims were actually done on a different form of glucosamine, namely crystalline glucosamine sulfate ("CGS").

52.    CGS, a pharmaceutical-grade product, is the stabilized form of glucosamine sulfate ("GS"). CGS was developed by the Italian manufacturer Rottapharm-Madaus and is used as a

_____

[9] There can be no real question that Defendant views Elations as a product meant to treat arthritis. Indeed, as late as February 2012, Defendant was engaged in a "Health Professionals Program" intended to market Elations to physicians, pharmacists and other licensed healthcare professionals. See Exhibit A. As part of the "Product Insight" directed at healthcare professionals, Defendant stated that "1,500 mg Glucosamine, which improves healthy joints, thickens joint fluid for better lubrication, and helps form the building blocks of joint cartilage" and "1,200 mg Chondroitin, which is a major component of joint cartilage, acts as an antioxidant to reduce joint damage, and stimulates cartilage production." Defendant further explained to healthcare professionals that Elations can "rejuvenate" joints, because "[d]rinking Elations daily ensures that joint cartilage and joint fluid have an abundant, continuous supply of the essential building blocks needed to optimize joint health." By focusing on the identifiable characteristics causes and symptoms of OA, Defendant clearly intended to convey to healthcare professionals that Elations is capable of effectively treating the disease.

Milberg Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

0021

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

prescription drug for OA in Europe. CGS is commonly referred to as "glucosamine sulfate," but it should not be confused with the dietary supplement glucosamine sulfate preparations available in the United States.[10]   Indeed, a number of high-quality clinical studies using dietary supplement grade GS were unable to replicate the favorable results obtained with pharmaceutical-grade CGS.[11]

53.   In fact, all of the clinical trials of glucosamine that have produced positive results used CGS, *not GH as in Elations*, and were limited exclusively to those carried out by Rottapharm. Accordingly, there is now widespread agreement in the scientific community that the efficacy and safety data obtained using CGS cannot be extrapolated to dietary supplement GS and GH:

- "[The Rotta preparation of glucosamine sulfate] has shown positive effects on symptomatic and structural outcomes of knee OA.  These results should not be extrapolated to other glucosamine salts (hydrochloride or preparations (over-the-counter or food supplements)) in which no warranty exists about content, pharmacokinetics and pharmacodynamics of the tablets."[12]

- "Perhaps the major limitation with extrapolating the generally favorable results from the glucosamine RCTs lies in the fact that most of the studies (65%) in the Cochrane review evaluated exclusively the prescription medicine made by the Rotta Pharmaceutical Company (a GS preparation that is approved as a prescription drug for OA in the European Union countries). In North America, glucosamine is not considered a conventional prescription drug, rather it is considered as a dietary supplement, which is widely available as an over the counter preparation. Since the

[10] *See* Herrero-Beaumont G, *et al.*, Use of crystalline glucosamine sulfate in osteoarthritis. *Future Rheumatol.* 2006, 1(4): 397-414 ("At present, it is unclear how other preparations of glucosamine sulfate, mainly available in countries where the substance is regulated as a dietary supplement, compare with this prescription formulation (crystalline glucosamine sulfate) in terms of active ingredient content, purity and stability, since this information is generally not available. When how the clinical efficacy and safety results obtained with crystalline glucosamine sulfate apply to these uncontrolled nutraceutical or generic preparations, and vice versa.").
[11] *See* David T. Felson, Glucosamine sulfate might have no pain or structural changes associated with osteoarthritis. *Nature Clinical Practice Rheumatology* 4, 518-19 (October 2008); McAlindon T, *et al.*, Effectiveness of glucosamine for symptoms of knee osteoarthritis: results from an internet-based randomized double-blind controlled trial. *Am. J. Med.* 2004, 117: 643-49; Cibere J, *et al.*, Randomised, double-blind, placebo-controlled glucosamine discontinuation trial in knee osteoarthritis. *Arthritis Care Res.* 2004, 51: 738-45; Hughes R, *et al.*, A randomized, double-blind, placebo-controlled trial of glucosamine sulfate as an analgesic in osteoarthritis of the knee. *Rheumatology* 2002, 41: 279-84.
[12] J.-Y. Reginster, *et al.*, Current role of glucosamine in the treatment of osteoarthritis. *Rheumatology* 2007, 46: 731-35.

12
CLASS ACTION COMPLAINT

content and purity of the various over the counter preparations is known to vary markedly, the relative efficacy and safety of the various preparations may also vary markedly[.]"[13]

"In this study, [crystalline glucosamine sulfate] was approved as a prescription drug, therefore, our results cannot be generalised to other glucosamine products (or compound mixtures) such as those available in some countries as dietary supplements."[14]

"Glucosamine derivatives are popular dietary supplements in the United States and other countries, exploiting the opportunity provided by the American Dietary Supplement Health and Education Act and the clinical research data obtained with glucosamine sulfate approved as a prescription drug for the treatment of osteoarthritis in Europe and elsewhere. The latter was used in our study and in most of the previous clinical experiences; at present, it is difficult to generalize these results to the highly variable and uncontrolled formulations of the other nutritional products claiming a glucosamine content."[15]

"Differences in the clinical effects with generic or dietary supplement glucosamine hydrochloride formulations may indeed by related to differences in dose regimens and in pharmacokinetics, which may lead to differences in the pharmacological properties. In addition, the presence of sulfates in the prescription drug formulation [crystalline glucosamine sulfate], which is stabilized according to a patented process, has also been suggested to be important from the point of view of favoring some of the compound pharmaco-metabolic characteristics, which might not be shared by glucosamine hydrochloride. Conversely, preparations of glucosamine sulfate, other than the prescription formulation, manifest differences in quality and

[13] Towheed TE, et al., Glucosamine therapy for treating osteoarthritis (Review). The Cochrane Database of Systematic Reviews, Issue 2, Art. No.: CD002946. ("2005 Cochrane Review").
[14] Reginster, et al., Long-term effects of glucosamine sulfate on osteoarthritis progression: a randomized, placebo-controlled clinical trial. Lancet 2001, 357 (9252): 251 –56.
[15] Pavelka, et al., Glucosamine Sulfate Use and Delay of Progression of Knee Osteoarthritis: A 3-Year, Randomized, Placebo-Controlled, Double-blind Study. Arch. Intern. Med. 2002, 162(18): 2113-23.

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

13

0023

1   dose regimens that would require appropriate pharmacokinetic and bioequivalence

2   assessment. Since this is not currently available, it is impossible to apply the

3   efficacy and safety results obtained with crystalline glucosamine sulfate to these

4   other preparations and *vice versa*[.]"[16]

5       "The present study has been conducted using the once-a-day soluble powder

6   formulation of crystalline glucosamine sulfate used in pivotal clinical trials, which is

7   a prescription drug in most European countries. Transfer of the efficacy and safety

8   data obtained with this substance and formulation to common dietary supplements,

9   has already been discouraged. In fact, these uncontrolled formulations often have a

10   much lower glucosamine content than reported in their label claims and are thus

11   commonly underdosed. In addition, there is currently no clinical justification to use

12   different glucosamine compounds or even glucosamine salts, e.g., hydrochloride, as

13   pivotal trials failed to show the same benefit."[17]

14       "Crystalline glucosamine sulfate is the only pharmaceutical product that has

15   demonstrated consistently that it is effective against the symptoms and progression

16   of knee osteoarthritis.... Glucosamine hydrochloride and other glucosamine sulfate

17   preparations have produced inconsistent clinical efficacy results, probably owing to

18   different pharmacokinetics, suboptimal dosing schedule, study design and, in some

19   studies, quality of the products.... Future studies should directly compare the

20   pharmacokinetics and therapeutic effects of glucosamine hydrochloride or other

21   glucosamine sulfate preparations with the reference crystalline glucosamine sulfate

22   product and regimen in suitably designed, placebo-controlled trials in OA patients,

23   before the former are further used to assess the role of glucosamine in OA since their

24   results may be misleading."[18]

25

26   [16] Herrero-Beaumont G, *et al.*, Use of crystalline glucosamine sulfate in osteoarthritis. *Future Rheumatol.* 2006, 1(4): 397-414.

27   [17] Persiani, *et al.*, Glucosamine oral bioavailability and plasma pharmacokinetics after increasing doses of crystalline glucosamine sulfate in man. *Osteoarthritis and Cartilage* 2005, 13(12): 1041–1049.

28   [18] Roy D Altman, Glucosamine therapy for knee osteoarthritis: pharmacokinetic considerations. *Expert Rev. Clin. Pharmacol.* 2009, 2(4): 359-71.

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

14

CLASS ACTION COMPLAINT

54.   Despite this overwhelming evidence, Defendant relies upon studies and meta-analyses utilizing CGS as the "clinical proof" that Elations, which does not contain CGS, improves "joint comfort" and "joint flexibility."

F.    The "Consensus" Among The Scientific Community Is That Glucosamine Hydrochloride (The Actual Ingredient In Elations) Is No More Effective Than Placebo

55.   According to Defendant's pre-filing communication to Plaintiff, "[a] vast amount of scientific data supports the claim that use of ingredients like those found in the Elations supplement impacts joints, resulting in greater joint comfort and flexibility."   *See* Ex. B (Defendant's 7/25/12 response to Plaintiff's CLRA letter).

56.   However, when you actually look at the "vast amount of scientific data," it tells a very different story.   Indeed, as a recent article discussing the body of scientific evidence on glucosamine explained, "[t]here appears to be consensus that GleN.HCl [glucosamine hydrochloride] lacks efficacy for the palliation of pain or function in OA [osteoarthritis]."[19]

57.   This "consensus" is reiterated throughout the scientific literature regarding GH:

- "[T]wo of the major published guidelines recommended glucosamine sulfate in the treatment of OA pain while another integrating more recent data did not consider glucosamine sulfate.   At this time, glucosamine hydrochloride cannot be recommended based on the available clinical data."[20]

- "In other pharmaceutical-grade products, glucosamine is supplied as hydrochloride, that is, a more readily available and easier to manufacture salt that is also present in several dietary supplements available in the markets around the world. This salt is often supplied in combination with chondroitin sulfate (CS) and has not proven effective in several trials."[21]

---

[19] Block, *et al.*, The effects of oral glucosamine on joint health: Is a change in research approach needed?, *Osteoarthritis and Cartilage* 2010, 18: 5-11.

[20] Henrotin, *et al.*, Is there any scientific evidence for the use of glucosamine in the management of human osteoarthritis?, *Arthritis Research & Therapy* 2012, 14:201.

[21] Roy D Altman, Glucosamine therapy for knee osteoarthritis: pharmacokinetic considerations, *Expert Rev. Clin. Pharmacol.* 2009, 2(4): 359-71.

15

CLASS ACTION COMPLAINT

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

1     •   "Trials using glucosamine hydrochloride had a very small summary effect size that

2        was statistically indistinguishable from the null. The finding that heterogeneity

3        among these trials was absent suggests that this summary effect is valid. Therefore,

4        we conclude that glucosamine hydrochloride has no effect on pain and that future

5        studies of this preparation are unlikely to yield useful results."[22]

6     •   "The best available evidence found that glucosamine hydrochloride, chondroitin

7        sulfate, or their combination provide no clinical benefit in patients with primary

8        [Osteoarthritis] of the knee."[23]

9     58.    The lack of effectiveness of GH was demonstrated recently in the

10    Glucosamine/Chondroitin Arthritis Intervention Trial ("GAIT") Study, the lone, large-scale

11    clinical trial to use GH.[24] Under the direction of the National Institutes of Health (NIH), one of the

12    world's foremost medical research centers, 13 highly prestigious research universities in the US

13    performed the GAIT Study, which was a randomized, double-blind, placebo controlled,

14    parallel assignment efficacy study on approximately 1,600 Osteoarthritis sufferers.

15    59.    After six months, researchers reported that, overall, GH and chondroitin sulfate

16    (whether alone, or in the exact combination found in Elations) are no more effective than

17    placebo.[25]

18

19   [22] Vlad, et al., Glucosamine for Pain in Osteoarthritis: Why Do Trial Results Differ? *Arthritis & Rheumatism* 2007,

20   56(7):2267-77.
      [23] U.S. Department of Health and Human Services – Agency for Healthcare Research and Quality, *Treatment of Primary*

21   *and Secondary Osteoarthritis of the Knee*, Evidence Report/Technology Assessment No. 157, Sept. 2007, at 106
      (systematic review of the scientific literature – including study-level meta-analyses and randomized controlled trials –

22   examining the clinical effectiveness of glucosamine, chondroitin sulfate, and a combination of the two ingredients in
      relieving joint pain associated with osteoarthritis).

23   [24] The results of the GAIT study were published in the New England Journal of Medicine. *See* Clegg, D.O. et al,
      Glucosamine, chondroitin sulfate, and the two in combination for painful knee osteoarthritis, *N Engl J Med* 2006, 354(8):

24   795-808.
      [25] The combination of GH and chondroitin sulfate appeared to help a small subset of participants with moderate-to-

25   severe pain. However, because of the small size of the subset, researchers specified that such findings should be
      considered "preliminary" and could not be confirmed without further testing designed for that purpose. The hypothesis

26   that these ingredients may help a subset of the population was undermined by the 2-year ancillary GAIT study and
      another study utilizing GAIT participants, both of which found that GH and chondroitin sulfate do not provide clinically

27   significant relief from OA pain. *See* Sawitzke, A.D., *et al.,* The effect of glucosamine and/or chondroitin sulfate on the
      progression of knee osteoarthritis: A report from the glucosamine/chondroitin arthritis intervention trial. *Arthritis*

28   *Rheum.* 2008, 58(10): 3183-91; Sawitzke, A.D., *et al.,* Clinical efficacy and safety over two years use of glucosamine,
      chondroitin sulfate, their combination, celecoxib or placebo taken to treat osteoarthritis of the knee: a GAIT report, *Ann*
      *Rheum Dis.* 2010, 69(8): 1459-64.

**CLASS ACTION COMPLAINT**

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

60.     When the GAIT Study was published in the New England Journal of Medicine, it was accompanied by an editorial which concluded the following:

> The finding that glucosamine hydrochloride was not more efficacious than placebo is not surprising. Several systematic reviews and meta-analyses have examined the efficacy of glucosamine in the treatment of osteoarthritis of the knee. In the most recent meta-analysis of eight randomized trials in which either glucosamine hydrochloride or glucosamine sulfate not manufactured by Rottapharm was compared with placebo, differences between the groups in the WOMAC[26] scores did not reach significance.... On the basis of the results from GAIT, it seems prudent to tell our patients with symptomatic osteoarthritis of the knee that neither glucosamine hydrochloride nor chondroitin sulfate alone has been shown to be more efficacious than placebo for the treatment of knee pain. If patients choose to take dietary supplements to control their symptoms, they should be advised to take glucosamine sulfate rather than glucosamine hydrochloride and, for those with severe pain, that taking chondroitin sulfate with glucosamine sulfate may have an additive effect.[27]

61.     To study whether GH and/or chondroitin sulfate could diminish the structural damage caused by OA, interested GAIT patients were offered the opportunity to continue their original study treatment for 18 more months, for a total of two years.[28]  The ancillary study enrolled 572 GAIT participants with moderate or severe knee Osteoarthritis, and the final sample included 357 subjects with Osteoarthritis in one or both knees.  Each of these subjects was randomly assigned to receive one of the five treatments used in the first GAIT study.

62.     The second GAIT analysis used x-rays to measure the physical effects of these supplements on knee joints.  Knee images from the 357 subjects were analyzed to see if daily GH/chondroitin supplements prevented a loss of joint space—the distance between the ends of bones in the joint.

63.     Once again, researchers found that there were no meaningful differences among people taking the combination of GH/chondroitin sulfate and a placebo.  In fact, researchers observed that loss of joint space width was greater with the combined treatment than with either

[26] WOMAC stands for Western Ontario and McMaster University Osteoarthritis Index, which is a is a set of standardized questionnaires used by health professionals to evaluate the condition of patients with osteoarthritis of the knee and hip.
[27] Hochberg, Marc C., Nutritional Supplements for Knee Osteoarthritis – Still No Resolution, *N Engl J Med* 2006, 354(8): 858-60.
[28] Sawitzke, A.D., *et al.*, The effect of glucosamine and/or chondroitin sulfate on the progression of knee osteoarthritis: A report from the glucosamine/chondroitin arthritis intervention trial. *Arthritis Rheum*, 2008, 58(10): 3183-91.

17

CLASS ACTION COMPLAINT

Milstein Adelman, LLP.
2800 Donald Douglas Loop North
Santa Monica, California 90405

1  treatment alone, which raised the possibility that the combination of GH and chondroitin sulfate

2  (in identical amounts to that found in Elations) may actually interfere with absorption.[29]

3      64.    Since the conclusion of the ancillary GAIT study, there was another study conducted

4  involving 662 GAIT participants with moderate-to-severe knee osteoarthritis.[30]  This subset

5  continued to receive their randomized treatment: glucosamine HCl (500 mg three times daily),

6  chondroitin sulfate (400 mg three times daily), glucosamine and chondroitin sulfate combined

7  (same doses), celecoxib (Celebrex, 200 mg once daily), or a placebo. Over two years, no treatment

8  achieved a clinically significant difference in WOMAC pain or function as compared with

9  placebo.

10     65.    In sum, because all of Defendant's purported substantiation relies on clinical studies

11  of CGS -- not GH as contained in Elations -- claims that the product contains a "clinically-proven

12  combination" that improves "joint comfort" and "joint flexibility" are unquestionably false and

13  misleading.

14     G.    Recent Evidence Undermines The Effectiveness Of Chondroitin Sulfate

15     66.    As with GH, recent evidence demonstrates chondroitin sulfate does nothing to

16  improve joint "comfort" or "flexibility":

17      •    "Efficacy of chondroitin sulfate over placebo for treating pain in OA was reported in

18           many of the smaller, earlier studies, but the estimates varied considerably from study

19           to study.   In recent years, larger-scale trials have reported little to no effect of

20           chondroitin sulfate treatment on the symptoms of OA."[31]

21      •    "No robust evidence supports the use of chondroitin in osteoarthritis. Large-scale,

22           methodologically sound trials indicate that the symptomatic benefit is minimal to

23           nonexistent.   The effect of chondroitin on joint space narrowing was assessed in

24           only a few trials. This effect is likely to be small, and its clinical significance is

[29] This hypothesis is supported by another recent study establishing that chondroitin sulfate inhibits GH absorption and decreases its bioavailability. See Jackson, et al., The human pharmacokinetics of oral ingestion of glucosamine and chondroitin sulfate taken separately or in combination. Osteoarthritis Cartilage 2010, 18: 297-302.

[30] See Sawitzke, A.D., et al., Clinical efficacy and safety over two years use of glucosamine, chondroitin sulfate, their combination, celecoxib or placebo taken to treat osteoarthritis of the knee: a GAIT report, Ann Rheum Dis. 2010, 69(8): 1459-64.

[31] See Miller, et al., Glucosamine and Chondroitin Sulfate, Rheum Dis Clin N Am 2011, 37: 103-118.

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

18

0028

uncertain. In patients with low-grade osteoarthritis, the use of chondroitin should be restricted to randomized, controlled trials. For patients with advanced osteoarthritis, a clinically relevant benefit is unlikely and the use of chondroitin should be discouraged."[32]

67.    In touting the efficacy of Elations' ingredients, Defendant simply ignores this scientific evidence which clearly demonstrates that the product cannot work as advertised.

**H.    There Is No Clinically Significant Evidence That The Other Ingredients In Elations Provide Any Joint Health Benefits**

68.    According to Defendant, the foregoing analysis (which clearly demonstrates the lack of effectiveness of GH and CS) does not present the entire picture, because it "ignore[s] the fact that the Elations supplment [sic] contains four active ingredients that work synergistically." *See* Ex. C (Sept 27, 2012 letter from Jill P. Meyer to Plaintiff). The other two "active" ingredients Defendant references are calcium and boron.

69.    Looking to the first "active" ingredient, some evidence suggests that calcium supplementation may help build and maintain strong bones, but there is no scientific evidence to support their use as a remedy for joint pain.

70.    As with calcium, there is no clinically significant evidence that boron provides joint pain relief, much less that it is "proven to reduce joint swelling, inflammation, and the oftentimes resulting pain." *Id.*

71.    The lone boron study cited by Defendant was a double-blind trial conducted at Royal Melbourne Hospital, Australia, between 1983 and 1987.[33]

72.    This study—which has been described as the "most convincing evidence that boron may be useful in the treatment of arthritis"—enrolled *only 20 patients. See* Rex E. Newnham, *Essentiality of Boron for Healthy Bones and Joints. Environmental Health Perspectives* 1994, 102(7): 83-85. Of those 20 patients, one in each the placebo group and the boron group dropped out before the second examination, and neither had improved or worsened during their brief

[32] *See* Reichenbach, *et al.*, Meta-analysis: Chondroitin for Osteoarthritis of the Knee or Hip, *Ann Intern Med.* 2007, 146: 580–590.
[33] *See* Travers RL, *et al.*, Boron and arthritis: the results of a double-blind pilot study. *J Nutr Med* 1990, 1:127–132.

19

**CLASS ACTION COMPLAINT**

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

0029

1  participation in the trial. *Id.* Of the remaining 18 patients, 3 more (2 who were on boron, and 1 on

2  placebo) dropped out between week 3 and the last examination, "apparently because of a

3  *significant deterioration in condition.*" *Id.* (emphasis added). In the end, only 15 patients (7

4  taking boron and 8 taking placebo) completed the study.

5      73.    While the study did find a *statistically* significant difference in the responses

6  between the 7 patients in the boron group and the 8 patients taking a placebo, these results are

7  preliminary at best, and certainly don't rise to the level of *clinically* significant evidence which

8  would support the assertion that "boron itself is proven to reduce joint swelling, inflammation, and

9  the oftentimes resulting pain." *See* Ex. C.

10      G.    Elations' False And Misleading Speed-Of-Action Claims.

11      74.    Defendant claims Elations "improves joint comfort in 6 days." However, a review

12  of the scientific and medical literature reveals that there is nothing in the body of scientific

13  research on GH and/or chondroitin sulfate that supports these bold claims. Much to the contrary,

14  these compounds are specifically designated as "slow acting."[34]

15      75.    Moreover, even pharmaceutical grade CGS (which Defendant uses as "support" for

16  its marketing and advertising claims) is not considered fast acting.[35]

17      76.    Accordingly, Defendant's claim that Elations improves joint comfort in just 6 days

18  is false and misleading, and, thus, violates California's consumer protection statutes.

19              **FIRST CAUSE OF ACTION**

20      VIOLATION OF BUSINESS & PROFESSIONS CODE § 17200, *ET SEQ.*

21      (Unfair and Fraudulent Conduct Prongs of the Act)

22      77.    Plaintiff incorporates by this reference the allegations contained in the preceding

23

24  [34] *See* k K M Jordan, *et al.*, EULAR Recommendations 2003: an evidence based approach to the management of knee
osteoarthritis: Report of a Task Force of the Standing Committee for International Clinical Studies Including Therapeutic

25  Trials (ESCISIT), *Ann Rheum Dis* 2003, 62: 1145-1155 ("SYSADOA is a generic term used for symptomatic slow
acting drugs for OA, and includes glucosamine sulphate and related compounds, chondroitin sulfate, and diacrein.").

26  [35] *See* Herrero-Beaumont G, *et al.*, Use of crystalline glucosamine sulfate in osteoarthritis, *Future Rheumatol.* 2006, 1(4):

27  397-414 ("[Crystalline] Glucosamine sulfate should not be regarded as a drug for short-term symptom relief, but one for
osteoarthritis disease management. This includes symptom modification over appropriate treatment durations,

28  specifically at least 6 months according to current regulatory guidelines, and possibly long-term trials for both joint
structure modification and symptom modification (i.e., true disease modification).").

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

                     20

paragraphs as if fully set forth herein.

78.    This cause of action is brought pursuant to *Business & Professions Code* § 17200, *et seq.*, on behalf of Plaintiff and a Class consisting of all persons residing in the State of California who purchased Elations for personal use and not for resale since December 28, 2008.

79.    As alleged hereinabove, Plaintiff has standing to pursue this claim as Plaintiff has suffered injury in fact and has lost money or property as a result of Defendant's actions as set forth herein. Specifically, prior to the filing of this action, Plaintiff purchased Elations for his own personal use. In so doing, he relied upon the false representations referenced above. Plaintiff has used Elations, but the product has not worked as advertised and was worthless.

80.    In its marketing and advertising, Defendant makes false and misleading statements regarding the uses and benefits of Elations, namely that the product contains a "clinically-proven combination" that improves "joint comfort" and "joint flexibility."

81.    Defendant is aware that the claims that it makes about Elations are false and misleading.

82.    The misrepresentations by Defendant are material facts and constitute an unfair and fraudulent business practice within the meaning of *Business & Professions Code* § 17200, *et seq.*

83.    Defendant's business practices, as alleged herein, are unfair because: (1) the injury to the consumer is substantial; (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) consumers could not reasonably have avoided the information because Defendant intentionally mislead the consuming public by means of the claims made with respect to Supple as set forth herein.

84.    Defendant's business practices as alleged herein are fraudulent because they are likely to deceive customers into believing that Elations has uses and benefits that it does not have.

85.    In addition, Defendant's use of various forms of advertising media to advertise, call attention to or give publicity to the sale of goods or merchandise which are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of *Business & Professions Code* § 17200, *et seq.*

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

21
CLASS ACTION COMPLAINT

0031

86.    Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct of unfair competition since Defendant is marketing and selling Elations in a manner likely to deceive the public.

87.    Defendant has peddled, and continues to peddle, its misrepresentations through a nationwide advertising campaign.

88.    There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

89.    Plaintiff and the putative class members were misled into purchasing Elations by Defendant's deceptive conduct as alleged hereinabove.

90.    Plaintiff and other putative class members were mislead and, because the misrepresentations and omissions were uniform and material, presumably believed that Elations had the ability to improve "joint comfort" and "joint flexibility" (which the product cannot).

91.    Pursuant to *Business & Professions Code* § 17203, Plaintiff and the members of the Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of advertising the sale and use of Elations.  Likewise, Plaintiff and the members of the Class seek an order requiring Defendant to disclose such misrepresentations, and additionally request an order awarding Plaintiff and the Class restitution of the money wrongfully acquired by Defendant by means of responsibility attached to Defendant's failure to disclose the existence and significance of said misrepresentations.

92.    Plaintiff and other members of the putative Class have suffered injury in fact and have lost money as a result of Defendant's false representations.  Indeed, Plaintiff and the Class purchased Elations in reliance on Defendant's false and misleading claim that the product contains a "clinically-proven combination" that improves "joint comfort" and "joint flexibility." Plaintiff would not have purchased Elations if he had known about the massive fraud perpetrated by Defendant.

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

22

**CLASS ACTION COMPLAINT**

0032

## SECOND CAUSE OF ACTION

### VIOLATION OF BUSINESS & PROFESSIONS CODE § 17200, *ET SEQ.*

#### (Unlawful Conduct Prong of the Act)

93.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

94.    The actions of Defendant, as alleged herein, constitute illegal and unlawful practices committed in violation of *Business & Professions Code* § 17200, *et seq.*

95.    Defendant has unlawfully marketed, advertised and sold Elations because: (1) it is violating sections 1770(a)(5), 1770(a)(7), and 1770(a)(9) of the CLRA, *Civil Code* § 1750, *et seq.*; and (2) it is violating *Business & Professions Code* § 17500.

96.    In addition, Defendant has unlawfully advertised and/or distributed Elations in violation of the California Health & Safety Code in that:

    a.    Defendant has disseminated false advertisements for Elations in that the product advertising contains false or misleading statements as to the purported ability of Elations to improve "joint comfort" and "joint flexibility," in violation of *Business & Professions Code* § 17500 and *Health & Safety Code* § 110390, which govern Defendant's conduct;

    b.    Defendant has manufactured, sold, delivered, held or offered for sale a product that is falsely advertised in violation of *Health & Safety Code* § 110395, which governs Defendant's conduct;

    c.    Defendant has received in commerce a product that is falsely advertised or delivered or proffered for delivery such a product in violation of *Health & Safety Code* § 110400, which governs Defendant's conduct; and

    d.    Defendant is making "health claims" regarding a disease or health-related condition (i.e. arthritis) on its labeling in violation of *Health & Safety Code* § 109875, which governs Defendant's conduct.

97.    There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

23

CLASS ACTION COMPLAINT.

Mitscin Adalman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

98.   Plaintiff and the putative class members were misled into purchasing Elations by Defendant's deceptive conduct as alleged hereinabove.

99.   Plaintiff and other putative class members were mislead and, because the misrepresentations and omissions were uniform and material, presumably believed that Elations had the ability to improve "joint comfort" and "joint flexibility" (which the product cannot).

100.   Pursuant to *Business & Professions Code* § 17203, Plaintiff and the members of the Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of advertising the sale and use of Elations. Likewise, Plaintiff and the members of the Class seek an order requiring Defendant to disclose such misrepresentations, and additionally request an order awarding Plaintiff and the Class restitution of the money wrongfully acquired by Defendant by means of responsibility attached to Defendant's failure to disclose the existence and significance of said misrepresentations.

101.   Plaintiff and other members of the putative Class have suffered injury in fact and have lost money as a result of Defendant's false representations. Indeed, Plaintiff and the Class purchased Elations in reliance on Defendant's false and misleading claim that the product contains a "clinically-proven combination" that improves "joint comfort" and "joint flexibility." Plaintiff would not have purchased Elations if he had known about the massive fraud perpetrated by Defendant.

### THIRD CAUSE OF ACTION

### VIOLATION OF BUSINESS & PROFESSIONS CODE § 17500, *ET SEQ.*

(False and Misleading Advertising)

102.   Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

103.   This cause of action is brought pursuant to *Business & Professions Code* § 17500, *et seq.*, on behalf of Plaintiff and a Class consisting of all persons residing in the State of California who purchased Elations for personal use and not for resale since December 28, 2008.

104.   *Business & Professions Code* § 17200 provides that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice." Additionally, *Business &*

24

**CLASS ACTION COMPLAINT**

0034

1  *Professions Code* § 17500 provides that it is unlawful for any person or corporation, or any

2  employee thereof "with intent directly or indirectly to dispose of real or personal property ... or to

3  induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be

4  made or disseminated before the public in this state, or to make or disseminate or cause to be made

5  or disseminated from this state before the public in any state, in any newspaper or other publication,

6  or any advertising device, or by public outcry or proclamation, or in any other manner or means

7  whatever, including over the Internet, any statement, concerning that real or personal property ... ,

8  or concerning any circumstance or matter of fact connected with the proposed performance or

9  disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of

10 reasonable care should be known, to be untrue or misleading ..."

11      105.    In its advertising for Elations, Defendant makes false and misleading statements that

12 Elations "clinically-proven combination" improves "joint comfort" and "joint flexibility" in as

13 little as 6 days.

14      106.    Defendant engaged in the deceptive conduct alleged hereinabove, which included

15 deceptive and untrue representations regarding Elations, representations made to induce the public

16 to purchase the product.

17      107.    In its marketing and advertising, Defendant makes knowingly false and misleading

18 statements regarding the uses and benefits of Elations.

19      108.    Defendant is aware that the claims that it makes about Elations are false and

20 misleading.

21      109.    In addition, Defendant's use of various forms of advertising media to advertise, call

22 attention to or give publicity to the sale of goods or merchandise which are not as represented in

23 any manner constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and

24 an unlawful business practice within the meaning of *Business & Professions Code* § 17200, *et seq.*

25      110.    There were reasonably available alternatives to further Defendant's legitimate

26 business interests, other than the conduct described herein.

27      111.    Plaintiff and the putative class members were misled into purchasing Elations by

28 Defendant's deceptive conduct as alleged hereinabove.

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

25

CLASS ACTION COMPLAINT

0035

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

112.   Plaintiff and other putative class members were mislead and, because the misrepresentations and omissions were uniform and material, presumably believed that Elations had the ability to improve "joint comfort" and "joint flexibility" (which the product cannot).

113.   Pursuant to *Business & Professions Code* §§ 17203 and 17535, Plaintiff and the members of the Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of advertising the sale and use of Elations. Likewise, Plaintiff and the members of the Class seek an order requiring Defendant to disclose such misrepresentations, and additionally request an order awarding Plaintiff and the Class restitution of the money wrongfully acquired by Defendant by means of responsibility attached to Defendant's failure to disclose the existence and significance of said misrepresentations.

114.   Plaintiff and other members of the putative Class have suffered injury in fact and have lost money as a result of Defendant's false representations. Indeed, Plaintiff and the Class purchased Elations in reliance on Defendant's false and misleading claim that the product contains a "clinically-proven combination" that improves "joint comfort" and "joint flexibility." Plaintiff would not have purchased Elations if he had known about the massive fraud perpetrated by Defendant.

## FOURTH CAUSE OF ACTION

## VIOLATION OF CALIFORNIA CIVIL CODE § 1750, *et seq.*

115.   Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

116.   Plaintiff brings this claim under *Civil Code* § 1750, *et seq.*, the CLRA, on behalf of himself and the Class, who were subject to Defendant's above-described unfair and deceptive conduct.

117.   As alleged hereinabove, Plaintiff has standing to pursue this claim as Plaintiff has suffered injury in fact and has lost money or property as a result of Defendant's actions as set forth herein. Specifically, prior to the filing of this action, Plaintiff purchased Elations for his own personal use. In so doing, he relied upon the false representations referenced above. Plaintiff has used Elations, but the product has not worked as advertised and was worthless.

26

118.    Plaintiff has concurrently filed the declaration of venue required by *Civil Code* § 1780(d). Plaintiff and members of the putative Class are individuals who have purchased goods (i.e., Elations) for personal use. This cause of action is asserted on behalf of a subclass of the putative Class, comprised of those members who purchased Elations within three (3) years of the commencement of this action.

119.    Defendants' conduct described herein was intended to result in the sale of Supple to the consuming public, and constituted the following practices proscribed by *Civil Code* § 1770:

a.    By representing that Elations' improves "joint comfort" and "joint flexibility," Defendant is "representing that goods... [have] uses, benefits, or qualities which they do not have";

b.    By representing that Elations contains a "clinically-proven combination" of ingredients, Defendant is representing that Elations is of a particular standard, quality, or grade, when it is of another;

c.    By representing that Elations' "clinically-proven combination" improves "joint comfort" and "joint flexibility," Defendant is "[a]dvertising goods... with intent not to sell them as advertised."

120.    Defendant knew or should have known that Elations is not capable of improving "joint comfort" and "joint flexibility."

121.    Defendant's actions as described herein were done with conscious disregard of Plaintiff's rights, and Defendant was wanton and malicious in its concealment of the same.

122.    Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA since Defendant is still representing that Elations has characteristics and abilities which the product does not have, and has thus injured Plaintiff and the Class.

123.    Plaintiff and other members of the putative Class have suffered injury in fact and have lost money as a result of Defendant's false representations. Indeed, Plaintiff and the Class purchased Elations in reliance on Defendant's false and misleading claim that the product contains a "clinically-proven combination" that improves "joint comfort" and "joint flexibility." Plaintiff

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

0037

1    would not have purchased Elations if he had known about the massive fraud perpetrated by

2    Defendant.

3        124.   Pursuant to *Civil Code* § 1780(a), Plaintiff seeks injunctive relief in the form of

4    enjoining Defendant from expressly or impliedly representing to current and potential purchasers of

5    Supple as follows:

6        a.   Remove all references, in all of Defendant's labeling, marketing and advertising,

7             that Elations maintains joint health;

8        b.   Remove all references, in all of Defendant's labeling, marketing and advertising,

9             that Elations improves "joint comfort";

10       c.   Remove all references, in all of Defendant's labeling, marketing and advertising,

11            that Elations improves "joint flexibility";

12       d.   Remove all references, in all of Defendant's labeling, marketing and advertising, to

13            "Elations Clinically-Proven Combination";

14       e.   Remove all references, in all of Defendant's labeling, marketing and advertising,

15            that Elations "Improves Joint Comfort in 6 Days!"; and

16       f.   Immediately cease making any false or misleading claims about Elations, including all

17            those referenced above.

18       125.   Plaintiff and members of the Class shall be irreparably harmed if such an order is

19    not granted.

20       126.   Pursuant to *Civil Code* § 1782, Plaintiff notified Defendant on or about June 19,

21    2012 (via letter) of the alleged violations of section 1770 and demanded that the same be

22    corrected. Defendant would not agree to the requested relief. Plaintiff now seeks an award of

23    restitution and damages in accordance with *Civil Code* § 1782(a) & (d).

24       127.   In addition, the CLRA has enhanced penalties for acts perpetrated against senior

25    citizens and disabled persons. If the defendant's conduct is directed at a class of persons who are

26    senior citizens and/or "disabled," a $5,000.00 civil penalty may be awarded to "each class

27    member." *Civ. Code* § 1780(b). A "disabled person" is someone who has a "physical or mental

28    impairment which substantially limits one or more major life activities." *Civ. Code* § 1761(f), (g).

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

28

CLASS ACTION COMPLAINT

1   Under California law, individuals suffering from arthritis are "disabled." Defendant's conduct is

2   clearly directed at senior citizens (the primary demographic afflicted with arthritis) and the

3   disabled (i.e. those diagnosed with arthritis), as Elations is intended to treat and/or prevent

4   arthritis.  Accordingly, the Court may award a civil penalty of up to $5,000 for each class member.

### PRAYER FOR RELIEF

6   WHEREFORE, Plaintiff, on behalf of herself and on behalf of the members of the Class

7   defined herein, pray for judgment and relief on all Causes of Action as follows:

8       A.      An order certifying that the action may be maintained as a Class Action;

9       B.      An order enjoining Defendant from pursuing the policies, acts, and practices

10              complained of herein;

11      C.      An order requiring Defendant to pay restitution to Plaintiff and all members of the

12              Class;

13      D.      Actual damages;

14      E.      Punitive damages;  *wail under CLRS!*

15      F.      For pre-judgment interest from the date of filing this suit;

16      G.      Reasonable attorneys' fees;

17      H.      Costs of this suit; and

18      I.      Such other and further relief as the Court may deem necessary or appropriate.

19  DATED: December 28, 2012                    MILSTEIN ADELMAN, LLP
20                                              Gillian L. Wade, State Bar No. 229124
                                                gwade@milsteinadelman.com
21                                              M. Isaac Miller, State Bar No. 266459
                                                imiller@milsteinadelman.com
22                                              2800 Donald Douglas Loop North
                                                Santa Monica, California 90405
23                                              Telephone:    (310) 396-9600
                                                Fax:          (310) 396-9635
24

25                                              By: _____
26                                                  Gillian L. Wade
                                                    M. Isaac Miller
27                                                  Attorneys for Plaintiff,
                                                    Robert McCrary and the Proposed Class
28

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

29

CLASS ACTION COMPLAINT



**JURY TRIAL DEMANDED**

Plaintiff demands a jury trial on all triable issues.

DATED: December 28, 2012

MILSTEIN ADELMAN, LLP
Gillian L. Wade, State Bar No. 229124
gwade@milsteinadelman.com
M. Isaac Miller, State Bar No. 266459
imiller@milsteinadelman.com
2800 Donald Douglas Loop North
Santa Monica, California 90405
Telephone:    (310) 396-9600
Fax:          (310) 396-9635

By:

Gillian L. Wade
M. Isaac Miller
Attorneys for Plaintiff,
Robert McCrary and the Proposed Class

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

30
CLASS ACTION COMPLAINT

# EXHIBIT A



## Program

### Product Insight

Read below for Glucosamine and Chondroitin details, product characteristics, Elations supplement safety facts, and more!

Glucosamine/Chondroitin
Calcium Citrate Malate (CCM)
Boron
Absorbability
Product Ingredients

#### Glucosamine/Chondroitin

Research indicates that taking 1,500 mg of glucosamine and 1,200 mg of chondroitin daily can help improve joint function and give joints what they need to stay healthy. Each bottle and powder stick of Elations contains these levels of glucosamine and chondroitin. Elations is also more absorbable than pills.

#### Calcium Citrate Malate (CCM)

CCM is composed of calcium in combination with two organic acids, citric acid, and malic acid, commonly called "fruit acids" because of their natural abundance in fruits. Numerous published studies support greater CCM absorption than milk or calcium carbonate and includes

- A study among women age 21-30 showing calcium absorption from CCM was 26% greater than that of calcium carbonate, a common dietary supplement, and 30% greater than that of milk. (Smith KT, Heaney RP, Flora L, Hinders SN. "Calcium Absorption from a New Calcium Delivery System (CCM), *Calcified Tissue International* (1987); 41:351-52).

- A study among older women (average age 57) which showed CCM absorption was 39%, a level 30-50% greater than typically found in milk (Anden NB, Peacock M, Khabera RL, De Castro JAS. "Calcium Absorption from Apple and Orange Juice Fortified with Calcium Citrate Malate (CCM)," *Journal of the American College of Nutrition* (1986); 15:313-316).

- A study among children (average age 14) which shows calcium absorption from CCM was 37% greater than for calcium carbonate (Heller JZ, Smith DL, Flora L, Stemenda C, Peng X, Johnston CC Jr. "Calcium Absorption from Calcium Carbonate and a New Form of Calcium (CCM) in Healthy Male and Female Adolescents", *American Journal of Clinical Nutrition* (1989); 49:1291-94).

back to top

#### Boron

The Physician's Desk Reference excerpt on boron reviews the pharmacokinetic, epidemiological and clinical data demonstrating boron's potential role in calcium metabolism.
back to top

#### Absorbability

As a liquid, Elations is inherently more quickly absorbed than supplement pills which need to disintegrate and dissolve in the stomach before passing into the intestines. Further, the calcium in CCM has been shown to be more absorbable into the bone than the calcium used in calcium supplements (calcium carbonate and calcium citrate, specific references listed above). Elations uses high-purity, low molecular weight glucosamine and particularly chondroitin to further accelerate absorption (and to allow the product to be clear and good-tasting).
back to top

DON'T MISS!

## Join the Elations Health Professional Program

Professional Memberships include special pricing or shipping! BUY NOW!

0042

Product Insight : Health Professional Program : Elations

## Product Ingredients

Each 8 oz. bottle of Elations contains dietary supplement ingredients including:

1,500 mg Glucosamine, which improves healthy joints, thickens joint fluid for better lubrication, and helps form the building blocks of joint cartilage;

1,200 mg Chondroitin, which is a major component of joint cartilage, acts as an antioxidant to reduce joint damage, and stimulates cartilage production;

300 mg Calcium, in the form of Calcium Citrate Malate (CCM), a more absorbable form of calcium which is vital for strong, healthy bones, prevents bone loss, is needed to anchor the cartilage to bone for strong joints, and the deficiency of which can lead to aching joints and muscle cramps;

6 mg Boron, an important dietary trace mineral found in plants, which helps the body utilize calcium, helps to build strong bones, joints and muscles.

The four key components of Elations (Glucosamine, Chondroitin, Calcium, and Boron) are shown to be important for maintaining normal healthy joint function. Supplements are shown to make these components available to the joints. Additional mechanism of action data noted below demonstrates how glucosamine and chondroitin contribute to improved joint health and mobility. All of this could be fairly characterized in consumer terms as rejuvenation.

Drinking Elations daily ensures that joint cartilage and joint fluid have an abundant, continuous supply of the essential building blocks needed to optimize joint health. Therefore, a daily liquid supplement that makes these components available to joints can be considered a way to "rejuvenate" joints every day, and something that should be consumed daily.

Home   About the Company   Contact Us   Privacy Policy   Terms & Conditions
©2013 The Oxford Company, LLC. Elations is a registered trademark of The Oxford Company, LLC. All rights reserved.
*The statements on this page have not been reviewed by the Food and Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease.

0043

# EXHIBIT B



Jill P. Meyer
Member
513.651.6124 (t)
513.651.6981 (f)
jmeyer@fbtlaw.com

July 25, 2012

Via Regular U.S. Mail and E-mail: gwade@milsteinadelman.com
Gillian L. Wade, Esq.
M. Isaac Miller, Esq.
Milstein Adelman LLP
2800 Donald Douglas Loop North
Santa Monica, CA 90405

    Re:   *Your Letter to The Elations Company LLC*

Dear Ms. Wade and Mr. Miller:

    I represent The Elations Company LLC with regard to the letter you sent dated June 19, 2012. Please direct any further inquiries regarding this matter to me.

    Your letter challenges a list of claims that you assert The Elations Company makes about Elations® liquid dietary supplement for joints. Your letter also demands multiple forms of relief, including a demand that the company cease making the claims you challenge. It appears, however, that you are viewing outdated, former advertising and/or product material. Indeed, the company ceased making some of the claims you challenge at least two years ago. (E.g., "Elations Clinically-Proven Combination" and "Improves Joint Comfort in 6 Days!")

    Beyond the claims that the company no longer makes, your letter asserts two contentions: (1) that no scientific evidence supports broad claims that Elations joint supplement improves joint comfort and flexibility and helps users maintain healthier joints; and (2) that the company's references to "joint comfort" and "joint flexibility" coupled with a picture of a bent knee amounts to an improper "health" claim that the product can treat or prevent arthritis. Both of these contentions are wholly unfounded.

    A vast amount of scientific data supports the claim that use of ingredients like those found in the Elations supplement impacts joints, resulting in greater joint comfort and flexibility.[1] In addition to the G.A.I.T study that you reference (wherein an impact was found on users with moderate to severe conditions), that widely available research establishes that those

---

[1] See, e.g., McAlindon, et al., *Glucosamine and Chondroitin for Treatment of Osteoarthritis,* JAMA, Vol. 283, No. 11, p. 1469-1475 (Mar. 15, 2000); Sahelian, *Glucosamine* (2000); Deal & Moskowitz, *Nutraceuticals as Therapeutic Agents in Osteoarthritis,* Osteoarthritis, Vol. 25, No. 2, p. 379-395 (May 1999); Setnikar, et al., *Pharmacokinetics of Glucosamine in Man,* Arznein-Forsch/Drug Res. 43, No. 10, p. 1109-1113 (1993).

3300 Great American Tower | 301 East Fourth Street | Cincinnati, OH 45202-4182 | 513.651.6800 | frostbrowntodd.com
Offices in Indiana, Kentucky, Ohio, Tennessee and West Virginia

Ms. Wade and Mr. Miller
July 25, 2012
Page 2

types of broad impact claims about a product with the active ingredients that Elations contains are supported by well-documented studies and data, and are fully supported as to the Elations product.

Contrary to your statement, Elations joint supplement is not marketed as a treatment for arthritis pain. The claims of Elation's impact on joint flexibility/comfort/health are known as structure/function claims, which are perfectly allowable under U.S. law. I direct you to the U.S Food & Drug Administration and the Federal Trade Commission for guidance on these types of claims. Such a claim about the impact on the structure/function of a knee joint does not amount to a health claim or – as you state here – an arthritis claim, either standing alone or when combined with a picture of a bent knee. A bent knee conveys a message of joint function and flexibility; nothing about a depiction of a bent knee pre-supposes that said knee is suffering from arthritis. Your assertion is a non-sequitur.

Finally, as further evidence that the existing advertising for Elations joint supplement is fully in compliance with the law, you will be interested to know that the U.S. Food & Drug Administration vetted the Elations advertising and claims well over two years ago and found no improper drug claims made by the claims you challenge. Consistent with that review, you will note that, per standard FDA guidance, every advertisement or package of Elations supplement contains the following statement: "The statements [on this page/package] have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease." The advertising for Elations fully complies with all applicable legal standards. Thus, The Elations Company cannot agree to your demands because it either does not make the claims you challenge or well-documented scientific data and legal guidance provides ample support for the claims.

Despite The Elations Company's full right and ability to make the claims you challenge that it actually still is making, the company remains willing to refund to Mr. McCrary or any other California resident, upon demand, the full purchase price paid for any Elations supplement purchased. The company will be placing a notice on its website to that effect in the very near future. If your client, or any California customer, was or is disappointed with the Elations supplement for any reason, a full refund will be provided upon request and proof of purchase. Please forward any such requests of which you are aware directly to me and I will ensure they are handled promptly.

Very truly yours,

FROST BROWN TODD LLC

Jill P. Meyer

Jill P. Meyer

CINLibrary 0106281.0597273  2550383v1

3300 Great American Tower | 301 East Fourth Street | Cincinnati, OH  45202-4182 | 513.651.6800 | frostbrowntodd.com
Offices in Indiana, Kentucky, Ohio, Tennessee and West Virginia

**EXHIBIT C**



Jill P. Meyer
Member
513.651.6124 (t)
513.651.6981 (f)
jmeyer@fbtlaw.com

September 27, 2012

Via Email: imiller@milsteinadelman.com
M. Isaac Miller, Esq.
Milstein Adelman LLP
2800 Donald Douglas Loop North
Santa Monica, CA 90405

Re:    *The Elations Company LLC*

Dear Mr. Miller:

This letter follows our telephone conversation of August 1, 2012, wherein we discussed the allegations in your June 19, 2012 letter and the July 25, 2012 response of The Elations Company to it. You followed our call with an email attaching a study for our further consideration. I agreed to further review with my client the data you provided and your position outlined during our phone call.

Your main contention during our conversation was that the Elations supplement cannot claim to improve joint comfort, flexibility, or health because the product includes glucosamine hydrochloride instead of glucosamine sulfate. You stated that the two variations are different and that no scientific data establishes that glucosamine hydrochloride has the same impact on the joints as glucosamine sulfate. As explained below, your contention is based on a faulty premise; thus, your conclusion is not supported, or supportable, based on scientific research. In addition, and perhaps even more fundamentally, your claim is disproven by the overall formula for the Elations supplement, which you do not address.

First, your contention fails to consider the overall Elations formula. In particular, you have ignored the fact that the Elations supplement contains four active ingredients that work synergistically, not just the two that you mention. You focus on the glucosamine and chondroitin to the exclusion of the boron and patented calcium, CCM, that are included. The latter two contribute significantly to the performance of the supplement and its impact on joints. See, e.g., Travers, R. L., Rennie, G. C., (1990). Boron and arthritis: The results of a double-blind pilot study. *Journal of Nutritional Medicine,* 1 (2), 127;  Newnham, R. E. (1994). Essentiality of Boron for Healthy Bones and Joints. *Environmental Health Perspectives,* 102, Supplement 7,

M. Isaac Miller
September 27, 2012
Page 2

83-85;  Hunt, C. D., Idso, J. P., (1999). Dietary Boron as a Physiological Regulator of the Normal Inflammatory Response: A Review and Current Research Progress.  As those (and other) studies show, boron itself is proven to reduce joint swelling, inflammation, and the oftentimes resulting pain.

Second, as we began discussing during our call, your reliance on a claim that glucosamine sulfate impacts the body differently than glucosamine hydrochloride is discredited by basic scientific principles, which are documented by a well-accepted body of scientific research and studies.  That research establishes emphatically and undisputedly that both formulations of glucosamine break down into the same active agent that has the impact on joints. Stated simply, once glucosamine - in either form - reaches the stomach, the acids break it down into separate units of 1) free glucosamine and 2) either sulfate or hydochloride.  It is the glucosamine in its free state that impacts the joints - not the salt component that is separated from it.  The salt impacts only the absorption rate, not the performance, of the free glucosamine. (It also is important to note that the vast majority of glucosamine sulfate that is used in the United States is just a mixture of glucosamine hydrochloride and potassium sulfate; it is not co-crystallized into a different compound nor is it the same compound as the glucosamine sulfate that was used in the Rottapharm study, as your position seems to assume.)  Thus, regardless of in what form the glucosamine is ingested (hydrochloride or sulfate), once it passes through the stomach, it is normalized into the same end product (glucosamine) by the scientific breakdown that naturally occurs when stomach acid interacts with it.  Significant scientific data establishes that regardless of the form in which it is ingested orally, the end products are bioequivalent.  See, e.g., Zhang, W., Nuki, G., Moskowitz, R. W., Abramson, S., Altman, R. D., Arden, N. K., Bierma-Zeinstra, S., et al. (2010). OARSI recommendations for the management of hip and knee osteoarthritis: part III: Changes in evidence following systematic cumulative update of research published through January 2009. *Osteoarthritis and cartilage / OARS, Osteoarthritis Research Society, 18*(4), 476–99. doi:10.1016/j.joca.2010.01.013;  Block, J. a, Oegema, T. R., Sandy, J. D., & Plaas, a. (2010). The effects of oral glucosamine on joint health: is a change in research approach needed? *Osteoarthritis and cartilage / OARS, Osteoarthritis Research Society, 18*(1), 5–11. doi:10.1016/j.joca.2009.07.005;  Aghazadeh-Habashi, A., & Jamali, F. (2011). The glucosamine controversy; a pharmacokinetic issue. *Journal of pharmacy & pharmaceutical sciences□: a publication of the Canadian Society for Pharmaceutical Sciences, Société canadienne des sciences pharmaceutiques, 14*(2), 264–73. Retrieved from http://www.ncbi.nlm.nih.gov/pubmed/21733414;  Anderson, J. W., Nicolosi, R. J., & Borzelleca, J. F. (2005). Glucosamine effects in humans: a review of effects on glucose metabolism, side effects, safety considerations and efficacy. *Food and chemical toxicology□: an international journal published for the British Industrial Biological Research Association, 43*(2), 187–201. doi:10.1016/j.fct.2004.11.006.

In short, your attacks on the basic claims that Elations makes about the efficacy of the Elations dietary supplement are unsustainable from a scientific standpoint and, thus, from a legal standpoint.  A vast number of well-documented scientific studies and underlying generally

0049

M. Isaac Miller
September 27, 2012
Page 3

accepted scientific principles provide ample substantiation for the claims that Elations supplement improves joint comfort, flexibility, and health.

Additionally, you alleged that the claims that Elations makes about "joint comfort" and "joint flexibility" are improper drug claims. You referred me to an FDA decision involving a supplement called Arthritis Assist. I have reviewed that opinion and, consistent with my position during our telephone call, the claims the manufacturer of that product was making were very different claims than the claims my client makes about the impact of the Elations supplement. The Arthritis Assist claims clearly amounted to drug claims - e.g., "alleviate pain, swelling and overall discomfort in your joints" and "specially formulated to provide fast-acting relief from the minor aches and pains of arthritis . . . . Its dual-action ingredients provide penetrating heat that gets right at the source of your pain and provide "[sic] hours of soothing comfort. . . . Rub on Arthritis Assist&#153; Cream and rub out the pain!". We are confident that claims referencing the impact on joint comfort and flexibility are proper structure/function claims.

As stated in my previous letter, The Elations Company remains willing to refund any purchases of Elations supplement by your client or other California residents who are dissatisfied with the product. Please forward that information to me.

Very truly yours,

FROST BROWN TODD LLC

Jill P. Meyer

CTNLibrary 0106281.0597278  2591513v1

3300 Great American Tower | 301 East Fourth Street | Cincinnati, OH 45202-4182 | 513.651.6800 | frostbrowntodd.com
Offices in Indiana, Kentucky, Ohio, Tennessee and West Virginia

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
MILSTEIN ADELMAN, LLP
Gillian L. Wade, State Bar No. 229124; M. Isaac Miller, Suite Bar No. 266459
2800 Donald Douglas Loop North
Santa Monica, California 90405
   TELEPHONE NO.: (310) 396-9600    FAX NO.: (310) 396-9635
ATTORNEY FOR (Name): ROBERT MCCRARY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Bernardino
   STREET ADDRESS: 303 W. Third St.
   MAILING ADDRESS: 303 W. Third St.
   CITY AND ZIP CODE: San Bernardino 94215
   BRANCH NAME: San Bernardino - Civil Division

SUPERIOR COURT
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

DEC 3 1 2012

By _____ Deputy

BY FAX

CASE NAME:
ROBERT MCCRARY V. THE ELATIONS COMPANY, LLC

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER |
|---|---|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter    ☐ Joinder | | CIVDS 1213489 |
| | | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: | |
| | | | DEPT: | |

Items 1-6 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☑ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☑ is    ☐ is not    complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☑ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☑ Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. ☑ monetary    b. ☑ nonmonetary; declaratory or injunctive relief    c. ☑ punitive
4. Number of causes of action (specify): Four (4)
5. This case ☑ is    ☐ is not    a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: December 28, 2012
Gillian L. Wade
_____
(TYPE OR PRINT NAME)                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

0051



## Introduction

Did you know that most civil lawsuits settle without a trial?

And did you know that there are a number of ways to resolve civil disputes without having to sue somebody?

These alternatives to a lawsuit are known as alternative dispute resolution (ADR). The most common forms of ADR are mediation, arbitration, and case evaluation. There are a number of other kinds of ADR as well.

In ADR, trained, impartial persons decide disputes or help parties decide disputes themselves. These persons are called neutrals. For example, in mediation, the neutral is the mediator. Neutrals normally are chosen by the disputing parties or by the court. Neutrals can help parties resolve disputes without having to go to court.

ADR is not new. ADR is available in many communities, through dispute resolution programs and private neutrals.

## Advantages of ADR

ADR can have a number of advantages over a lawsuit.

- ADR can be speedier. A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.

- ADR can save money. Court costs, attorneys' fees, and expert fees can be saved.

- ADR can permit more participation. The parties may have more chances to tell their side of the story than in court and may have more control over the outcome.

- ADR can be flexible. The parties can choose the ADR process that is best for them. For example, in mediation the parties may decide how to resolve their dispute.

- ADR can be cooperative. This means that the parties having a dispute may work together with the neutral to resolve the dispute and agree to a remedy that makes sense to them, rather than work against each other.

- ADR can reduce stress. There are fewer, if any, court appearances. And because ADR can be speedier, and save money, and because the parties are normally cooperative, ADR is easier on the nerves. The parties don't have a lawsuit hanging over their heads for years.

Revised 01-04-12

0053

• • ADR can be more satisfying.  For all the above reasons, many people have reported a high degree of satisfaction with ADR.

Because of these advantages, many parties choose ADR to resolve a dispute, instead of filing a lawsuit.  Even when a lawsuit has been filed, the court can refer the dispute to a neutral before the parties' positions harden and the lawsuit becomes costly.  ADR has been used to resolve disputes even after a trial, when the result is appealed.

## Disadvantages of ADR

ADR may not be suitable for every dispute.

• If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

• There generally is less opportunity to find out about the other side's case with ADR than with litigation.  ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

• The neutral may charge a fee for his or her services.

• If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

• Lawsuits must be brought within specified periods of time, known as statutes of limitation.  Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

## Three Common Types of ADR

This pamphlet describes the forms of ADR most often found in the California state courts and discusses when each may be right for a dispute.

• MEDIATION

In mediation, a neutral (the mediator) assists the parties in reaching a mutually acceptable resolution of their dispute.  Unlike lawsuits or some other types of ADR, the mediator does not decide how the dispute is to be resolved.  The parties do.

Mediation is a cooperative process, in which the parties work together toward a resolution that tries to meet everyone's interests, instead of working against each other, where at least one party loses.  Mediation normally leads to better relations between the parties and to resolutions that hold up.  For example, mediation has been very successful in family disputes, particularly with child custody and visitation.

0054

Mediation is particularly effective when the parties have a continuing relationship like neighbors or business people. Mediation also is very effective where personal feelings are getting in the way of a resolution. This is because mediation normally gives the parties a chance to let out their feelings and find out how each other sees things.

Mediation may not be a good idea when one party is unwilling to discuss a resolution or when one party has been a victim of the other or cannot have enough bargaining power in the mediation. However, mediation can be successful for victims seeking restitution from offenders. A mediator can meet with the parties separately when there has been violence between them.

- ARBITRATION

In arbitration, a neutral (the arbitrator) reviews evidence, hears arguments, and makes a decision (award) to resolve the dispute. This is very different from mediation, where the mediator helps the parties reach their own resolution. Arbitration normally is more informal and much speedier and less expensive than a lawsuit. Because of the large number of cases awaiting trial in many courts, a dispute normally can be heard much more quickly by an arbitrator than by a judge. Often a case that may take a week to try in court can be heard by an arbitrator in a matter of hours, because evidence can be submitted by documents (like medical reports and bills and business records), rather than testimony.

There are two kinds of arbitration in California: Private arbitration, by agreement of the parties involved in the dispute, takes place outside of the courts and normally, is binding. In most cases "binding" means that the arbitrator's decision (award) is final and there will not be a trial or an appeal of that decision. By contrast, a decision by an arbitrator in a case referred by the courts, known as "judicial arbitration," is not binding, unless parties agree to be bound. A party who does not like the award may file a request for trial with the court within a specified time. However, if that party does not do better in the trial than in arbitration, he or she may have to pay a penalty.

Arbitration is best for cases where the parties want a decision without the expense of a trial. Arbitration may be better than mediation when the parties have no relationship except for the dispute.

Arbitration may not be a good idea when the parties want to resolve their dispute by themselves, or with the aid of a neutral.

- CASE EVALUATION

In case evaluation, a neutral (the evaluator) gives an opinion on the strengths and weaknesses of each party's evidence and arguments, and makes an evaluation of the case. Each party gets a chance to present the case and hear the other side. This may lead to a settlement, or at least help the parties prepare to resolve the dispute later on.

0055

Case evaluation, like mediation, can come early in the dispute and save time and money.

Case evaluation is most effective when someone has an unrealistic view of the dispute or when the only real issue is what the case is worth, or when there are technical or scientific questions to be worked out.

Case evaluation may not be a good idea when it is too soon to tell what the case is worth or when the dispute is about something besides money, like a neighbor playing loud music late at night.

## Additional Information

There are several other types of ADR beside mediation, arbitration, and case evaluation. Some of these are conciliation, settlement conferences, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR types. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute.

The selection of a neutral is an important decision. There is no legal requirement that the neutral to be licensed or hold any particular certificate. However, some programs have established qualification requirements for neutrals. You may wish to inquire about the qualifications of any neutral you are considering.

Agreements reached through ADR normally are put in writing by the neutral and, if the parties wish, may become binding contracts that can be enforced by a judge.

You may wish to seek the advice of an attorney as to your legal rights and other matters relating to the dispute.

## Whom Do You Call?

To locate a dispute resolution program or neutral in your community:

- Contact the California Department of Consumer Affairs, Consumer Information Center, toll free, 1-800-952-5210, or

- Contact the local bar association, or

- Look in the Yellow Pages under "Arbitrators" or "Mediators."

There may be a charge for services provided by private arbitrators and mediators.

0056

Superior Court of California
County of San Bernardino



## CONTRACTED MEDIATION SERVICE PROVIDERS.

The following mediation service providers are under contract with the County of San Bernardino to provide the listed alternate dispute resolution (ADR) services under referral by the Court at no or low cost. The contractors may also provide additional mediation services outside of their contracts with the County.

*Landlord-tenant, Unlawful Detainer, Small Claims.*

Inland Fair Housing and Mediation Board
Program Director: Lynne Anderson, Executive Director
City Center Building
10681 Foothill Boulevard, Suite 101
Rancho Cucamonga, CA 91730
TEL (909) 984-2254, or (800) 321-0911
FAX (909) 460-0274
WEB www.inmedbd.com

*Civil & Family Law (except custody and support):*

Inland Valleys Justice Center
Program Director: Kym Adams, Executive Director
1710A Plum Ln
Redlands, CA 92374
TEL (909)798-7117
TOLL FREE (877) 832-9325
FAX (877) 839-1926
WEB www.ivjc.org
EMAIL info@ivjc.org

0057

## Accommodations For Persons With Disabilities Using Court Facilities

The Americans With Disabilities Act (ADA) and State law require all state and local governmental entities, including the courts to provide reasonable accommodations for the needs of persons with disabilities. The ADA benefits people who have an interest in court activities, programs and services. In 1996 the Judicial Council of California, the policy making body for the courts, adopted California Rules of Court, rule 1.00 (former rule 989.3) to implement the ADA in the state court system.

Under the ADA, State laws, and the court rule, a person is entitled to an accommodation if he or she is an "eligible person with a disability." This means the person has a physical or mental impairment that limits one or more major life activities, has a record of such impairment, or is regarded as having such impairment.

It is the individual's responsibility to contact the court to request accommodations that would best suit his or her situation. The individual may request an accommodation by completing the Request for Accommodations by Persons with Disabilities (Judicial Council Form MC-410) or by other means, and provide the request to court staff. If the individual is involved in more than one case, they must submit a separate request (MC-410 form) for each case. The individual should give the court at least five working days notice whenever possible. The court may grant, modify or deny the request. The information presented will be kept confidential unless ordered released by a Judicial officer, or a written waiver of confidentiality is received from the requestor.

The court will evaluate all requests to make reasonable modifications to its policies, practices, and procedures when these modifications are necessary to avoid discriminating against a person because of a disability.

Service animals are permitted in court facilities. The ADA defines a service animal as any guide dog, signal dog, or other animal individually trained to provide assistance to an individual with a disability. Service animals may go to all areas of the court where customers are normally allowed.

For free tools that allow persons with visual disabilities to read documents in Adobe Acrobat PDF format, please visit http://www.adobe.com/enterprise/accessibility/main.html These tools convert PDF documents into either HTML or ASCII text that can be read by many screen-reading programs.

For further information and forms:

Jurors: Please contact the Jury Services Office at (909) 884-1858.

Others: Please contact the court's ADA Coordinator at sprentiss@sb-courts.org

Court employees: To request accommodation for yourself, please contact your supervisor or the Court's Personnel Department. For information on assisting court customers with Ada issues, refer to the courts intranet site www.sb-court.org

If you should have any questions or concerns regarding Americans with Disabilities, please contact Sharon Prentiss, Director of Court Administrative Services at (909) 708-8745.

Request for Accommodation Instruction Sheet (Non Fillable Form and Rule of Court 1)
http://www.sb-court.org/Portals/0/Documents/PDF/ADA/ADA-Persons-With-Disabilities-MC410QA.pdf

Request for Accommodation Form Fillable Version (MC-410)
http://www.courts.ca.gov/documents/mc410.pdf

Q&A on Rule of Court 1.100
http://www.sb-court.org/Portals/0/Documents/PDF/ADA/Requestsforaccommodationsbypersonswithdisabilities.pdf
Access and Fairness Advisory Flyer
http://www.sb-court.org/Portals/0/Documents/PDF/ADA/ProvidingDisabilityAccommodations.pdf

# EXHIBIT "B"



MILSTEIN ADELMAN LLP
Gillian L. Wade, State Bar No. 229124
gwade@milsteinadelman.com
M. Isaac Miller, State Bar No. 266459
imiller@milsteinadelman.com
2800 Donald Douglas Loop North
Santa Monica, California 90405
Telephone:   (310) 396-9600
Fax:         (310) 396-9635

Attorneys for Plaintiff,
Robert McCrary and the Proposed Class

FILED
SUPERIOR COURT
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

DEC 31 2012

By _____ Deputy

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

| | |
|---|---|
| ROBERT MCCRARY, individually and on behalf of all others similarly situated, | CASE NO: |
| Plaintiffs, | CLASS ACTION |
| vs. | DECLARATION OF GILLIAN L. WADE REGARDING VENUE [CAL. CIV. C. § 1780(d)] |
| THE ELATIONS COMPANY, LLC, a Delaware limited liability company; and DOES 1 through 100, inclusive, | |
| Defendants. | |

DECLARATION OF GILLIAN L. WADE REGARDING VENUE

0059

## DECLARATION OF GILLIAN L. WADE

I, Gillian L. Wade, do hereby declare and state as follows:

1.    I am a Partner at the Law Offices of Milstein Adelman, LLP, counsel of record for Plaintiff Robert McCrary, and am licensed to practice before all courts in the State of California. I have personal knowledge of all of the facts stated herein, and if called to testify as a witness, I could and would competently testify to them.

2.    This Court is proper for trial of this action pursuant to Cal. Civil Code section 1780(d) because Defendants are doing business in San Bernardino and the transaction at issue occurred in San Bernardino.

I declare and state under the penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on December 28, 2012 at Santa Monica, California.

_____
Gillian L. Wade, Declarant

*Milstein Adelman, LLP*
*2800 Donald Douglas Loop North*
*Santa Monica, California 90405*

CLASS ACTION COMPLAINT

0060

# EXHIBIT "C"



# EXHIBIT "D"

Original    SCANNED

1  MILSTEIN ADELMAN LLP
   Gillian L. Wade, State Bar No. 229124
2  gwade@milsteinadelman.com
   M. Isaac Miller, State Bar No. 266459
3  imiller@milsteinadelman.com
   2800 Donald Douglas Loop North
4  Santa Monica, California 90405
   Telephone:    (310) 396-9600
5  Fax:          (310) 396-9635

6  Attorneys for Plaintiff,
   Robert McCrary and the Proposed Class

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO CIVIL DIVISION

JAN 1 5 2013

BY _Sherri Hunt_
SHERRI HUNT, DEPUTY

### SUPERIOR COURT FOR THE STATE OF CALIFORNIA

### FOR THE COUNTY OF SAN BERNARDINO

BY FAX

| | |
|---|---|
| ROBERT MCCRARY, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    vs.<br><br>THE ELATIONS COMPANY, LLC, a Delaware limited liability company; and DOES 1 through 100, inclusive,<br><br>    Defendants. | CASE NO.: CIVDS1213489<br><br>**CLASS ACTION**<br><br>**PLAINTIFF'S NOTICE OF PROOF OF PERSONAL SERVICE OF SUMMONS TO DEFENDANT THE ELATIONS COMPANY, LLC** |

*Milstein Adelman, LLP*
*2800 Donald Douglas Loop North*
*Santa Monica, California 90405*

Attached hereto as Exhibit A is the Plaintiffs' Proof of Service of the Summons, Class Action Complaint, Civil Case Cover Sheet, Alternative Dispute Resolution Package, Declaration of Gillian L. Wade Regarding Venue, Notice of Case Assignment for all Purposes, Notice of OSC, Service of Summons and Complaint Notice of Case Management Conference for the following Defendant:

1. THE ELATIONS COMPANY, LLC, a Delaware limited liability company;

Dated: January 15, 2013

Respectfully submitted,
**MILSTEIN ADELMAN, LLP**

By: _____
Gillian L. Wade
M. Isaac Miller
Attorneys for Plaintiff Robert McCrary

Milstein Adelman LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

1

PLAINTIFF'S NOTICE OF PROOF OF PERSONAL SERVICE OF SUMMONS TO DEFENDANT
THE ELATIONS COMPANY, LLC

# EXHIBIT A

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address):
GILLIAN L. WADE, (SBN 229124)
M. ISAAC MILLER, (SBN 268459)
MILSTEIN ADELMAN, LLP
2800 DONALD DOUGLAS LOOP NORTH
SANTA MONICA, CA 90405

TELEPHONE NO.: (310) 396-9600    FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name): PLAINTIFF

FOR COURT USE ONLY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN BERNARDINO
STREET ADDRESS: 303 W. THIRD STREET
MAILING ADDRESS:
CITY AND ZIP CODE: SAN BERNARDINO 94213
BRANCH NAME:

PLAINTIFF/PETITIONER: ROBERT MCCRARY, INDIVIDUALLY, ET AL.

DEFENDANT/RESPONDENT: THE ELATIONS COMPANY, LLC, ET AL.

| | |
|---|---|
| PROOF OF SERVICE OF SUMMONS | CASE NUMBER: CIVDS1213489 |
| | Ref. No. or File No.: 845160 |

(Separate proof of service is required for each party served.)

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. ☒ Summons
   b. ☒ Complaint (CLASS ACTION)
   c. ☒ Alternative Dispute Resolution (ADR) package
   d. ☒ Civil Case Cover Sheet (served in complex cases only)
   e. ☐ cross-complaint
   f. ☒ other (specify documents): DECLARATION OF GILLIAN L. WADE REGARDING VENUE; NOTICE OF CASE ASSIGNMENT FOR ALL PURPOSES NOTICE OSC: SERVICE OF SUMMONS AND COMPLAINT NOTICE OF CASE MANAGEMENT CONFERENCE

3. a. Party served: (specify name of party as shown on documents served):
      THE ELATIONS COMPANY, LLC, A DELAWARE LIMITED LIABILITY COMPANY
   b. Person served (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) (specify name and relationship to the party named in item 3a):
      SCOTT LASCALA, AGENT FOR SERVICE OF PROCESS
4. Address where the party was served: 1209 ORANGE STREET
      WILLMINGOTN, DE 19801

5. I served the party (check proper box)
   a. ☒ by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on (date): JANUARY 8, 2013. (2) at: (time) 3:45 PM
   b. ☐ by substituted service. On (date):                  at: (time)              I left the documents listed in item 2 with or in the presence of (name and title or relationship to the person indicated in item 3):
      (1) ☐ (business) a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
      (2) ☐ (home) a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
      (3) ☐ (physical address unknown) a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on (date):                (city):                or ☐ a declaration of mailing is attached.
      (5) ☐ I attach a declaration of diligence stating actions taken first to attempt personal service.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

PROOF OF SERVICE OF SUMMONS

Code of Civil Procedure § 417.10

0066

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of LOS ANGELES, State of CALIFORNIA. I am over the age of 18 and not a party to within action; my business address is 2800 Donald Douglas Loop North, Santa Monica, CA 90405.

On January 15, 2013, I served the foregoing documents described as:

**PLAINTIFF'S NOTICE OF PROOF OF PERSONAL SERVICE OF SUMMONS TO DEFENDANT THE ELATIONS COMPANY, LLC**

On interested parties in this action by sending a true copy of the document to the following parties as follows:

> **THE ELATIONS COMPANY, LLC**
> Registered Agent for Service:
> c/o The Corporation Trust Company
> Corporation Trust Center
> 1209 Orange Street
> Wilmington, DE 19801

----- (BY ELECTRONIC MAIL) I caused the document(s) to be successfully transmitted via electronic mail to the offices of the addressees.

----- (BY ELECTRONIC SERVICE) I caused the document(s) to be sent to the offices of the addressees via Online Filing Service.

----- (BY FACSIMILE) I transmitted pursuant Rule 2.306, the above-described document by facsimile machine (which complied with Rule 2003(3)), to the attached listed fax number(s). The transmission originated from facsimile phone number (310) 396-9635 and was reported as complete and without error.

----- (BY OVER NIGHT DELIVERY) I caused such envelope(s) thereon fully prepaid to be placed in the Federal Express box at Santa Monica, California.

----- (BY PERSONAL SERVICE) I caused such envelope(s) to be hand delivered to the offices of the addressees.

xxxx (BY US MAIL) I caused such envelope(s) with postage thereon fully prepaid, with return receipt requested, to be placed in the United States mail at Santa Monica, California, pursuant to California Code of Civil Procedure § 415.40. I am readily familiar with this business' practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

1

0068

Executed on January 15, 2013 at Santa Monica, California

xxxx   (STATE) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

——   (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

David Marin

2

0069

1

PROOF OF SERVICE
STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

2

3    At the time of service, I was over 18 years of age and **not a party to this
action**.  I am employed in the County of Los Angeles, State of California.  My
business address is 333 South Hope Street, 43rd Floor, Los Angeles, CA 90071-
4    1422.

5    On February 7, 2013, I served true copies of the following document(s)
described as **NOTICE OF REMOVAL OF ACTION PURSUANT TO 28 U.S.C.
6    §§ 1332(d), 1441, and 1453** on the interested parties in this action as follows:

7    Gillian L. Wade                    310-396-9600 Telephone
M. Issac Miller                    310-396-9635 Fax
8    MILSTEIN ADELMAN LLP               gwade@milsteinadelman.com
2800 Donald Douglas Loop North     imiller@milsteinadelman.com
9    Santa Monica, CA  90405

10

11    ☐    **BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I
electronically filed the document(s) with the Clerk of the Court by using the
12    CM/ECF system.  Participants in the case who are registered CM/ECF users will be
served by the CM/ECF system.  Participants in the case who are not registered
13    CM/ECF users will be served by mail or by other means permitted by the court
rules.

14

15    ☒    **BY FEDEX:**  I enclosed said document(s) in an envelope or package
provided by FedEx and addressed to the persons at the addresses listed in the
Service List.  I placed the envelope or package for collection and overnight delivery
16    at an office or a regularly utilized drop box of FedEx or delivered such document(s)
to a courier or driver authorized by FedEx to receive documents.

17

18    I declare under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct and that I am employed in the office
of a member of the bar of this Court at whose direction the service was made.

19

20    Executed on February 7, 2013, at Los Angeles, California.

21

22    TRACY L. FIELDING

23

24

25

26

27

28

SMRH:408012190.1                    -1-                    PROOF OF SERVICE

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Jesus Bernal and the assigned discovery Magistrate Judge is Oswald Parada.

The case number on all documents filed with the Court should read as follows:

## EDCV13- 242 JGB (OPx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=========================================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [ ] **Southern Division** | [X] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐)<br>ROBERT MCCRARY, individually and on behalf of all others similarly situated | DEFENDANTS<br>THE ELATIONS COMPANY, LLC, a Delaware limited liability company; and DOES 1 through 100, inclusive |
|---|---|
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>Gillian L. Wade, SBN 229124<br>MILSTEIN ADELMAN LLP<br>2800 Donald Douglas Loop North<br>Santa Monica, CA 90405<br>Tel: 310-396-9600 | Attorneys (If Known)<br>Sascha Henry, SBN 191914; Paul Seeley, SBN 252318<br>Sheppard, Mullin, Richter & Hampton LLP<br>333 South Hope Street, 43rd Floor<br>Los Angeles, California 90071-1422<br>Tel: 213-620-1780 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding  ☒ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes ☐ No   ☒ MONEY DEMANDED IN COMPLAINT: $ unspecified

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. §§ 1332, 1441 and 1453

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 190 Other Contract | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 195 Contract Product Liability | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accommodations | ☐ 630 Liquor Laws | SOCIAL SECURITY |
| ☒ 890 Other Statutory Actions | ☐ 196 Franchise | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 61 HIA(1395ff) |
| ☐ 891 Agricultural Act | REAL PROPERTY | | ☐ 445 American with Disabilities – Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 210 Land Condemnation | IMMIGRATION | ☐ 446 American with Disabilities – Other | ☐ 660 Occupational Safety/Health | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 893 Environmental Matters | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 230 Rent Lease & Ejectment | ☐ 463 Habeas Corpus-Alien Detainee | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

**ED CV 13 - 00242 JGB (OPx)**

**FOR OFFICE USE ONLY:**   Case Number:

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

American LegalNet, Inc.
www.FormsWorkflow.com

FEB - 7 2013

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?    ☒ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?    ☒ No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)    ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                                ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                                ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                                ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
     ☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| San Bernardino County | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
     ☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Delaware and Ohio |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
     Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| San Bernardino County | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER):  _Paul Seeley_    Date February 7, 2013

PAUL SEELEY
Counsel for Defendant

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

American LegalNet, Inc.
www.FormsWorkflow.com

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com

1

<u>PROOF OF SERVICE</u>
<u>STATE OF CALIFORNIA, COUNTY OF LOS ANGELES</u>

2

At the time of service, I was over 18 years of age and **not a party to this action.** I am employed in the County of Los Angeles, State of California. My business address is 333 South Hope Street, 43rd Floor, Los Angeles, CA 90071-1422.

3

4

5

On February 7, 2013, I served true copies of the following document(s) described as **CIVIL COVER SHEET** on the interested parties in this action as follows:

6

7

Gillian L. Wade                          310-396-9600 Telephone
M. Issac Miller                          310-396-9635 Fax

8

MILSTEIN ADELMAN LLP              gwade@milsteinadelman.com
2800 Donald Douglas Loop North       imiller@milsteinadelman.com

9

Santa Monica, CA 90405

10

11

☐  **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

12

13

14

15

☒  **BY FEDEX:** I enclosed said document(s) in an envelope or package provided by FedEx and addressed to the persons at the addresses listed in the Service List. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of FedEx or delivered such document(s) to a courier or driver authorized by FedEx to receive documents.

16

17

18

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

19

20

Executed on February 7, 2013, at Los Angeles, California.

21

22

_____
TRACY L. FIELDING

23

24

25

26

27

28