SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
SASCHA HENRY, Cal. Bar No. 191914
JONATHAN D. MOSS, Cal. Bar No. 252376
ROBIN A. ACHEN, Cal. Bar No. 287033
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone:   213.620.1780
Facsimile:   213.620.1398
Email:        shenry@sheppardmullin.com
              jmoss@sheppardmullin.com
              rachen@sheppardmullin.com

Attorneys for Defendant
The Elations Company, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| ROBERT MCCRARY, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>    vs.<br><br>THE ELATIONS COMPANY, LLC, a Delaware limited liability company and DOES 1-100, inclusive,<br><br>      Defendants. | Case No. 5:13-cv-00242-JGB<br><br>*Honorable Jesus G. Bernal*<br><br>**CLASS ACTION**<br><br>**DECLARATION OF SASCHA HENRY IN SUPPORT OF DEFENDANT THE ELATIONS COMPANY, LLC'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE REBUTTAL REPORT, OPINIONS AND TESTIMONY OF BRUCE R. ISAACSON, DBA, MBA**<br><br>Courtroom:    1<br>Date:         November 10, 2014<br>Time:         9:00 a.m.<br><br>Trial Date:    March 17, 2015 |

SMRH:433912854.1

DECLARATION OF SASCHA HENRY ISO DEFENDANT'S OPPOSITION TO
MOTION TO EXCLUDE DR. ISAACSON.

## INDEX OF EVIDENCE

| Title of Document | Pages |
|---|---|
| Declaration of Sascha Henry | 1 |
| Exhibit A – Expert Report of Dr. Thomas J. Maronick | 3 |
| Exhibit B – Expert Rebuttal Report of Bruce R. Isaacson, MBA, DBA | 54 |
| Exhibit C – Excerpts from the Deposition of Dr. Thomas J. Maronick | 117 |

SMRH:433912854.1

DECLARATION OF SASCHA HENRY ISO DEFENDANT'S OPPOSITION TO
MOTION TO EXCLUDE DR. ISAACSON.

## DECLARATION OF SASCHA HENRY

I, Sascha Henry, declare as follows:

1.     I am an attorney at law duly licensed to practice before this Court.  I am a partner with the law firm of Sheppard, Mullin, Richter & Hampton LLP, counsel of record for Defendant The Elations Company, LLC ("Defendant") in this action.  If called as a witness, I could and would competently testify to all facts within my personal knowledge except where stated upon information and belief.

2.     On or around May 5, 2014, my office received service of Thomas J. Maronick's expert report, entitled "An Empirical Analysis of Consumers' Perceptions of 'Clinically Proven' Claim on Elations Dietary Supplement." Attached hereto as **Exhibit A** is a true and correct copy of Dr. Maronick's Expert Report.

3.     On or around June 12, 2014, my office served the Expert Rebuttal Report of Bruce R. Isaacson, MBA, DBA on the plaintiff in response to the Report of Dr. Thomas J. Maronick.  Attached hereto as **Exhibit B** is a true and correct copy of Dr. Isaacson's Expert Rebuttal Report.

4.     On May 29, 2014, I deposed Dr. Thomas J. Maronick.  Attached hereto as **Exhibit C** are true and correct copies of excerpts from Dr. Maronick's deposition transcript.

I declare under penalty of perjury under the laws of the state of California and the laws of the United States of America that the foregoing is true and correct.

Executed October 20, 2014, at Los Angeles, California.

*/s/ Sascha Henry*
Sascha Henry

-2-

# Exhibit A

# AN EMPIRICAL ANALYSIS OF CONSUMERS' PERCEPTIONS OF "CLINICALLY PROVEN" CLAIM ON ELATIONS DIETARY SUPPLEMENT

Prepared for:
Milstein Adelman LLP
Santa Monica, California

By:
Thomas J. Maronick, DBA, JD
Professor of Marketing
Towson University
Towson, Maryland

April, 2014

Elations Report

1

# AN EMPIRICAL ANALYSIS OF CONSUMERS' PERCEPTIONS OF "CLINICALLY PROVEN" CLAIM ON ELATIONS DIETARY SUPPLEMENT

### -Report-

## BACKGROUND

.    I am a Professor of Marketing in the College of Business and Economics at Towson University in Towson, Maryland.  My educational background includes a BA in Philosophy from St. Thomas Seminary, an MSBA from the University of Denver, a Doctorate in Business Administration (DBA) from the University of Kentucky with a major in Marketing.  It also includes a JD from the University of Baltimore, School of Law.  I am an inactive member of the Maryland Bar.  At Towson University I teach undergraduate and graduate courses in strategic marketing and marketing research.  I have also taught graduate and executive development courses at a number of universities in the Baltimore and Washington DC area.

My professional background includes Director of Impact Evaluation in the Bureau of Consumer Protection at the Federal Trade Commission (FTC) from 1980 – 1997.  In that capacity I was the in-house marketing expert for all divisions of the Bureau, advising attorneys and senior management on marketing aspects of cases being considered or undertaken by Commission attorneys.  I was also responsible for the evaluation of research submitted by firms being investigated by the Commission and for the design and implementation of all consumer research undertaken by the Bureau during that period.  Since leaving the Commission in 1997, I have served as an expert-witness in marketing-related cases and have testified in Federal and State courts.  A copy of my resume, which includes my publications, is included as Exhibit 1.  A list of cases where I have testified as an expert is included as Exhibit 2.

2

**Exhibit A**                                                                                    **Page 4**

## SCOPE OF ENGAGEMENT

I have been retained by attorneys representing Robert McCrary in a class action against The Elations Company, LLC to design and implement an on-line survey of individuals who have purchased or considered purchasing an over-the-counter remedy for joint discomfort or the symptoms of arthritis. In designing the study I am relying on my educational background, my academic/teaching background, and my professional experiences designing consumer surveys for academic purposes as well as for the FTC and for litigation as described above and in my Curriculum Vitae.  I have also reviewed documents associated with this matter, including marketing surveys and analysis undertaken by The Elations Company.  (See Exhibit 3 for list of all documents considered).

I am being compensated at $450.00 per hour and my compensation is not dependent on the outcome of this litigation.

## SUMMARY OF OPINION

Four conclusions flow from this study of consumers in the target market for the Elations Joint Supplement Beverage that claims to offer improved health or joint comfort.  First, the main message consumers take from the label, among others, is that the Elations product promises joint relief and/or healthy joints and that the product is more absorbable than pills.  Consumers also take a message that the product "works" as claimed.

Second, the third most important reason (combining responses for the first, second, and third important reasons) for purchasing the product, (after that it provides joint health in 6 days and that it results in "healthier joints") is that the label says or suggests that Elations has a "clinically proven formula" or that it is a "clinically proven combination."  Importantly, even when the "clinically proven" claim is not expressed on the label, respondents indicate that it is

3

implied and is the third most important reason for buying the product, apparently because of the express efficacy claims made on the label.

Third, respondents interpret the phrase "clinically proven formula" or "clinically proven combination" to mean that the company has conducted formal tests that prove the express and implied claims that the product "works" as claimed.

Fourth, most respondents (79%) would be more willing to buy the product if it had a "clinically proven formula," with almost half of those respondents (49%) saying they would be willing to pay more for the product if the manufacturer said it had a "clinically proven formula."

**METHODOLOGY**

The data were collected using the Qualtrics.com internet survey platform, with the sample drawn from an internet panel of individuals who have agreed to participate in internet surveys on a periodic basis. Online surveys using internet panels is a well-accepted approach in the field of advertising and consumer research.

The universe for this study was a nationwide sample of individuals 21 or older who have experienced joint discomfort or the symptoms of arthritis and who have either purchased or considered purchase of an over-the-counter product to treat their joint discomfort. Following Qualtrics.com's standard practice, panel members who met the initial age criteria were sent an email message inviting them to participate in an online survey by clicking on a link included with the email invitation. There was no mention of the topic of the survey in the email invitation. Respondents who clicked the link, i.e., agreed to participate in the online survey, were first asked whether they had experienced joint discomfort or the symptoms of arthritis and,

**Exhibit A**                                          **Page 6**

if yes, whether they had purchased or considered purchase of an over-the-counter product to treat the problem. A copy of the main study questionnaire is attached as Exhibit 3.

Qualified respondents were then randomly assigned to one of three "blocks," each of which contained the front and back label of an Elations "Joint Supplement Beverage" product. The first block (Label 1) contained the "Clinically Proven Formula" claim on the back label. The label also made claims that the product "improves joint comfort in 6 days" and that the product is "More absorbable than pills." The second block (Label 2) contained an image with the "Clinically-Proven Combination" claim on the back label. The label also made claims that the product "Improves your joint health" and that it is "Shellfish free." The third block (Label 3) did not contain any "Clinically-Proven" claim. It did claim that the product is "Shellfish free" and that it "Helps improve your joint comfort" and "...your joint flexibility."

In Part 1 of the study, a total of 454 respondents saw one of the three versions of the Elations label (i.e., 151-153 for each of the three labels) and no respondent saw more than one of the three versions of the label.

Respondents in each block were first asked to review the front and back of the label and then asked an open-ended question "What, if anything, does the label say or suggest about the product?" with their verbatim responses recorded. They were then asked if there was "anything else" that the label said or suggested about the product, again with their verbatim responses recorded.

Respondents were then asked to identify, based on their review of what the label said or suggested, which of a list of seven reasons was the most important, the second most important,

and the third most important reasons for buying the product. The reasons[1] included: healthier joints, great taste, Glucosamine, clinically proven formula, joint comfort in 6 days, brand, and shellfish free. Respondents in the first two blocks were then shown the back panel from the package and directed to note the claim "Clinically Proven Formula" (Label 1) or "Clinically-Proven Combination" (Label 2). They were then asked what the phrase means, with their verbatim responses recorded. Respondents in block 3 (Label 3 -- which did not contain the "clinically proven" claim) were asked "If the manufacturer of this product said it was a "clinically proven formula," would they be more willing or less willing to buy it and, if they said they would be "more/much more willing to buy it," they were asked whether they would be willing to pay more for the product if it had a "clinically proven formula." Finally, respondents were asked three demographic questions: gender, age, and education.

Part 2. In order to obtain a better understanding of what the phrase "clinically proven" meant to consumers, a follow-up study was undertaken from an identical sample of 100 consumers, using the same methodology. These respondents were shown the first block (Label 1) and asked the same questions as those in Part 1described above, plus one additional question regarding their understanding of the "clinically proven" phrase. The findings for Part 2 of the study are included in the relevant tables below. A copy of the Part 2 questionnaire is attached as Exhibit 4.

**FINDINGS**

Demographic Profile. As noted in Table 1, two-thirds of the respondents in both Part 1 and Part 2 of the study were female. Additionally, the majority of respondents in both parts were

---

[1] The response options were randomized in all questions where the list is utilized.

between age 41-60, and the majority of respondents in both Part 1 and Part 2 had at least some college.  The similarities in demographic characteristics between the respondents in Part 1 and Part 2 demonstrate that they are comparable samples.

### Table 1
#### Demographic Profile of Respondents

|           |                     | Part 1      | Part 2    |
|-----------|---------------------|-------------|-----------|
| Gender    | Male                | 170 (37%)   | 39 (39%)  |
|           | Female              | 284 (63%)   | 61 (61%)  |
|           | TOTAL               | 454         | 100       |
| Age       | Under 21            | 0           | 0         |
|           | 21-30               | 2           | 0         |
|           | 31-40               | 16 (4%)     | 2   (2%)  |
|           | 41-50               | 151 (33%)   | 47 (47%)  |
|           | 51 – 60             | 190 (42%)   | 31 (31%)  |
|           | Over 60             | 95 (21%)    | 20 (20%)  |
|           | TOTAL               | 454         | 100       |
| Education | High School or less | 110 (24%)   | 22 (22%)  |
|           | Some College        | 125 (28%)   | 30 (30%)  |
|           | 2 Yr College        | 70 (15%)    | 19 (19%)  |
|           | 4 Yr College        | 97 (21%)    | 15 (15%)  |
|           | Grad School/Degree  | 52 (11%)    | 14 (15%)  |
|           | TOTAL               | 454         | 100       |

Perception of the Product – Label 1.  As noted in the methodology above, respondents were first asked what the label said or suggested about the product, with their verbatim responses recorded.  The verbatim perceptions of the first label show that the main messages respondents take from the label are efficacy claims, i.e., that the product delivers relief in 6 days, is effective in treating joint pain, and/or that it is more absorbable than pills.  Other responses relate to ingredients, i.e., that the product contains liquid Glucosamine and Chondroitin, and that it is fruit flavored.

Importance of Factors in Purchase Decision.  Respondents were then given a list of seven possible reasons for purchase of the product and asked, based on what is said or suggested on the

**Exhibit A**                                    **Page 9**

label, what is the most important reason, the second most important reason, and the third most important reason for purchasing the product.  As noted in Table 2, the most important reasons for buying the Elations product (i.e., combining the three "important" reasons) is that the product provides joint comfort in 6 days (33.1%), and that it results in "healthier joints (24.9%).  The third most important reason for purchasing the product in Part 1 (22.3%) is that the label says or suggests that product has a "clinically proven formula."  It is also noteworthy that there are no significant differences between responses to Part 1 and Part 2, thereby confirming the comparability of the samples.

Table 2
**Important Reason to Buy Elations**
Label 1

| | Part 1 | | | | Part 2 *** |
|---|---|---|---|---|---|
| | Most Important Reason | Second Most Important | Third Most Important | Total | |
| Healthier joints* | 34 | 43 | 36 | 113 (24.9%) | 76 (25.3%) |
| Great taste | 6 | 16 | 20 | 42  (9.3%) | 32 (10.7%) |
| Glucosamine | 14 | 14 | 14 | 42  (9.3%) | 28  (9.3%) |
| Clinically proven formula | 13 | 39 | 49 | 101 (22.3%) | 66 (22.0%) |
| Joint comfort in 6 days | 80 | 34 | 23 | 137 (33.1%) | 83 (27.7%) |
| Brand | | 2 | 4 | 6  (1.3%) | 6  (0.2%) |
| Shellfish free | 2 | 2 | 5 | 9  (2.0%) | 4  (0.1%) |
| Other | 1 | 1 | | 2 | 3  (0.1%) |
| Total | 151 | 151 | 151 | 453** | 300** |

*The response options were randomized. **Because totals are summations across three questions, the totals are also summations; ***Totals only reported here for Part 2

Meaning of "Clinically Proven Formula."  As noted in the methodology, respondents were shown the back panel of the label and asked to note the phrase "Clinically Proven Formula."  They were then asked what the phrase meant, with their verbatim responses recorded.  As noted in Table 3, the most common perception of the meaning of the phrase is that it says or suggests that the product "is proven to work/works" (46.4%% of respondents), followed by the

8

general perception that it has been "tested" (17.9% of respondents).  Moreover, as noted in Table

3, the responses to Part 2 showed similar results, with 54.1% of respondents saying the phrase

"clinically proven formula" means that it has been proven to work, or that it "works," followed

by that it has been "tested" (17.3%).

<div align="center">

Table 3
Meaning of "Clinically Proven Formula"
Label 1

</div>

| Verbatim Response[2] | Part 1  Study | Part 2 |
|---|---|---|
| Study/Clinical study done | 10 (6.6%) | 5   (5.1%) |
| Tested (general) | 27 (17.9%) | 17 (17.3%) |
| Scientific study done | 3   (2.0%) | 2   (2.0%) |
| Tested in a clinic | 8   (5.3%) | 3   (3.1%) |
| Tested on actual people | 10   (6.6%) | 1   (1.0%) |
| Proven to work/works | 70 (46.4%) | 53 (54.1%) |
| FDA approved | 3   (2.0%) | 1   (1.0%) |
| Don't know/Not sure/Nothing | 2   (1.3%) | 1   (1.0%) |
| Miscellaneous | 18 (11.9%) | 15 (15.3%) |
| TOTAL | 151 | 98 |

As noted in the methodology, respondents to Part 2 were asked their understanding of the

phrase "clinically proven" after reviewing the back of the label a second time.  As noted in Table

4, over half of the respondents to Part 2 (52%) believe the phrase "clinically proven" says or

suggests that the manufacturer has tested the product and proven it works as claimed.  Moreover,

a total of 78% of respondents believe either the manufacturer or an independent organization

tested the product and proved it worked as claimed.

---

[2] Numerous respondents gave answers that "fit" in more than one category.  The decision rule that was followed was:  if "works/proven" mentioned the response was coded in that category; if "works/proven" was not mentioned, it was assigned a code in the next most specific category.  Thus, if a respondent said that it was "tested on people and proven to work," the response would be coded as "proven."  If the response did not mention "proven to work," it would be coded as "tested on actual people."   If the response did not include "on people" (i.e., only "tested") it would be coded as "tested (general)".

**Table 4**
**Understanding of "Clinically Proven"**
**Label 1 (Part 2)**

| Response Options* | |
|---|---|
| The manufacturer tested the product and proved it works as claimed | 52 (52.0%) ⎫ 78.0% |
| An independent organization tested the product and proved it works as claimed | 26 (26.0%) ⎭ |
| The manufacturer tested the product for safety but not necessarily to determine that it works as claimed | 5 (5.0%) |
| The FDA tested the product for safety but not to determine that it works as claimed | 10 (10.0%) |
| Neither the manufacturer nor any other organization did any tests on the product to determine whether it was safe or works as claimed | 2 (2.0%) |
| The manufacturer tested the product but the results showed it didn't work as claimed | 4 (4.0%) |
| Other | 1 (1.0%) |
| TOTAL | 100 |

*Response options randomized.

<u>Perception of the Product – Label 2.</u>  As was the case with Label 1, one-third of all respondents were first asked what the label says or suggests about the Elations product, with their verbatim responses recorded.  The verbatim perceptions of the second label show that the main messages respondents take from the package are efficacy claims, i.e., that the product works in 6 days, will help with joint pain, and is more absorbable than pills.  Other responses relate to ingredients, i.e., that the product is shellfish free, has Glucosamine and Chondroitin, and that it has 30 calories per bottle.

<u>Importance of Factors in Purchase Decision</u>.  Respondents were then given a list of seven possible reasons for purchase of the product and asked, based on what is said or suggested on the label, what is the most important reason, the second most important reason, and the third most important reason for purchasing the product.  As noted in Table 5, the most important reasons for

10

**Exhibit A**                                    **Page 12**

buying the Elations product (i.e., combining the three "important" reasons) are that using the

product results in "healthier joints" (26.3%) and that the product provides joint comfort in 6 days

(23.4%).  It is also noteworthy that the third most important reason (19.6% across the three

important reasons) is that the label says or suggests that the product has a "clinically proven

formula."

**Table 5**
**Important Reason to Buy Elations**
**Label 2**

|  | Most Important Reason | Second Most Important | Third Most Important | Total |
|---|---|---|---|---|
| Healthier joints* | 51 | 37 | 31 | 119 (26.3%) |
| Great taste | 5 | 9 | 15 | 29  (6.4%) |
| Glucosamine | 12 | 18 | 24 | 54 (11.9%) |
| Clinically proven formula | 19 | 31 | 39 | 89 (19.6%) |
| Joint comfort in 6 days | 48 | 36 | 22 | 106 (23.4%) |
| Brand | 2 | 4 | 3 | 9  (2.0%) |
| Shellfish free | 13 | 14 | 15 | 42  (9.8%) |
| Other | 1 | 2 | 2 | 5  (1.1%) |
| Total | 151 | 151 | 151 | 453 |

*The response options were randomized

Meaning of "Clinically-Proven Combination."  As noted in the methodology, respondents

were shown the back panel of the label and asked to note the phrase "Clinically-Proven

Combination."  They were then asked what the phrase meant, with their verbatim responses

recorded.  As noted in Table 6, the most common perception of the meaning of the phrase is that

it suggests or implies that the product "is proven to work/works" (349.3% of respondents),

followed by the general perception that it has been "tested" (11.5% of respondents).

**Exhibit A**                                    **Page 13**

Table 6
**Meaning of "Clinically-Proven Combination"**
Label 2

| Verbatim Response[3] | |
|---|---|
| Study/Clinical study done | 2  (1.4%) |
| Tested (general) | 17 (11.5%) |
| Scientific study done | 1  (0.7%) |
| Tested in a clinic | 10  (6.8%) |
| Tested on actual people | 3  (2.0%) |
| Proven to work/works | 73 (49.3%) |
| FDA approved | 2  (1.4%) |
| Don't know/Not sure/Nothing | 6  (4.1%) |
| Miscellaneous | 34 (23.0%) |
| TOTAL | 148 |

Perception of the Product – Label 3.  As was the case with the first two labels, one-third
of all respondents were first asked their perception of the Elations product they had reviewed,
with their verbatim responses recorded.  The verbatim perceptions of the third  package show
that the main messages respondents take from the label are general efficacy claims, i.e., that the
product helps joint flexibility and joint comfort, it is a healthy product that gives more relief, and
that is more absorbable than pills.  Other responses relate to ingredients, i.e., that the product is
shellfish free, has Glucosamine and Chondroitin, and that it has 30 calories per bottle.

Importance of Factors in Purchase Decision.  As was the case with the first two blocks,
respondents were then given a list of seven possible reasons for purchase of the product and
asked, based on what is said or suggested on the label, what is the most important reason, the
second most important reason, and the third most important reason for purchasing the product.
As noted in Table 7, the most important reasons for buying the Elations product (i.e., combining
the three "important" reasons) are that using the product results in "healthier joints" (28.1%), that
the product provides joint comfort in 6 days (25.1%).  It is also noteworthy that, even though the

---

[3] See Footnote #2 for decision rule.

"clinically proven formula" claim was not mentioned on the third label, the respondents indicated that the label said or suggested that having a "clinically proven formula" was the third most important reason (19.9% across the three important reasons) to buy the product.

### Table 7
### Important Reason to Buy Elations
#### Label 3

|  | Most Important Reason | Second Most Important | Third Most Important | Total |
|---|---|---|---|---|
| Healthier joints* | 63 | 37 | 30 | 130 (28.1%) |
| Great taste | 0 | 9 | 15 | 24   (5.2%) |
| Glucosamine | 18 | 23 | 19 | 101 (21.9%) |
| Clinically proven formula | 19 | 32 | 40 | 91 (19.9%) |
| Joint comfort in 6 days | 41 | 39 | 36 | 116 (25.1%) |
| Brand | 1 | 1 | 1 | 3   (0.6%) |
| Shellfish free | 10 | 12 | 11 | 33   (7.1%) |
| Other | 2 | 1 | 2 | 5   (1.1%) |
| Total | 154 | 154 | 154 | 462 |

*The response options were randomized

<u>Willing to Pay More if had a "Clinically Proven Formula."</u>  Respondents seeing the third package were asked whether they would be more willing to buy the Elations product if the product had a "clinically proven formula." As noted in Table 8, 79% of respondents said they would be "much more likely" or "more likely" to buy the product if it had a "clinically proven formula,"

### Table 8
### Likelihood of Buying with
### "Clinically Proven Formula"
#### Label 3

| If had "Clinically Proven Formula" |  |  |
|---|---|---|
| Much more likely to buy | 61 (40%) | 121 (79%) |
| More likely to buy | 60 (39%) | |
| Wouldn't make a difference | 28 (18%) | |
| Less likely to buy | 1   (1%) | |
| Much less likely to buy | 1   (1%) | |
| Don't know/Not sure | 3   (2%) | |
| TOTAL | 154 | |

13

**Exhibit A**                                        **Page 15**

Those who said they were more likely to buy the product if it contained a clinically proven formula (n=121) were asked whether they would pay more for the product.  As noted in Table 9, almost half (49%) of those respondents who said more likely to buy it said they would pay more for it.

<div align="center">

**Table 9**
**Willing to Pay More with**
**"Clinically Proven Formula"**

| Willing to pay more? | |
|---|---|
| Yes | 59 (49%) |
| No | 25 (21%) |
| Don't know/Not sure | 37 (31%) |
| TOTAL | 121 |

</div>

**CONCLUSION**

Four conclusions flow from this study of consumers in the target market for the Elations product that claims to offer joint pain relief.  First, the main message consumers take, among others, from the label is that the Elations product promises joint relief and/or healthy joints and that the product is more absorbable than pills.  Consumers also take a message that the product "works" as claimed.

Second, the third most important reason (combining responses for the first, second, and third important reasons) for purchasing the product (after that it provides joint health in 6 days and that it results in "healthier joints") is that the label says or suggests that Elations has a "clinically proven formula" or that it is a "clinically proven combination."  Importantly, even when the "clinically proven" claim is not expressed on the label, respondents indicate that it is

implied and is the third most important reason for buying the product, apparently because of the express efficacy claims made on the label.

Third, respondents interpret the phrase "clinically proven formula" or "clinically proven combination" to mean that the company has conducted formal tests that prove the express and implied claims that the product "works" as claimed.

Fourth, most respondents (79%) would be more willing to buy the product if it had a "clinically proven formula," with almost half of those respondents (49%) saying they would be willing to pay more for the product if the manufacturer said that it had a "clinically proven formula."

Signed this 23ʳᵈ of April, 2014 at Baltimore, Maryland.

Thomas J. Maronick, DBA, JD

**Exhibit A**                                                                 **Page 17**

# EXHIBIT 1

# CURRICULUM VITAE
## THOMAS JOSEPH MARONICK

**PERSONAL INFORMATION**

| | |
|---|---|
| 5911 Charlesmead Avenue | Towson University |
| Baltimore, Maryland 21212 | Towson, Maryland 21252 |
| (410) 435-8387 | (410) 704-4077 |
| FAX (410) 532-2904 | FAX (410) 704-3772 |
| e-mail maronick@verizon.net | e-mail tmaronick@towson.edu |

**EDUCATION**

Juris Doctor
University of Baltimore School of Law, Baltimore, Maryland
      -Emphasis on Corporate/Business and Consumer Law
      -Admitted to the Bar, State of Maryland

Doctor of Business Administration
University of Kentucky, Lexington, Kentucky
      -Major in Marketing; Minor in Management and Org. Behavior
      -Dissertation:  "A Multivariate Analysis of Organizational Climate
              in the Channel of Distribution"

Master of Science in Business Administration
University of Denver, Denver, Colorado
      -Major in Marketing

Bachelor of Arts
St. Thomas Seminary, Kenmore/Seattle, Washington
      -Major in Philosophy

**ACADEMIC APPOINTMENTS**

Professor of Marketing
Towson University College of Business and Economics, Towson, MD, 1987-- Present
      -Responsible for teaching courses in Marketing Management,
       Marketing Strategy, Marketing Research, Marketing Seminar, Ethics/Public Policy

Associate Professor of Marketing
University of Baltimore School of Business, Baltimore, MD
      -Responsible for teaching undergraduate and graduate courses
       in Marketing, Marketing Management, Marketing Research,
       Consumer Behavior, Business Policy & Strategy, Small Business Strategy

Instructor of Business Administration
Virginia Commonwealth University, Richmond, VA
      -Responsible for teaching undergraduate and graduate course in Management

**NON-ACADEMIC EMPLOYMENT**

Director--Office of Impact Evaluation, Federal Trade Commission 1980 -- 1997
Bureau of Consumer Protection, 1980 -- 87 [Full-time]; 1987 -- 97 [Part-time]
      -Served as the FTC=s in-house expert on marketing and survey matters.
      -Responsible for design and implementation of over 300 marketing and consumer surveys
         undertaken by Commission as part of policy-making and litigation activities.
      -Provided expert advice/testimony to staff on marketing & consumer behavior issues

<u>Marketing Consultant</u>, 1997 -- present
-Provide expert advice/guidance on marketing strategy and consumer research issues as part of litigation support teams for plaintiff and defendant clients
-Serve as testifying expert witness (deposition, hearing, trial) in consumer-related litigation, class-action certification, deceptive advertising, Lanham Act issues cases, consumer survey research
-Have undertaken over 60 survey research projects for clients in litigation-related matters, including advertising and trademark/trade-dress issues

## FIELDS OF SPECIAL INTEREST

| | |
|---|---|
| Marketing Mgt./Strategic Planning | Consumer Protection/Public Policy |
| Marketing/Advertising Research | Executive Development |
| Expert Witness/Lanham Act Matters | Class Action Litigation |

## EXPERT WITNESS/LITIGATION SUPPORT

<u>**AREAS**</u>:   Class Action Litigation
Marketing/Marketing Practices
Advertising/Deceptive Advertising
Trademark/Trade Dress/Consumer Confusion
Consumer Behavior
Survey Research/Advertising Research/Copy Testing

<u>**MATTERS**</u>:   Advertising:   Made-in-USA
Automobile claims
Retailing:   Pricing
Advertising
Warranties
Telecommunications:
Advertising/Deception
Marketing/Promotional Materials
Target Markets
Software/Internet:
Internet ISP Software Claims
Internet Domain Name Issues
Package Goods:
Deceptive Claims in Advertising
Deceptive Labeling
Direct Marketing:
Advertising/Promotion
Target Markets
Trademark/Trade Dress:
Consumer Confusion
Consumer Surveys:
Design/Implementation
Analysis/Critique

<u>**WEBSITE**</u>:  **adexpert.net**

**Exhibit A**                                **Page 20**

**PAPERS AND PUBLICATIONS**
(previous 10 years)

"A Review of Direct-to-Consumer (DTC) Advertising and Sales of Prescription Drugs:  Does DTC Advertising Increase Sales and Market Share?@ (with Riva Kahn) Journal of Pharmaceutical Marketing & Management, Vol. 13 (4) (Nov.) 2001.

"Extended Warranties:  Consumer Misperceptions of Retailer Claims" Proceedings, European Institute of Retailing and Services Studies, Prague, Czech Republic (July, 2004)

"Celebrity v. Company President as Endorsers of High Risk Products for Elderly Consumers@ Journal of Promotion Management Vol. 11, (4), (Nov.) 2005.

"Impact of a Festival Market on Downtown Shopping Behavior" Proceedings, AMS/Korean AMS CPM Conference, Seoul, Korea (July, 2006)

"Consumer Perceptions of Extended Warranties" Journal of Retail and Consumer Services, Vol. 14 (2) (May) 2007.

"Specialty Retail Center's Impact on Downtown Shopping, Dining, and Entertainment:  A Longitudinal Analysis" International Journal of Retail and Distribution Management, Vol. 35 (7) (November) 2007.

 "The Role of the Internet in Survey Research:  Guidelines for Researchers and Experts" Proceedings, Global Business and Technology Association Conference, Madrid, Spain (July, 2008).

"Country of Origin – Does It Matter Anymore?"  Proceedings, Academy of Marketing Science 2009 World Marketing Congress, Oslo, Norway (July, 2009)

"The Role of the Internet in Survey Research:  Guidelines for Researchers and Experts" Journal of Global Business and Technology, Vol. 5 (1), Spring, 2009.

"Pitting the Mall and the Internet in Advertising-Research Competition" Journal of Advertising Research. Vol. 51 (1) (March), 2011.

"Do Consumers Read Terms of Service Agreements When Installing Software – An Empirical Analysis" Proceedings. Athens Institute for Educational Research, Athens, Greece (July, 2011)

"Do Consumers Read Terms of Service Agreements When Installing Software – An Empirical Analysis" (under Review) Journal of Marketing & Public Policy

# EXHIBIT 2

**TESTIMONY SUMMARY – 2008-2014**
**Trial or Deposition**
**Thomas J. Maronick, DBA, JD**

1.     **Hadis Nafar, et al v. Hollywood Tanning Systems, Inc.** \*\*
       U.S. District Court – District of New Jersey
       January, 2008 (deposition)
       -- For Defendant

2.     **Brink's Home Security, Inc. v. Apx Alarm Solutions**
       U.S. District Court – Southern District of Texas
       January, 2008 (deposition)
       -- For Defendant

3.     **David Craig, et al. v. Maurice Tunstall, et al** \*\*
       Circuit Court of Mobile County Alabama
       August, 2008 (deposition)
       --For Plaintiff

4.     **Primepoint LLC v. Primepay, Inc**.
       U.S. District Court – District of New Jersey
       December, 2008 (deposition)
       February, 2009 (trial)
       --For Defendant

5.     **In re Expedia Hotel Taxes and Fees Litigation** \*\*
       Superior Court of Washington (King County)
       April, 2009 (deposition)
       --For Plaintiff

6.     **Farberware Licensing Company LLC v. Meyer Marketing Co. LTD** \*\*
       U.S. District Court – Southern District of New York
       May, 2009 (deposition)
       August, 2009 (trial)
       --For Plaintiff

7.     **Pennington Seed v. Scotts Miracle Grow, Inc.** \*\*
       U.S. District Court – Southern District of Georgia
       May, 2009 (hearing)
       -- For Plaintiff

8.     **Alcel, Inc v. Performance Review Institute, Inc**.
       U.S. District Court – Eastern District of Virginia
       October, 2009 (deposition)
       --For Plaintiff

9. **State of Iowa v. Adaptive Marketing, LLC** **
  District Court for Polk County Iowa
  October, 2009 (deposition)
  November, 2009 (trial)
  --For Defendants

10. **Waterbury Hospital, et al v. U.S. Foodservice, Inc**
  U.S. District Court – District of Connecticut
  January, 2010 (deposition)
  -- For Plaintiff

11. **Christopher Kremmell v. North American Company for Life and Health Insurance**
  U.S. District Court – Central District of California
  April, 2010 (deposition)
  --For Plaintiff

12. **POM Wonderful LLC v. Organic Juice, Inc** **
  U.S. District Court – Southern District of New York
  May, 2010 (deposition)
  --For Defendants

13. **Ryan Goldstein v. The Home Depot USA, Inc**. **
  U.S. District Court – Northern Georgia
  May, 2010 (deposition)
  --For Plaintiffs

14. **FPX, LLC v. Google, Inc, et al**. **
  U.S. District Court – Eastern Texas
  June, 2010 (deposition)
  --For Plaintiffs

15. **Express, LLC v. Forever 21, Inc**. **
  U.S. District Court – Central District of California
  June, 2010 (deposition)
  --For Defendants

16. **In re Aqua Dots Products Liability Litigation** **
  U.S District Court – Northern District of Illinois
  September, 2010 (deposition)
  --For Defendants

**Exhibit A**          **Page 24**

17.   **Kristin Wells, et. al., v. Abbott Laboratories, Inc**. **
Superior Court of the State of California for Los Angeles
October, 2010 (deposition)
-For Plaintiffs

18.   **Federal Trade Commission v. Washington Data Resources**
Federal Trade Commission, Washington, DC
November, 2010 (deposition)
-For Defendants

19.   **Nupil S. Amin, et. al., v. General Mills, Inc and Yoplait USA, Inc**.
U.S. District Court –District of New Jersey
December, 2010 (deposition)
-For Plaintiffs

20.   **Robert Bernardo, et. al. v. Morrison Homes, Inc. and Vista Lakes**
Circuit Court – Orange County, FL
February, 2011 (Deposition)
-For Plaintiffs

21.   **In Re:  Front Loading Washing Machines**
U.S. District Court – District of New Jersey
March, 2011 (Deposition)
--For Defendants

22.   **Salon Fad, et al v. L'Oreal USA, Inc., et al** **
U.S. District Court – Southern District of New York
July, 2011 (Deposition)
-For Plaintiffs

23.   **Aviva Sports, Inc. v. Fingerhut Direct Marketing, Inc. et al**
U.S. District Court – District of Minnesota
July, 2011 (Deposition)
-For Plaintiffs

24.   **New Look Party Limited v. Louise Paris LTD and Sears Brands LLC**
U.S. District Court – Southern District of New York
November, 2011 (Deposition)
-For Plaintiffs

25.   **Federal Trade Commission v. Financial Freedom, Inc**
U.S. District Court – Eastern District of Texas
November, 2011 (Trial)
-For Defendants

26. **Wag 'N Enterprises LLC v. United Animal Nations d/b/a RedRover**
U.S. District Court – Eastern District of Virginia
February, 2012 (Deposition)
--For Defendants

27. **Jeremiah Johnson of Behalf of Himself and All Others Similarly Situated v. General Mills, Inc.**
U.S. District Court –Central District of California
February, 2012 (Deposition)
--For Plaintiffs

28. **American Optometric Association v. American Board of Optometry\*\***
U.S. District Court – Central District of California
April, 2012 (Deposition)
August, 2012 (Trial)
--For Plaintiffs

29. **Pennington Seed v. Scotts Miracle Grow, Inc. \*\***
U.S. District Court – Richmond, VA
May, 2012 (Hearing)
June, 2013 (Deposition)
August, 2013 (Trial)
--For Plaintiffs

30. **In Re: POM Wonderful LLC Marketing and Sales Practices Litigation**
U.S. District Court – Central District of California
May, 2012 (Deposition)
--For Plaintiffs

31. **Von Kaenel v. Skinny Girl Cocktails, LLC \*\***
U.S. District Court – Central District of California
June, 2102 (Deposition)
--For Plaintiffs

32. **Forest River, Inc. v. Hartland Recreational Vehicles, LLC\*\***
U.S. District Court – Northern District of Indiana
July, 2012 (Deposition)
--For Plaintiffs

33. **Margaret Martinez, et al v. Nash Finch Co, d/b/a/ Avanza Supermarket \*\***
U.S. District Court – Colorado
November, 2012 (Deposition)
--For Plaintiffs

34.  **American National Insurance Co. v. American National Investment
     Advisors\*\***
     U.S. District Court – Eastern District of Illinois
     December, 2012 (Trial)
     --For Defendants

35.  **Lifeguard Licensing, Inc. v. GoGo Sports \*\***
     U.S. District Court – California
     January, 2013 (Deposition)
     --For Defendants

36.  **Anton Glenz, et al v. RCI, LLC**
     U.S. District Court – District of New Jersey
     March, 2013
     --Special Master Appointed by the Court

37.  **Invisible Fence, Inc. v. Fido's Fences, Inc**. \*\*
     U.S. District Court – Eastern District of Tennessee
     June, 2013 (Deposition)
     --For Defendants

38.  **FTC v. Living Essentials (5 Hr. Energy)** \*\*
     Federal Trade Commission, Washington, DC
     July, 2013 (Hearing)
     --For Defendants

39.  **In re:  POM Wonderful LLC Marketing Practices Litigation\*\***
     U.S. District Court – Central District of California
     August, 2013 (deposition)
     --For Plaintiffs

40.  **Bruce and Stubbs, et al v. Teleflora LLC \*\***
     U.S. District Court – Central District of California
     October, 2013 (Deposition)
     --For Plaintiffs

41.  **Jeffrey Sachs, et al v. Toyota Motor Corporation\*\***
     Superior Court of California (Los Angeles)
     December, 2013 (Deposition)
     --For Plaintiffs

42.  **Mary Rivera, et al v. Toyota Motor Corporation \*\***
     U.S. District Court – Eastern District of New York
     January, 2014 (Deposition)
     --For Plaintiffs

**Exhibit A**                                                    **Page 27**

43.    Jake T. Shumbo, et al v. K2 Corporation, et al
               Superior Court – Hartford, CT
               April, 2014 (Deposition)
               --For Plaintiffs

                                        **Surveys

# EXHIBIT 3

*Elations - Part 1*

▼ Intro Screen Block                                                    Block Options ▼

Q1
▼       Thank you for taking a few minutes to answer this short survey.  If you are not sure of
        an answer to a question, please indicate "Don't know/Not sure."  Please do not guess.

‹                                                                          ›

Page Break

Q2
▼      Have you ever experienced joint discomfort or the symptoms of arthritis?

        ○  Yes

        ○  No

        ○  Don't know/Not sure

‹                                                                          ›

If **No** Is **Selected**, Then Skip To **End of Survey**

Page Break

Q3
▼      Have you used an over-the-counter product in the past year to treat joint flexibility problems, joint discomfort, or the
       symptoms of arthritis?

        ○  Yes

        ○  No

        ○  Can't recall

‹                                                                          ›

If **Yes** Is **Selected**, Then Skip To **Below is the front and back label fro...**

Page Break

Q4
▼      In the past year have you considered using an over-the-counter product to treat joint flexibility problems, joint discomfort, or
       the symptoms of arthritis?

        ○  Yes

        ○  No

        ○  Can't recall

‹                                                                          ›

If **No** Is **Selected**, Then Skip To **End of Survey**

Page Break

**Exhibit A**

**Page 30**

Q5

Below is the front and back label from a package of a dietary supplement product for joint health.  Please look at the package as you might if you saw it on a store shelf when you were looking for a product for joint comfort. Take as much time as you need to read about the product.

‹                                                                                    ›

Page Break

▾ Block 1 Label 1                                                    Block Options ▾

Q6



‹                                                                                    ›

Q7



Q8

What, if anything, does the package say or suggest about the product? [PLEASE SPECIFY]

Page Break

Q9

Anything else? [PLEASE SPECIFY]

Page Break

**Q10**

Based on your review of what is said or suggested on the labels, which of the following, if any, is the <u>most important reason</u> for buying this product?

○ Healthier joints

○ Great taste

○ Glucosamine

○ Clinically proven formula

○ Joint comfort in 6 days

○ Brand

○ Shellfish free

○ Other (specify)

⟨                                                            ⟩

Page Break

**Q11**

Based on your review of what is said or suggested on the labels, after ${q://QID11/ChoiceGroup/SelectedChoices} which of the following, if any, is the <u>second most important reason</u> for buying this product?

○ Healthier joints

○ Great taste

○ Glucosamine

○ Clinically proven formula

○ Joint comfort in 6 days

○ Brand

○ Shellfish free

○ Other (specify)

⟨                                                            ⟩

Page Break

**Q12**

Based on your review of what is said or suggested on the labels, after ${q://QID13/ChoiceGroup/SelectedChoices}, which of the following, if any, is the <u>third most important reason</u> for buying this product?

○ Healthier joints

○ Great taste

○ Glucosamine

○ Clinically proven formula

○ Joint comfort in 6 days

○ Brand

○ Shellfish free

○ Other (specify)

⟨                                                            ⟩

Page Break

Q13

Here is the label again.  Note the phrase "Clinically Proven Formula."

Q14



Q15

Based on your review of the label, what does the phrase "Clinically Proven Formula" mean? [PLEASE SPECIFY]

Page Break

Block 2-Label 2

Block Options

Q16

Q17



Q18

What, if anything, does the package say or suggest about the product? [PLEASE SPECIFY]

< >

Page Break

Q19

Anything else? [PLEASE SPECIFY]

< >

Page Break

Q20

Based on your review of what is said or suggested on the labels, which of the following, if any, is the most important reason for buying this product?

○ Healthier joints

○ Great taste

○ Glucosamine

○ Clinically proven combination

○ Joint comfort in 6 days

○ Brand

○ Shellfish free

○ Other (specify)

< >

Page Break

Q21

Based on your review of what is said or suggested on the labels, after ${q://QID43/ChoiceGroup/SelectedChoices}, which of the following, if any, is the second most important reason for buying this product?

○ Healthier joints

○ Great taste

○ Glucosamine

○ Clinically proven combination

○ Joint comfort in 6 days

○ Brand

○ Shellfish free

○ Other (specify)

< >

Page Break

**Q22**

Based on your review of what is said or suggested on the labels, after ${q://QID44/ChoiceGroup/SelectedChoices}, which o
the following, if any, is the _third most important reason_ buying this product?

○ Healthier joints

○ Great taste

○ Glucosamine

○ Clinically proven combination

○ Joint comfort in 6 days

○ Brand

○ Shellfish free

○ Other (specify)

    `_____`

⟨                ⟩

          Page Break

**Q23**

**Here is the label again.  Note the phrase "Clinically-Proven Combination" in the purple
box.**

⟨                ⟩

**Q24**



**Q25**

Based on your review of the label, what does the phrase "Clinically Proven Combination" mean? [PLEASE SPECIFY]

`_____`

⟨                ⟩

Page Break

Block -3 Label 3

Block Options ▼

Q26



Q27



Q28

What, if anything, does the package say or suggest about the product? [PLEASE SPECIFY]

Page Break

Q29

Anything else? [PLEASE SPECIFY]

Page Break

**Q30**

Based on your review of what is said or suggested on the labels, which of the following, if any, is the most important reason for buying this product?

○ Healthier joints

○ Great taste

○ Glucosamine

○ Clinically proven formula

○ More absorbable than pills

○ Brand

○ Shellfish free

○ Other (specify)

Page Break

**Q31**

Based on your review of what is said or suggested on the labels, after ${q://QID19/ChoiceGroup/SelectedChoices}, which of the following, if any, is the second most important reason for buying this product?

○ Healthier joints

○ Great taste

○ Glucosamine

○ Clinically proven formula

○ More absorbable than pills

○ Brand

○ Shellfish free

○ Other (specify)

Page Break

**Q32**

Based on your review of what is said or suggested on the labels, after ${q://QID20/ChoiceGroup/SelectedChoices}, which of the following, if any, is the third most important reason for buying this product?

○ Healthier joints

○ Great taste

○ Glucosamine

○ Clinically proven formula

○ More absorbable than pills

○ Brand

○ Shellfish free

○ Other (specify)

Page Break

**Exhibit A**

**Page 40**

**Q33**

If the manufacturer of this product said it was a "clinically proven formula," would you be...

○ Much more likely to buy the product

○ More likely to buy the product

○ It wouldn't make a difference in my likelihood of buying the product

○ Less likely to buy the product

○ Much less likely to buy the product

○ Don't know/Not sure

⟨                                                                          ⟩

Page Break

**Q34**

**Display This Question:**
    **If**  If the manufacturer of this product said it was a "clinically proven formula," would you be...  **Much more**
**likely to buy the product**  **Is**  **Selected**

    **Or**  If the manufacturer of this product said it was a "clinically proven formula," would you be...  **More likely to**
**buy the product**  **Is**  **Selected**

Would you be willing to pay more for the product if it was a "clinically proven formula"?

○ Yes

○ No

○ Don't know/Not sure

⟨                                                                          ⟩

Page Break

▼ Demogrpahics                                                    Block Options ▼

**Q35**

Gender

○ Male

○ Female

⟨                                                                          ⟩

Page Break

**Q36**

Age?

○ Under 21

○ 21 - 30

○ 31 - 40

○ 41 - 50

○ 51 - 60

○ Over 60

⟨                                                                          ⟩

Page Break

Case 5:13-cv-00242-JGB-SP   Document 193   Filed 10/20/14   Page 44 of 132   Page ID #:6622

**Q37**

Education?

- ○ High School or less
- ○ Some college/technical school
- ○ 2-Yr college degree
- ○ 4-Yr college degree
- ○ Graduate school/degree

‹                                                                    ›

# EXHIBIT 4

*Elations-IX (Part 2)*

▼ Intro Screen Block                                                                    Block Options ▼

**Q1**    **Thank you for taking a few minutes to answer this short survey.  If you are not sure of**
   ▼      **an answer to a question, please indicate "Don't know/Not sure."  Please do not guess.**

‹                                                                                         ›

Page Break

**Q2**    Have you ever experienced joint discomfort or the symptoms of arthritis?
   ▼
          ○ Yes
          ○ No
          ○ Don't know/Not sure

‹                                                                                         ›

If No Is Selected, Then Skip To End of Survey

Page Break

**Q3**    Have you used an over-the-counter product in the past year to treat joint flexibility problems, joint discomfort, or the
   ▼      symptoms of arthritis?

          ○ Yes
          ○ No
          ○ Can't recall

‹                                                                                         ›

If Yes Is Selected, Then Skip To Below is the front and back label fro...

Page Break

**Q4**    In the past year have you considered using an over-the-counter product to treat joint flexibility problems, joint discomfort, or
   ▼      the symptoms of arthritis?

          ○ Yes
          ○ No
          ○ Can't recall

‹                                                                                         ›

If No Is Selected, Then Skip To End of Survey

Page Break

Q5

Below is the front and back label from a package of a dietary supplement product for joint health.  Please look at the package as you might if you saw it on a store shelf when you were looking for a product for joint comfort. Take as much time as you need to read about the product.

‹                                                                    ›

Page Break

Block 1 Label 1                                                    Block Options ▾

Q6



Q7



Q8

What, if anything, does the package say or suggest about the product? [PLEASE SPECIFY]

Page Break

Q9

Anything else? [PLEASE SPECIFY]

Page Break

**Q10**

Based on your review of what is said or suggested on the labels, which of the following, if any, is the most important reason for buying this product?

- ○ Healthier joints
- ○ Great taste
- ○ Glucosamine
- ○ Clinically proven formula
- ○ Joint comfort in 6 days
- ○ Brand
- ○ Shellfish free
- ○ Other (specify)

<                               >

Page Break

**Q11**

Based on your review of what is said or suggested on the labels, after ${q://QID11/ChoiceGroup/SelectedChoices} which of the following, if any, is the second most important reason for buying this product?

- ○ Healthier joints
- ○ Great taste
- ○ Glucosamine
- ○ Clinically proven formula
- ○ Joint comfort in 6 days
- ○ Brand
- ○ Shellfish free
- ○ Other (specify)

<                               >

Page Break

**Q12**

Based on your review of what is said or suggested on the labels, after ${q://QID13/ChoiceGroup/SelectedChoices}, which of the following, if any, is the third most important reason for buying this product?

- ○ Healthier joints
- ○ Great taste
- ○ Glucosamine
- ○ Clinically proven formula
- ○ Joint comfort in 6 days
- ○ Brand
- ○ Shellfish free
- ○ Other (specify)

<                               >

Page Break

**Q13**

Here is the label again.  Note the phrase "Clinically Proven Formula."

**Q14**



**Q15**

Based on your review of the label, what does the phrase "Clinically Proven Formula" say or suggest about the product? [PLEASE SPECIFY]

Page Break

**Q16**

Based on what is said or suggested on the label, which of the following, if any, is meant by "clinically proven."

○  The manufacturer tested the product and proved it works as claimed

○  An independent organization tested the product and proved it works as claimed

○  The manufacturer tested the product for safety but not necessarily to determine that it works as claimed

○  The FDA has tested the product for safety but not necessarily to determine that it works as claimed

○  Neither the manufacturer nor any other organization did any tests on the product to determine whether it was safe or works as claimed

○  The manufacturer tested the product but the results showed it didn't work as claimed

○  Other (specify)

Page Break



Exhibit A
Page 49

# EXHIBIT 5

## List of Documents Considered

Plaintiff's Motion for Class Certification (redacted) in *McCrary v. The Elations Company*

Defendant's Opposition to Motion for Class Certification (redacted) in *McCrary v. The Elations Company*

Plaintiff's Reply to Motion for Class Certification (redacted) in *McCrary v. The Elations Company*

Order Granting Motion for Class Certification and Motion for Leave to File Fourth Amended Complaint in *McCrary v. The Elations Company*

Order Denying Motion to Dismiss Fourth Amended Complaint in in *McCrary v. The Elations Company*

Documents Bates-stamped as EC00006817-EC00006823, produced in *McCrary v. The Elations Company*

Protective Order in *McCrary v. The Elations Company*

"Survey Evidence in False Advertising Cases" in Shari Diamond and Jerre Swann <u>Trademark and Deceptive Advertising Surveys:  Law, Science, and Design</u>, ABA (2012)

PROOF OF SERVICE

UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA

I am employed in the County of LOS ANGELES, State of CALIFORNIA.  I am over the age of 18 and not a party to within action; my business address is **2800 Donald Douglas Loop North, Santa Monica, CA 90405**.

On May 5, 2014, I served the foregoing documents described as:

**AN EMPIRICAL ANALYSIS OF CONSUMERS' PERCEPTIONS OF "CLINICALLY PROVEN" CLAIM ON ELATIONS DIETARY SUPPLEMENT BY THOMAS J. MARONICK, DBA, JD**

On interested parties in this action by sending a true copy of the document to the following parties as follows:

> SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
> Sascha Henry,
> Paul Seeley
> 333 South Hope Street, 43rd Floor
> Los Angeles, California 90071-1422
> Telephone: 213.620.1780
> Facsimile: 213.620.1398
> shenry@sheppardmullin.com
> pseeley@sheppardmullin.com
>
> *Attorneys for*
> *The Elations Company, LLC*

------ (BY ELECTRONIC MAIL) I caused the document(s) to be successfully transmitted via electronic mail to the offices of the addressees.

------ (BY ELECTRONIC SERVICE) I caused the document(s) to be sent to the offices of the addressees via Online Filing Service.

------ (BY FACSIMILE) I transmitted pursuant Rule 2.306, the above-described document by facsimile machine (which complied with Rule 2003(3)), to the attached listed fax number(s). The transmission originated from facsimile phone number (310) 396-9635 and was reported as complete and without error.

------ (BY OVER NIGHT DELIVERY) I caused such envelope(s) thereon fully prepaid to be placed in the Norco Overnite box at Santa Monica, California.

------ (BY PERSONAL SERVICE) I caused such envelope(s) to be hand delivered to the offices of the addressees.

1

**Exhibit A**                                           **Page 52**

1
2   xxxx   (BY US MAIL) I caused such envelope(s) with postage thereon fully prepaid, with return
       receipt requested, to be placed in the United States mail at Santa Monica, California, pursuant
3      to California Code of Civil Procedure § 415.40. I am readily familiar with this business'
       practice for collecting and processing correspondence for mailing.  On the same day that
4      correspondence is placed for collection and mailing, it is deposited in the ordinary course of
       business with the United States Postal Service.

5
   Executed on May 5, 2014, at Santa Monica, California
6
   ------   (STATE) I declare under penalty of perjury under the laws of the State of California that the
7      above is true and correct.

8   xxxx   (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at
   whose direction the service was made.
9

10
                                        David Marin
11                                      David Marin

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                         2

# Exhibit B

1   .

2

3

4

5

6

7

8                   UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11   ROBERT MCCRARY, individually              Case No.: ED CV 13-00242 JGB (OPx)
     and on behalf of all others similarly
12   situated,                                  **CLASS ACTION**

13                      Plaintiffs,             **EXPERT REBUTTAL REPORT FROM
                                                DR. BRUCE ISAACSON IN RESPONSE**
14            vs.                               **TO THE REPORT OF DR. THOMAS J.
                                                MARONICK**
15   THE ELATIONS COMPANY, LLC; a
     Delaware limited liability company; and
16   DOES 1 through 100 inclusive,

17                      Defendants.

18

19

20

21

22

23

24

25

26

27

28

1.      I have been retained by attorneys representing the defendant in the above litigation.  This report sets forth my opinions, developed in response to the report of Dr. Thomas J. Maronick in this matter.[1]  In light of the ongoing discovery in this matter, I reserve the right to supplement this report.

## SUMMARY OF MY OPINIONS

2.      Based on my review of Dr. Maronick's report, my review of other materials, and analysis I have conducted, I believe that the survey provided by Dr. Maronick fails to meet generally-accepted standards for survey research, such as those specified in sources such as the "Reference Guide on Survey Research."[2]  For example, the Maronick survey lacks a control, qualifies respondents along criteria that do not match the class definition, uses images of labels that do not correspond to labels used on Elations in the marketplace, has vague and leading survey questions, offers respondents response options that are often leading or incomplete, and mixes formats between a "reading test" and a "memory test."

3.      Due to these and other problems, nearly one-third (32.1%) of respondents to the Maronick survey should be removed from the survey database.

4.      As I describe in this report, these issues are fundamental to survey design, execution, and analysis.  Dr. Maronick's survey does not provide reliable or valid measures, and conclusions from that survey cannot be considered reliable or valid.

## OVERVIEW OF THE MARONICK SURVEY

5.      Dr. Maronick states on page 3 of his Expert Report that he was retained to "… design and implement an on-line survey of individuals who have purchased or considered purchasing an over-the-counter remedy for joint discomfort or the symptoms of arthritis."

6.      Potential respondents to the Maronick survey were qualified in Question 2 as having "…

---

[1] Dr. Maronick's report is signed April 23, 2014.

[2] Shari Seidman Diamond, "Reference Guide on Survey Research" from *Reference Manual on Scientific Evidence*, 3rd Edition, Federal Judicial Center, National Research Council, 2011.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

ever experienced joint discomfort or the symptoms of arthritis," and in Questions 3 and 4 as having used or considered using in the past year an over-the-counter product "… to treat joint flexibility, joint discomfort, or the symptoms of arthritis."

7.      After qualification, respondents were randomly assigned to either Block 1, Block 2, or Block 3.  Each block provided the substantive questions in the survey.  The images shown to respondents, and some of the survey questions, varied by block.  In the last section of the survey, respondents were asked questions relating to gender, age, and education.

8.      The Maronick survey has two Parts.  The Part 1 survey includes Block 1, Block 2, and Block 3, while the Part 2 survey consists of the Block 1 stimulus and questions, with one additional question asked of respondents.

9.      On pages 3 and 4 of his report, Dr. Maronick provides four major conclusions based on the survey and related analysis:

    i.    <u>Main message</u>:  Dr. Maronick concludes that the main message of the Elations label "… is that the Elations product promises joint relief and/or healthy joints and that the product is more absorbable than pills."

    ii.    <u>Reasons for purchase</u>:  Dr. Maronick concludes that the third most important reason for purchasing Elations "… is that the label says or suggests that Elations has a 'clinically proven formula' or that it is a 'clinically proven combination.'"  Dr. Maronick also concludes that even when the "clinically proven" claim is not on the label, it is still "… the third most important reason for buying the product, apparently because of the express efficacy claims made on the label."

    iii.    <u>Meaning of "clinically proven"</u>:  Dr. Maronick concludes that, "… respondents interpret the phrase 'clinically proven formula' or 'clinically proven combination' to mean that the company has conducted formal tests that prove the express and implied claims that the product 'works' as claimed."

    iv.    <u>Willingness to purchase</u>:  Dr. Maronick concludes that 79% of respondents would be more willing to buy the product if it had a "clinically proven formula," and 49% of those respondents would be willing to pay more.

- 2 -

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

10.     These conclusions lack sufficient basis because Dr. Maronick's survey fails to meet certain standards and guidelines that apply broadly to the types of surveys submitted in legal matters.  Specific flaws in the Maronick report include the following:

    i.     Dr. Maronick's survey does not include a control, so it cannot isolate attitudes associated with Elations labels, as underlying attitudes toward Elations or joint supplements may affect survey measures.  Data from the Maronick survey analyzed in this report show that a control would greatly change Dr. Maronick's reported results.

    ii.     The qualification criteria used in the Maronick survey do not match the class definition.  For example, the survey is not restricted to California consumers, does not qualify on purchase, and likely includes consumers who used or considered products unrelated to this matter.

    iii.     The survey database has other flaws with qualification, including respondents who answered "don't know" to qualification questions, and respondents with IP addresses identical to prospective respondents who did not qualify for the survey.

    iv.     The images used in the Maronick survey are not sufficiently legible, and were altered so they do not correspond to actual labels used on Elations.

    v.     The Maronick survey has questions that use vague terms, lack "don't know" options, are leading, and have leading or incomplete response options.

    vi.     Survey images were displayed improperly in the survey, mixing the "memory test" and "reading test" formats, and failing to exclude small devices.

    vii.     Survey data not analyzed in the Maronick report contradicts his findings.

11.     This report includes a list of respondents who should be removed from the survey database because they answered "don't know" to key qualification questions, did not pass key qualification questions, finished the survey either suspiciously quickly or abnormally slowly, had an "IP address" duplicated with a prospective respondent, or provided verbatim responses that indicated an obvious lack of attention or lack of understanding.  Of the 554 respondents in the survey database, 32.1% (178) should be removed due to at least one of these problems.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

12.     After reviewing my qualifications and certain background information, I will discuss my opinions of the Maronick survey in more detail.

**MY QUALIFICATIONS**

13.     I am the owner and President of MMR Strategy Group ("MMR"), a marketing research and consulting firm, and am an expert in research, surveys, and marketing.

14.     For approximately 35 years,[3] MMR has provided marketing research and consulting, consisting primarily of the design, execution, and analysis of thousands of surveys, as well as expertise related to marketing and strategy.  Our experience includes many surveys used in intellectual property litigation and false advertising matters.  Our clients have included well-known organizations, such as Farmers Insurance Group, Goodyear Tire & Rubber Company, Cigna Health Insurance, several regions of the American Automobile Association, Nestlé USA, Inc., Smart & Final Stores, RE/MAX, and Kaplan Test Prep.

15.     In addition, over our history, my firm has served Alberto-Culver, The Hollywood Bowl, Denny's, and many other organizations, and completed thousands of studies.

16.     I received a Bachelor of Science degree in engineering from the Technological Institute at Northwestern University in 1985, and Master of Business Administration and Doctor of Business Administration degrees from the Harvard Graduate School of Business Administration in 1991 and 1996.  At Harvard, I received my MBA with highest distinction as a Baker Scholar and was a Dean's Doctoral Fellow, writing 14 publications on marketing and strategy, including best-selling teaching materials.

17.     I have taught marketing and strategy for executive groups and executive MBA programs, and, for my research, I have won awards from institutions including The Institute for the Study of Business Markets at Penn State University and Harvard University.

18.     In terms of professional experience, I have been a marketing and strategy consultant at The Boston Consulting Group, Senior Vice President at a publicly traded data processing

---

[3] Until approximately November, 2009, the firm was known as Marylander Marketing Research.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

**Exhibit B**                                                    **Page 58**

company that is now a division of Intuit, Division President at a media services company, and Vice President responsible for marketing and strategy at a national financial services company.  I also served as the West Coast Practice Leader at a division of an international strategy consulting firm, where my responsibilities included developing curriculum and serving as lead faculty for executive education programs in marketing and strategy.

19.     I am a member of the American Marketing Association and the Marketing Research Association. My firm is a member of the Council of American Survey Research Organizations and the International Trademark Association.  I am on the editorial board of the *Journal of Business-to-Business Marketing*, and am a member of *The Trademark Reporter* Committee of the International Trademark Association.  I regularly consult with clients regarding marketing, research, and strategy, and also address conferences and groups on the same issues.  My public speaking includes addressing law firms and bar associations on the use of research and surveys in litigation and related areas.

20.     For example, in 2013 I was an invited speaker and/or discussion leader at a multi-day course on surveys and marketing/advertising claims, at the annual conference of the International Trademark Association, at a Continuing Legal Education seminar sponsored by the Los Angeles County Bar Association, and at the Corporate Researchers Conference hosted by the Marketing Research Association.

21.     I have authored or co-authored articles for publications such as the *Intellectual Property Law Newsletter* of the American Bar Association, Intellectual Property Law Section; *Intellectual Property, Intellectual Property Magazine*, *Quirk's Marketing Research Review*, and others.

22.     Over my career, I have personally designed, overseen, and analyzed hundreds of research studies.  I have also provided expertise in marketing, strategy, surveys, and consumer behavior to clients in a variety of industries.  A copy of my curriculum vitae and litigation expert witness experience is attached as Exhibit 1.

- 5 -

**MATERIALS REVIEWED AND COMPENSATION**

23.     For purposes of this rebuttal report, I have gathered and/or reviewed (but not necessarily relied upon) a wide variety of materials, including the following:

  i.    The report of Dr. Thomas J. Maronick, titled "An Empirical Analysis of Consumers' Perceptions of 'Clinically Proven' Claim on Elations Dietary Supplement," signed April 23, 2014.

  ii.   Other materials provided by Dr. Maronick in response to document production requests, including electronic files of the survey data and other items (Bates numbers TM00001 to 54).

  iii.  The transcript of Dr. Maronick's deposition, taken May 29, 2014.

  iv.   The Fourth Amended Complaint in this matter.

  v.    Orders from the United States District Court, Central District of California, dated January 13, 2014, and June 4, 2014.

  vi.   Pictures of Elations labels, Bates numbers EC00011297 to 11306 as well as EC0006817 to 6823.

  vii.  Elations commercials, Bates numbers EC00011307 to 11309.

  viii. Marketing research reports, Bates numbers EC00010118 to 10146.

  ix.   The Elations website, at www.Elations.com, as well as packages of Elations.

  x.    Customer comments, Bates numbers EC0000496 to 6810.

24.     In addition, I consulted published literature and cases relevant to the issues and theories in this matter, the most relevant of which are cited in this report.  I also rely on my knowledge in fields such as surveys, consumer behavior, and marketing.

25.     For activities related to this report, my firm charged $21,500.  After this report, my time is billed at $675 per hour, with a daily rate for testimony at trial or deposition.

26.     The next section describes my objections to Dr. Maronick's survey and opinions in more detail.

- 6 -

**DETAILED BASIS FOR OBJECTIONS TO THE MARONICK SURVEY**

27.     My objections to Dr. Maronick's survey, as well as to opinions expressed in his report, are as follows:

**A. The Maronick survey does not include a control, so it cannot isolate attitudes associated with Elations labels.**

28.     In his report, Dr. Maronick provides a series of statements about messages allegedly associated with Elations labels.  For example, on pages 3 and 4 of his report, he describes the main messages consumers take from the label, reasons for purchasing Elations, or the meaning of phrases such as "clinically proven formula" or "clinically proven combination."

29.     The Maronick survey seeks to measure the attitudes, beliefs, or messages associated with Elations labels.  When conducting such measurements, it is important to filter out pre-existing attitudes toward topics such as Elations, joint supplement beverages, beverage companies in general, and the use and meaning of clinical testing.  The relevant attitudes are those conveyed by the Elations labels rather than pre-existing attitudes that would exist even among consumers who have never seen an Elations label.

30.     For example, it is possible that some consumers believe that <u>all</u> joint supplement beverages are clinically tested, regardless of what a label might state or imply.  Other consumers may believe that <u>no</u> such beverages are clinically tested, irrespective of the label.  The appropriate inquiry in this matter is not just whether certain attitudes occur, but whether their frequency is associated with the Elations labels.

31.     A "control" is commonly used in survey research to isolate the effect of a specific item, such as the Elations labels.  With a control, a survey can remove the effect of other background elements so that the element of interest can be measured.  Without a control, it is not possible to know whether the results of the Maronick survey are due to the Elations label, or another cause.  As one author stated, "… the purpose of a control is to enable us to rule out one or more alternative explanations for the observed effect so that the presumed cause remains as the only

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

**Exhibit B**                    **Page 61**

… explanation for the obtained effect."[4]

32.     Without a control, survey measures can be affected by extraneous factors, such as pre-existing attitudes that are unrelated to the Elations label.  As the "Reference Guide on Survey Research" states,

> "Surveys that merely record consumer impressions have a limited ability to answer questions about the origins of those impressions.  The difficulty is that the consumer's response to any question on the survey may be the result of information or misinformation from sources other than the trademark the respondent is being shown or the commercial he or she has just watched."

33.     The "Reference Guide" also states that closed-ended questions, such as those used in the Maronick survey, can be "… seriously problematic… Only when control groups or control questions are added to the survey design can this question format provide reasonable response estimates."[5]

34.     One possible control for the Maronick survey would have been similarly-recruited respondents who are shown labels that do not contain statements relating to "clinically proven." By comparing attitudes among respondents shown labels with or without those statements, a survey can isolate the effect associated with the Elations label.

35.     The lack of a control means that the Maronick survey fails to measure how much of the relevant attitudes are specifically associated with Elations, making the results not valid.  As one source stated, "Just as, in most circumstances, no one would trust the results of a 'lineup' in which witnesses were shown only the suspect, the results of a litigation survey, without any controls, are strongly suspect."[6]

---

[4] Jacob Jacoby, "Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys," *The Trademark Reporter*, July-August 2002, p. 894.

[5] Shari Seidman Diamond, "Reference Guide on Survey Research," from *Reference Manual on Scientific Evidence, 3rd Edition*, Federal Judicial Center, National Research Council, 2011, pages 394, 397, and 398.  The "Reference Guide" also states that asking respondents to base their responses on a label, as was instructed in the Maronick survey, is problematic if respondents are not able to identify the source of their impressions.

[6] "Litigation Surveys—Social 'Science' as Evidence, by Michael Rappeport, *The Trademark Reporter*, Vol. 92, July-August 2002, p. 986.

- 8 -

36.     The Maronick survey, organized into 3 blocks and 2 parts, allowing a comparison that demonstrates what might have occurred with the proper use of a control.   Respondents in Block 1 were shown two images, one of which contained the phrase "Clinically Proven Formula." Block 2 respondents also were shown 2 images, one of which contained the phrase "Clinically Proven Combination."  (In fact, respondents in Block 1 and Block 2 were shown the images containing these phrases twice, and the second time they were specifically directed to note the phrase "Clinically Proven Formula" or "Clinically Proven Combination.")

37.     Respondents in Block 3 were also shown two images but neither included text relating to "Clinically Proven Formula" or "Clinically Proven Combination."  The comparison between Block 3 and either Block 1 and Block 2 shows what might have happened had the Maronick survey included a control.[7]  Typically, a control is designed to be as similar as possible to the test item, but changes only the item under dispute, which in this case is the phrase "Clinically Proven Combination" or "Clinically Proven Formula."

38.     In his deposition, Dr. Maronick stated that he views Block 3 as a control for Block 1 and Block 2, "Well, block three is a control in one sense for both blocks one and two because it does not have either the 'clinically proven formula' language or the 'clinically proven combination' -- is that what -- 'clinically proven combination' language in it."[8]

39.     If Block 3 is intended as a control for Block 1 and Block 2, the results for Block 3 should be subtracted from the results for the other Blocks for identical (or nearly-identical) questions that were asked in all three Blocks.[9]

40.     A similar three-part question series in each Block asked about the importance of different factors in the purchase of Elations.  In Block 3, Question 30 asked, "Based on your review of what is said or suggested on the labels, which of the following, if any, is the most important

---

[7] I am discussing Block 3 as an example, and am not opining that Block 3 provides an appropriate control.  Block 3 differed from Blocks 1 and 2 in other respects, such as the questions asked or the stimuli shown to respondents.

[8] Maronick deposition transcript, page 87.

[9] A control is typically subtracted from the test to identify the measure specifically associated with the item of interest.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

**Exhibit B**                                                                                          **Page 63**

1    reason for buying this product?" Questions 31 and 32 used similar phrasing, but asked about the

2    second and third most important reason.  In Block 1, Questions 10/11/12 used similar phrasing,

3    while Block 2, Questions 20/21/22 were similar.

4    41.      The results are summarized in Table A.  As can be seen, 22.3% of respondents in Block 1

5    selected "Clinically proven formula" as the first, second, or third most important reason to buy

6    Elations, compared with 22.0% in Block 2 and 19.6% in Block 3.  In other words, nearly 20% of

7    Block 3 respondents selected "Clinically proven formula" as an important reason based on the

8    label, even though they were shown a label that does not include this phrase.[10]

### Table A:  Selection of "Clinically Proven Formula" as an Important Factor

|  | Part 1, Block 1 | Part 2, Block 1 | Part 1, Block 2 | Part 1 Block 3 |
|---|---|---|---|---|
| Questions asked[11] | 10, 11, 12 | 10, 11, 12 | 20, 21, 22 | 30, 31, 32 |
| % of respondents selecting "Clinically proven formula" | 22.3% | 22.0% | 19.6% | 19.9% |
| **Net measure, after accounting for the control** | **3.6%** | **2.1%** | **(0.3%)** | |

16   42.      Table A subtracts the 19.9% of Block 3 respondents from the other percentages to create

17   a net percentage.[12]  After this calculation, which removes unrelated or pre-existing attitudes and

18   beliefs, the net percentage is close to zero or below zero for Block 1 from Part 1, Block 1 from

19   Part 2, and Block 2 from Part 1.

20   43.      If Dr. Maronick intended Block 3 as a control for Blocks 1 and 2, the measurements after

21   accounting for that control show no effect associated with the Elations labels tested in Block 1

22   and Block 2.

---

[10] As described later in this report, each question in the 3-question series had 8 response options. If respondents selected their answer completely at random, each response would have a 12.5% (=1/8) chance of selection on each of the 3 questions.

[11] Data for these questions are from Tables 2, 5, and 7 of the Maronick report.

[12] In his deposition, Dr. Maronick agreed that the control data should be used to reduce the test results (see Maronick deposition transcript, pages 82 and 85).  He also stated that although he originally intended the "shellfish free" response as a control item to Questions 10, 11, and 12 in Block 1, this item would not be an appropriate control (deposition transcript, page 84).

- 10 -

**B. The qualification criteria used in the Maronick survey do not match the class definition.**

44.  Page 5 of the Fourth Amended Complaint defines the class in this matter as, "All persons who purchased Elations in California from May 2009 through December 2012, for personal use and not for resale, when the following claims were on the packaging and/or labeling of Elations: 'clinically-proven combination' and/or 'clinically-proven formula.'"  My understanding is that this was amended by the Court on June 4, 2014 to:  "All persons residing in the State of California who purchased Elations, from May 28, 2009 through September 30, 2013, for personal use and not for resale, when the following claims were on the packaging and/or labeling of Elations:  'clinically-proven combination' and/or 'clinically-proven formula.'"

45.  The Maronick survey used three questions to qualify respondents.  Question 2 asked, "Have you ever experienced joint discomfort or the symptoms of arthritis?"  Question 3 asked, "Have you used an over-the-counter product in the past year to treat joint flexibility problems, joint discomfort, or the symptoms of arthritis?"  Question 4 asked, "In the past year have you considered using an over-the-counter product to treat joint flexibility problems, joint discomfort, or the symptoms of arthritis?"  Respondents qualified for the survey if they answered:

- ▪ "Yes" or "Don't know/Not sure" to Question 2, <u>and</u>
  - "Yes" to Question 3, <u>or</u>
  - "No" or "Can't recall" to Question 3 and "Yes" or "Can't recall" to Question 4.

46.  The respondents interviewed in the online survey differ from the defined class in a number of important respects.  First, the class includes only California consumers, but the Maronick survey was conducted nationwide.  The survey does not ask respondents for the state of their residence, so it is not possible to know whether the survey includes a single California respondent, or whether results from California respondents are similar to the nationwide sample.

47.  A second difference is that the class definition focuses on consumers who purchased Elations, but the survey does not use purchase as a qualifying criteria.  In fact, the survey never asks respondents whether they have ever purchased Elations, or any other product. Instead, as described earlier, Question 2 qualifies respondents as having "ever experienced" joint discomfort

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

**Exhibit B**                                                    **Page 65**

or arthritis, while Questions 3 and 4 qualify respondents as, in the past year, having "used" or "considered using" an "over-the-counter product to treat joint flexibility problems, joint discomfort, or the symptoms of arthritis." "Considered using" is a vague phrase that can have any number of meanings, from a momentary thought about a product passed in a store, to detailed deliberation and discussion with medical professionals.

48.     Questions 2, 3, and 4 not only fail to ask about the purchase of Elations, they also fail to qualify prospective respondents as using Elations or even using related items such as joint supplement drinks or beverages that contain supplements such as chondroitin, glucosamine, calcium, or boron. Respondents should answer yes to Questions 3 and 4 if they never consumed Elations, but did consume other products, such as:

  i.     Pain medications, such as Advil, Tylenol, or aspirin.

  ii.    Creams and ointments, such as BENGAY, Capzasin or Arnica Oil.

  iii.   Vitamins or supplements, such as calcium.

  iv.    Heat wraps or cold compresses.

  v.     Stretchable wraps, splints, canes, or other products to take pressure off painful joints.

  vi.    Products for stretching or exercise, such as medicine balls, resistance bands, yoga mats, or other items.

49.     Although all of these products could potentially be purchased by a consumer wishing to treat joint flexibility or discomfort, none of them are appropriate for a survey in a matter where the class is defined as consumers who purchased Elations.

50.     The qualifying questions in the Maronick survey are both over-inclusive and under-inclusive. They are over-inclusive in qualifying prospective respondents who have purchased products unrelated to the class definition, and they are under-inclusive in restricting the survey to respondents experiencing specific conditions that are not part of the proposed class definition. Question 2 asked whether prospective respondents ever experienced "joint discomfort or the symptoms of arthritis." However, a consumer may purchase Elations as a preventative measure,

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

and such a consumer may never experience any discomfort or arthritis.[13] Similarly, Questions 3 and 4 ask whether respondents purchased products for "joint flexibility problems, joint discomfort, or the symptoms of arthritis." Again, consumers may purchase Elations who have never experienced joint problems, joint discomfort, or arthritis.

**C. The survey database has other qualification problems, including respondents who answered "don't know" to qualification questions, lack of specificity as to the source of respondents, and respondents with duplicate IP addresses.**

51.     In addition to using qualification criteria that do not match the class definition, the process of qualifying potential respondents for the Maronick survey exhibited a number of problems.

52.     One problem with the process of qualifying respondents is that respondents were allowed into the survey who answered 'don't know' or 'can't recall' to qualification questions. As described earlier, respondents were accepted into the survey who answered:

    i.     "Don't know/Not sure" to Question 2 ("… ever experienced joint discomfort or the symptoms of arthritis"),

    ii.     "Can't recall" to Question 3 ("… used an over-the-counter product…") and/or

    iii.     "Can't recall" to Question 4 ("considered using an over-the-counter product…").

53.     These qualification criteria mean that the survey database includes respondents who may or may not qualify for the survey.[14] These respondents should not be included in the database.

54.     Another problem with the qualification process is that Dr. Maronick is unable to specify the source for the respondents in the survey. Dr. Maronick writes on page 4 of his report that respondents were "… drawn from an internet panel of individuals who have agreed to participate in internet surveys on a periodic basis." However, his report does not specify the panel used, the company that provided the panel, or the qualities of the panel.

---

[13] In his deposition, Dr. Maronick agreed that it is possible for someone to purchase Elations if they have no symptoms of arthritis or joint discomfort. (See Maronick deposition transcript, page 103).

[14] We also do not know whether survey respondents match Elations consumers or the product category in demographics. Table 1 on page 7 of the Maronick report shows that approximately 62% of the survey respondents are female, and 96% are 41 or older. In his deposition, Dr. Maronick said that he has no data to justify whether those demographic targets are appropriate.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

**Exhibit B**          **Page 67**

55.     At deposition, Dr. Maronick stated that he did not actually select the panel used for his survey, but asked a panel broker called "CMT Marketing" to select the panel.  Dr. Maronick did not even describe for CMT the qualities of the panel that he wanted.[15]  The selection of a panel provider is an important decision, in part because the panel management company's practices can influence the type and quality of survey respondents.  However, to my knowledge, Dr. Maronick has not indicated the source of respondents for his survey, and was not involved in the selection of the panel used for his survey.

56.     A third problem with the qualification process is that it appears that the Maronick survey qualified respondents with duplicate IP addresses.  An IP address is a unique identifier to specify a particular computer.  It is common practice in survey administration to evaluate IP addresses and make sure that the same respondent does not take the same survey twice or attempt to take the survey twice.[16]  However, inspection of the survey database from the Maronick survey shows that IP addresses for 10 respondents who failed the screening criteria are duplicated among respondents in the survey.  It appears that these respondents attempted to take the survey, did not qualify, but somehow ended up in the survey database anyway.

### D. The images used in the Maronick survey are not sufficiently legible and do not correspond to actual Elations labels.

57.     The Maronick survey was conducted online and showed 6 images of Elations labels to respondents, including 2 labels shown in Block 1, 2 labels in Block 2, and 2 labels in Block 3. Had the survey been conducted in person and showed actual Elations packages rather than images of labels, respondents would have seen survey stimuli closer or identical to what they would have encountered at retail.

58.     Given a decision to use images of labels, it is important that the survey provide images that correspond to marketplace conditions.  However, the images used in the Maronick survey are

---

[15] Maronick deposition transcript, pages 8-9.

[16] Dr. Maronick agrees that duplicate IP addresses should not be included in a survey and that it is "normal procedure" to remove duplicates.  See Maronick deposition transcript, page 97-98.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

**Exhibit B**                                                      **Page 68**

not as legible as actual packages, and contain elements that were never present on actual Elations labels.

59.     In Block 1, respondents saw the image below, which shows the front of the Elations label, in Question 6.[17]



60.     On the right of the image, near the bottom, a text box provides an FDA statement that states, "This statement has not been evaluated by the Food and Drug Administration.  This product is not intended to diagnose, treat, cure, or prevent any disease."  The image of the front Elations label shown in Question 6 is not the same quality as if respondents had been shown an actual Elations package.  For most respondents, the FDA label would not be legible in the survey.

61.     In addition the label image above shows a number of dashed and solid lines which run horizontally and vertically through the images.  These lines are likely used to place the label on Elations packaging, and would not be visible on an actual label.

---

[17] Bates number 6821.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

62.     The second image shown to Block 1 respondents, in Question 7 and again in Question 14, displays the back of an Elations label.  That image is shown below:[18]



63.     On an Elations package, this label would appear on the back of the package.  A consumer looking at a retail shelf would see the first image from Block 1, but would not see this second image unless they physically picked up the product and removed it from the shelf to look at all sides of the product.  However, in the Maronick survey, every respondent saw both images even though in the actual marketplace, it is unlikely that every consumer at retail would view the Elations package from all sides.

>>

>>

>>

>>

>>

>>

>>

_____

[18] Bates number 6820.

- 16 -

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

64.     Like respondents in Block 1, Block 2 respondents were also shown two images of Elations

labels. The first image shown in Question 16 displays the front label, and is shown below.[19]



65.     The image above differs from the labels used by Elations in a number of respects.  For

example, the label shown in the image uses different colors for background and for text than the

label used on actual Elations packages.  Also, as with the front label from Block 1, the FDA

statement is not legible on the Block 2 labels and the label shows a number of vertical and

horizontal lines that would not be visible on an actual label.

66.     Block 2 respondents were shown a second label in Question 17 and again in Question 24.

That label is shown below.[20]

>>

>>

>>

_____

[19] Bates number 6823.

[20] This label was taken from a screen shot of the Maronick survey.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)



67.     As with the second image in Block 1, this label would appear on the back of the Elations

package.  A consumer looking at a retail shelf would not see this second image unless they

physically picked up the product and removed it from the shelf to look at all sides of the product.

In the survey, every respondent saw both images, even though it is unlikely that every consumer

at retail would view the Elations package from all sides.

68.     Perhaps more importantly, the image above never appeared on an Elations package.

The actual Elations label that corresponds most closely to the label shown in Questions 17 and 24

is shown on the next page.[21]  As can be seen, the box with the knee joint does not appear in the

same place on the Elations package as it appears in the Maronick survey.  In the survey, the box

with the knee joint was inserted near the nutritional information and the phrase "Shellfish Free,"

even though it appears on the opposite side in the image below.

---

[21] Bates number 6822.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

Drink one 8 oz. bottle each day. Learn more at www.elations.com.
* This statement has not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat,
Helps Improve Your Joint Comfort
Helps Improve Your Joint Flexibility
More Absorbable Than Pills

EC00006822

69.     The image used in Questions 17 and 24 not only moved the knee joint box to a place where it did not appear on the original, but also included text in the box that did not appear on the original.  The label used in the Maronick survey shows 3 knee joints; the text "With Elations Clinically-Proven Combination" appears under the middle knee joint.  On the label above, "Helps Improve Your Joint Flexibility" appears under the middle knee joint.

70.     Dr. Maronick stated in deposition that he superimposed the box with the knee joints onto an image taken from the back of the Elations package.  The image above came from Dr. Maronick, not Elations, as demonstrated by this exchange during his deposition:[22]

Q     All right.  Now, where did you get the images that are used in Q16 and Q17?

A     Counsel provided the images to me in clear. . .  And the -- the box that's up on the second image --

Q     Q17?

A     -- Q17, that was on -- was on a separate screen, a separate image.  But I wanted to capture that, because it has some efficacy benefits of this product.  So I took that off of that upper label, which was, I think on the top of the package and put it onto here.  So that, again -- figured that was something communicated from the package.  I didn't create something.  I simply took it, what was literally on the top of the package, the image from the top and added it to this thing.  And if you look at the original for this, that was a blank space there.  So I was able to put it in there, and it -- and, again, that wasn't the -- what I was testing.  I thought that was a good way to put it in there and communicate that as part of this package.

>>
>>
>>
>>
>>

---

[22] Maronick deposition transcript, pages 35-36.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

1    71.    The two labels below were shown to Block 3 respondents, in Questions 26 and 27.[23]





---

[23] Both labels were obtained from screen shots of the Maronick survey.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

72.     Once again, the FDA statement is not legible and the labels show vertical and horizontal lines that would not be visible on actual labels.  Also, the second label, as with the second label in Block 2, was never used on actual Elations packages.  Instead Dr. Maronick superimposed the box with the knee joints on top of the actual Elations label, in a manner never used on Elations packages.

**E.  The Maronick survey has questions that use vague terms, lack "don't know" options, are leading, and have leading or incomplete response options.**

73.     The wording of survey questions is one of the most fundamental and most important elements of any survey.  As the "Reference Guide on Survey Research" states, survey items should be clear, precise, and unbiased:  "When unclear questions are included in a survey, they may threaten the validity of the survey by systematically distorting responses if respondents are misled in a particular direction, or by inflating random error if respondents guess because they do not understand the question."[24]

74.     Unfortunately, the Maronick survey incorporates a number of vague questions that do not clearly specify concepts and terms.  These questions include the following:

   i. <u>Reasons for purchase</u>:  Three series of questions, encompassing a total of 9 items, ask about the importance of reasons for purchase in Questions 10/11/12, 20/21/22, and 30/31/32.  All three series suffer from vague phrasing.  For example, Question 10 asks respondents in Block 1, "Based on your review of what is said or suggested on the labels, which of the following, if any, is the most important reason for buying this product."  (Questions 11 and 12 follow-up with similar phrasing to ask about the second and third most important reasons.)  These 9 questions do not indicate whether "important reason" means important to the respondent, or important to other people, such as purchasers who are not the respondent.  Also, as described later in this report, the Maronick survey does not

_____

[24] "Reference Guide on Survey Research," previously cited, pages 387-388.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

**Exhibit B**      **Page 76**

qualify respondents as purchasing any product; respondents who interpret this question as asking about their own reasons for purchase may never have actually purchased any relevant product, giving them no basis to answer this question.

ii.   Demographics: All three demographics questions suffer from vague phrasing. Question 35 asks only "Gender."  The question does not indicate whose gender is requested.  Question 36 asks "Age?"  The question does not indicate whose age is requested.  Question 21 asks "Education?"  Among other possibilities, a respondent might answer this thinking about the highest level of education they have completed, the level they have started, or the level they hope to complete.

75.     The problems with questions in the Maronick survey extend beyond lack of clarity to a lack of "don't know" options.  A "don't know" response option offers the respondent the ability to indicate that they don't know which response to select, or how to answer the question.  For example, Question 10 in the Maronick survey asks, "Based on your review of what is said or suggested on the labels, which of the following, if any, is the most important reason for buying this product?"  Respondents presented with this question answered by selecting from a series of response options, but had no option to indicate that they do not know which option is most important.  Other questions in the Maronick survey lack "don't know" options, such as Questions 11, 12, 20, 21, 22, 30, 31, and 32, which ask about the first, second, or third most important reasons for purchase.

76.     The problems with the lack of "don't know" options are exacerbated by Dr. Maronick's survey instructions in Question 1, which instruct respondents as follows, "Thank you for taking a few minutes to answer this short survey.  If you are not sure of an answer to a question, please indicate 'Don't know/Not sure.'  Please do not guess."  Respondents answering survey questions that did not have a "don't know" options could not follow this instruction.

77.     Providing a "don't know" response option to survey questions where a respondent might not know the answer is a commonly-accepted and commonly-expected practice in surveys.  As the "Reference Guide on Survey Research" states, "By signaling to the respondent that it is appropriate not to have an opinion, the question reduces the demand for an answer and, as a

- 23 -

result, the inclination to hazard a guess just to comply."[25]

78.      In the absence of a "don't know" option, respondents are forced to select a response they may not actually prefer over "don't know."  As one source stated, "…much error in surveys arises from random responses by respondents who really have no opinion, perceptions, attitudes, or views on the question asked, and simply flip mental coins in order to satisfy the interviewer's expectation of an answer."[26]

79.      The survey also includes a number of questions that are leading or that respondents have no basis to answer.  For example, Question 33 asked whether respondents would be more or less likely to buy the product if "… the manufacturer of this product said it was a 'clinically proven formula.'"  Those who responded that they were more likely or much more likely to buy the product were asked Question 34, which asked whether they would be willing to pay more.

80.      Question 33 leads the respondent to select a particular answer, because "clinically proven formula" sounds like a benefit in the absence of any other information or an actual package.  However, Question 33 does not ask how a "clinically proven formula" compares with other product features.  Also, the phrasing of Question 33, which asks about more likely to purchase or less likely to purchase, assumes that the respondent would purchase the product in the first place.  As described earlier, no survey question asks whether respondents would purchase any product.

81.      Respondents have even less basis to answer Question 34, which does not specify how much more they would have paid for a "clinically proven formula," or how much the product they saw in the survey costs at all.  In his deposition (page 140), Dr. Maronick agreed that his survey cannot tell how much more people would pay:

> Q      So you can't say what a -- the responding -- whether they would be willing to pay
>          one cent more versus a hundred dollars more for clinically proven?
>
> A      That's correct.

---

[25] "Reference Guide on Survey Research", previously cited, p. 390.

[26] Liefeld, Dr. John P., "How Surveys Overestimate the Likelihood of Consumer Confusion," in *The Trademark Reporter*, Vol. 93, July-August 2003, p. 945.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

82.     Similar problems exist among a number of the options provided for questions with fixed responses.

83.     For example, as described earlier, each block in the Maronick survey presented a three-question series asking about the first, second, and third most important reasons for buying this product.[27]  For each of these series, respondents were provided with 8 response options;  in Block 1 these options included Healthier joints, Great taste, Glucosamine, Clinically proven formula, Joint comfort in 6 days, Brand, Shellfish free, and Other (specify).

84.     The response options were presented to respondents in random order; for example, in Block 1, the order of responses for Question 10 was not necessarily the same as the order of responses for Questions 11 and 12.  Some respondents may have been confused by the change in the order of responses across the series of 3 related questions.

85.     Also, response options selected by respondents were not removed from the list in subsequent questions, so a respondent could pick the same item as their first, second, and third response option.[28] As shown below in Table B, across the 3 blocks, 55 respondents selected the same answer either 2 times or 3 times across these 3 questions, including 47 respondents who selected the same answer 2 times, and another 8 respondents who selected the same answer 3 times.

86.     Respondents who selected the same response option multiple times did not follow the instructions in the follow-up questions in these 3-part series, which asked for the second or third most important reason "after (RESPONSE)."  As described earlier in this report, the response options lacked "don't know" or "none of the above options."  For some respondents, selecting the same option more than once may have been a way to indicate that no other listed response options seemed appropriate.  It is also possible that some respondents who selected the same option more than once may have done so because they were not paying sufficient attention to the question or the response options.

---

[27] In Block 1, the series included Questions 10, 11, and 12.  Block 2 included Questions 20, 21, and 22.  Block 3 had Questions 30, 31, and 32.

[28] Dr. Maronick agrees that the survey did not prevent a respondent from selecting the same item multiple times in these questions. (See Maronick deposition transcript, page 22).

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

**Exhibit B**                                    **Page 79**

**Table B: Respondents Who Selected the Same Importance Factor Multiple Times**

Based on your review of what is said or suggested on the labels…

Q10/Q20/Q30 … which of the following, if any, is the <u>most important reason</u> for buying this product?

Q11/Q21/Q31 …after (RESPONSE) which of the following, if any, is the <u>second most important reason</u> for buying this product?

Q12/Q22/Q32 …after (RESPONSE) which of the following, if any, is the <u>third most important reason</u> for buying this product?

| Questions asked | Total | Part 1 Block 1 Q10/11/12 | Part 2 Block 1 Q10/11/12 | Part 1 Block 2 Q20/21/22 | Part 1 Block 3 Q30/31/32 |
|---|---|---|---|---|---|
| Respondents selecting same response for any 2 questions | 47 | 7 | 13 | 13 | 14 |
| | 8.5% | 4.6% | 13.0% | 8.7% | 9.1% |
| Respondents selecting same response for all 3 questions | 8 | 3 | 0 | 4 | 1 |
| | 1.4% | 2.0% | 0.0% | 2.7% | 0.6% |
| **Respondents selecting same response for 2 or 3 questions** | **55** | **10** | **13** | **17** | **15** |
| | **9.9%** | **6.6%** | **13.0%** | **11.4%** | **9.7%** |

87.     The response options to these questions are also problematic because they exclude some reasonable reasons for purchasing the product, some of which are featured on the label.  In Block 1, the 8 response options listed for Questions 10, 11, and 12 did not include possible answers such as:

      i.   <u>30 calories</u>, which is listed at the top of the front label and on the back label.

      ii.   <u>Chondroitin</u>, which is listed in large capital letters in the middle of the front label, and smaller type at the bottom of the front label.

      iii.   <u>More absorbable than pills</u>, which is listed in a large colored circle on the back label.

      iv.   <u>Boron</u>, which is in the ingredient list on the back label.

      v.   <u>Calcium</u>, which is listed in the nutritional box on the back label.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

**Exhibit B**                                                                                      **Page 80**

88.     All of these product features or benefits are listed on the label, yet none of them were among the response options offered to respondents for Questions 10, 11, and 12.[29]  Similarly, Questions 20/21/22 and 30/31/32 also excluded items from the response options that were featured on the label.

89.     Had Dr. Maronick's survey included these other items, these questions would have had more than 8 response options and the percentage of respondents selecting "Clinically proven formula" almost certainly would be lower.  This is apparent from the response patterns to these questions.

90.     Tables 2, 5, and 7 in Maronick report shows that 19.6% to 22.3% of respondents selected "clinically proven" in these 3-part question series.  If respondents had selected their response options totally at random, with 8 response options, each response would receive approximately 1/8 or 12.5% of the responses.  Each response was selected by about 20% of respondents, which is not surprising considering the 12.5% chance of random selection, conducted across 3 chances for selection given that these are 3-part series of questions.

91.     As another example of the problems with response options provided in the survey, Question 16 in Part 2 also offers responses that are potentially confusing, and not mutually exclusive.  Question 16 asks, "Based on what is said or suggested on the label, which of the following, if any, is meant by 'clinically proven'"  Respondents answer by selecting from the following response options:[30]

   i.     The manufacturer tested the product and provided it works as claimed

   ii.    An independent organization tested the product and proved it works as claimed

   iii.   The manufacturer tested the product for safety but not necessarily to determine that it works as claimed

   iv.    The FDA has tested the product for safety but not necessarily to determine that it works as claimed

---

[29] It is possible that respondents could have selected "Other (specify)" and written in any of these responses.  However, respondents tend not to take the extra steps to do so when provided with other pre-listed responses.

[30] The responses were not numbered in the survey.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

**Exhibit B**                                                    **Page 81**

1          v.    Neither the manufacturer nor any other organization did any test on the product to

2                determine whether it was safe or works as claimed

3          vi.   The manufacturer tested the product but the results showed it didn't work as

4                claimed

5          vii.  Other (specify)

6    92.    The response options listed above exhibit a number of problems.  Three of the options,

7    including options 4, 5, and 6, are simply not credible.  Option 4 suggests that the FDA did the

8    testing, yet many people may believe that the FDA does not do any product testing.  Option 5

9    suggests that nobody did any testing, and Option 6 suggests that testing was done unsuccessfully;

10   both of these outcomes are unlikely to result in a label claim relating to testing.  Also, Question

11   16 does not specify whether the respondent should select all the responses that apply, or only one

12   option, and there are no responses for a respondent to indicate either "don't know" or "none of

13   the above."

14   93.    The format of the response options for Question 16 in Part 2 may lead respondents

15   toward selecting the first two options, given the lack of credibility of the other options and the

16   lack of a "don't know" response.[31]

17

18        **F.  Survey images were displayed improperly in the survey, mixing the "memory test"**

19        **and "reading test" formats, and failing to exclude small devices.**

20   94.    As described earlier, the display of images was key to the Maronick survey.  A total of 6

21   images of Elations labels were tested across the 3 blocks of the survey.  The display of those

22   images reflected at least three executional problems.

23

24

25

26   [31] No option from Question 16 defines the nature of the testing, the standards that were used in the
     testing, the type of expertise or protocols involved in the testing, or any other aspect of how the

27   testing was conducted.  Also, the options in Question 16 do not appear to be developed based on
     responses from Question 15 in Block 1, which was an open-ended question asking about the

28   meaning of the phrase "Clinically Proven Formula."

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

95. The first problem is that some survey questions were asked with the label in view, while other questions were asked with labels out of sight. For example, in Block 1, the sequence was as follows:

    i. Questions 6 and 7 showed respondents two images of Elations labels. With those pictures in view, respondents were asked Question 8, "What, if anything, does the package say or suggest about the product? [PLEASE SPECIFY]"

    ii. The images were removed from view, and respondents were asked Question 9, which followed up on Question 8 by asking "Anything else? [PLEASE SPECIFY]"

    iii. Questions 10, 11, and 12, asked about important reasons for buying the product. The labels were still not in view.

    iv. After Questions 10, 11, and 12, the second label was shown again. With that label on screen, respondents were asked Question 15, "Based on your view of the label, what does the phrase 'Clinically Proven Formula' mean?"

96. A similar sequence was used in the other blocks. The sequence places the labels in view for some questions, but out of sight for others, and likely makes it difficult for respondents to answer certain questions.

97. For example, Questions 10, 11, and 12 ask the respondent to select the most important, second most important, and third most important reasons to buy this product "Based on your review of what is said or suggested on the labels…" Although the question directs the respondent to answer based on the label, the label is not in view for the respondent to consider in answering these questions. Instead, the question relies upon the respondent's memory as to what the label said.

98. The format where survey questions are asked without a stimulus in view is sometimes referred to as a "memory test." The alternative, which asks questions while the product is in view, is called a "reading test."

99. A memory test is not appropriate for the survey because impressions based on the Elations packaging are formed while the package is in view, and decisions such as whether to

purchase Elations are also made while Elations is in view.  As Dr. Maronick stated in deposition, a study on packaging used at retail should be a reading test, not a memory test: "… it's a reading test or a memory test, are the two criteria.  With packaging you want to do a reading test.  Why?  Because the respondent is in the store… In packaging studies, particularly, you want it to be a reading test.  You want – you know, because they can pick it up and look at it.  What are they taking from it."[32]

100.    Despite this statement, the Maronick survey mixes the two formats.

101.    A second problem with the display of images in the Maronick survey relates to the devices used by respondents.  The survey did not ask which device was used to take the survey, and did not ask whether the images that are the subject of the survey could be legibly viewed by respondents taking the survey.  Some survey respondents may have taken the survey on very small devices, such as mobile phones; it is unlikely that survey images would be legible on such devices.


**G. Survey data not analyzed in the Maronick report contradict his findings.**

102.    All three of the blocks in Dr. Maronick's survey included questions similar to Question 8, 18, and 28, which asked, "What, if anything, does the package say or suggest about the product? [PLEASE SPECIFY]" and Question 9, 19, and 29, which asked "Anything else? [PLEASE SPECIFY]".  In each block, these two questions were asked in identical phrasing, immediately after respondents were shown the two images for the Block.

103.    Dr. Maronick's report provides no reporting or analysis of the responses from these questions.  Page 5 of his report mentions the questions, but his report provides no tables or analyses discussing the data from these questions.  However, page 3 of the Maronick report provides conclusions regarding the main messages that consumers take from the label. The bases for these conclusions are not provided in the report and are not explained, as the report does not provide analysis of the only survey questions that measure the main message of the labels,

---

[32] Maronick Deposition transcript, page 92.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

**Exhibit B**                    **Page 84**

namely Questions 8, 18, and 28, and the related follow-up Questions 9, 19, and 29.

104.     Staff at my firm, under my direct supervision, analyzed the responses to see whether the verbatim comments from these questions referenced any phrase mentioning clinical testing in any format.   Because these questions are open-ended, they are likely to elicit top of mind thoughts on respondents' minds while and immediately after they were shown the images.[33]

105.     The results of this analysis are listed below in Table C.  As can be seen in the table, 6.0% of Block 1 respondents in Part 1 mentioned "clinical," "clinically proven," or a similar term, compared with 3.0% of respondents in Block 1 Part 2,  2.7% of Block 2 respondents, and no respondents in Block 3.  In other words, approximately 3% to 6% of respondents mentioned clinical in response to seeing the images in Dr. Maronick's survey.  This suggests that only a small percentage of respondents consider "clinically proven" or "clinically tested" to be part of the main message conveyed by the labels.  The verbatim responses referencing "clinical," "clinically proven," or a similar term are shown in Exhibit 2.

### Table C:  Analysis of Responses Referencing "Clinically Proven" In Questions 8, 9, 18, 19, and 28, 29

| | Part 1, Block 1 | Part 2, Block 1 | Part 1, Block 2 | Block 3 |
|---|---|---|---|---|
| Questions asked[34] | Q8/Q9 | Q8/Q9 | Q18/Q19 | Q28/Q29 |
| Sample size | 151 | 100 | 149 | 154 |
| Number of respondents mentioning "clinical" or "clinically proven" | 9 | 3 | 4 | 0 |
| Percent of respondents mentioning "clinical" or "clinically proven" | 6.0% | 3.0% | 2.7% | 0.0% |

[33] These questions were asked as a two-part series. For the first question, the label was in view. For the second question, the label was not in view.

[34] Data for these questions are from Tables 2, 5, and 7 of the Maronick report.

- 31 -

**Exhibit B**                                                                 **Page 85**

**SUMMARY OF FLAWS ON THE SURVEY DATABASE**

106.    This rebuttal report has described a number of problems with the Maronick survey, including the lack of a control, qualification criteria that do not match the class definition, other qualification problems, images that are not legible and do not correspond to Elations labels, vague or leading questions and responses, and improper display of survey images.

107.    Dr. Maronick appears to agree that these are important issues.  In his deposition, when asked to name generally accepted procedures for surveys, Dr. Maronick responded, "That you have -- probably that you've sampled the proper universe, that you've drawn an appropriate sample from that universe, that you have designed questions that are clear, unambiguous, and nonleading, the three primary ones."[35]

108.    These types of flaws tend to bias, confuse and fatigue respondents, and their effect is apparent in surveys that required a suspiciously short time to complete, or an abnormally long time to complete.

109.    In his deposition, Dr. Maronick indicated that he believed the survey would take, on average about 3 to 4 minutes to complete but he did not exclude any respondents based on the amount of time they took to complete the survey.[36]  The database provided by Dr. Maronick included a field indicating the amount of time each respondent took to complete the survey.  The Maronick survey database includes 133 respondents (24.0% of the survey database) who completed the survey in 2 minutes or less.  This is not sufficient time to be qualified, view the images, and thoughtfully complete the survey.

110.    Similarly, a number of respondents took too long to complete the survey.  A survey such as Dr. Maronick's can be easily completed within 15 minutes.  However, 8 respondents (1.4% of the survey database) took longer than 30 minutes to complete the survey, including 4 respondents (0.7% of the survey database) who took more than 45 minutes and 2 respondents (0.4% of the survey database) who took more than 1 hour.

_____

[35] See Maronick deposition transcript, page 63.

[36] See Maronick deposition transcript, page 30-31 and 99-101.  Dr. Maronick also stated that few people would take more than 3 or 4 minutes to complete the survey.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

**Exhibit B**                                                                              **Page 86**

111.    The flaws and biases in the Maronick survey are also manifested in verbatim responses which are not coherent or not responsive to the question asked.  The survey database for Part I includes these 24 verbatim responses from 19 respondents:

| Respondent ID# | Question | Response | Question | Response |
|---|---|---|---|---|
| R_0Cx0jcyEyzw8xAp | Q.8 | "don't know" | Q.9 | "no" |
| R_8pNhMRb26nzAIwl | Q.8 | "none" | Q.9 | "NEW" |
| R_2fSRQXjNqrR4h8N | Q.8 | "nothing" | Q.9 | "no" |
| R_cJ8N8nEpBdtwn3L | Q.15 | "?" | | |
| R_6fhpKKeRHrdOrrv | Q.15 | "awsome" | | |
| R_aho7kjwMctjSatD | Q.15 | "don't know" | | |
| R_55OltAuOVrhVYS9 | Q.15 | "NOT MUCH" | | |
| R_6sxPs810RoO8iwd | Q.18 | "dont know" | Q.19 | "don't know /" |
| R_0vJxJPXYFnWkRcp | Q.18 | "don't know" | Q.19 | "na" |
| R_868qbeRpHPPtZpb | Q.18 | "good" | Q.19 | "N/a" |
| R_bx4LRNECs66IaUZ | Q.18 | "good" | Q.19 | "no" |
| R_9ohxB8zAZ4iEQfz | Q.18 | "na" | Q.19 | "ok" |
| R_6JWO0ok7z14wLpb | Q.18 | "new" | Q.19 | "no" |
| R_6sxPs810RoO8iwd | Q.25 | "dont know" | | |
| R_1HWbO6ttuHlvxYN | Q.25 | "don't know" | | |
| R_1YXV61gFAHHIdHD | Q.25 | "don't see it" | | |
| R_868qbeRpHPPtZpb | Q.25 | "good" | | |
| R_bx4LRNECs66IaUZ | Q.25 | "good" | | |
| R_9ohxB8zAZ4iEQfz | Q.25 | "good" | | |
| R_0vJxJPXYFnWkRcp | Q.25 | "na" | | |
| R_cYkcrtXRvHeidEx | Q.28 | "DO NOT KNOW" | Q.29 | "NEVER HAVE SEEN IT AT THE STORE" |
| R_6eZLCowRsIDHgbP | Q.28 | "n/a" | Q.29 | "n/a" |
| R_2gziRxri4Mda22N | Q.28 | "na" | Q.29 | "no" |
| R_0OPwWma5dhhC1b7 | Q.28 | "no much" | Q.29 | "no" |

112.    The database for Part II includes these 7 verbatim responses from 5 respondents:

| Respondent ID# | Question | Response | Question | Response |
|---|---|---|---|---|
| R_0OMN8qddW7pSs7j | Q.8 | "I DONT KNOW" | Q.9 | "I DONT KNOW" |
| R_1FZ7rEcFBXVLL8h | Q.8 | "none" | Q.9 | "none" |
| R_42EoP66naAFGjtz | Q.8 | "nonthing" | Q.9 | "nothing" |
| R_7QD7mU9LP6pXtat | Q.8 | "not sure" | Q.9 | "not sure" |
| R_cLL3dm79rGMYoId | Q.15 | "not really" | | |
| R_42EoP66naAFGjtz | Q.15 | "nothing" | | |
| R_1FZ7rEcFBXVLL8h | Q.15 | "very good" | | |

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

**Exhibit B**                    **Page 87**

113.    As shown by the above responses, a total of 24 respondents (4.3% of the survey database) provided 31 verbatim responses that reflect respondents who are distracted, inattentive, or unable to answer the questions asked.

114.    In fact, the survey database includes a large number of respondents who should have been excluded for the reasons described in this report, including survey responses that display these issues:

    i.    "Don't Know" on key qualification criteria:  A total of 21 respondents (3.8% of the survey database) answered "Don't know" to Question 2.  Another 2 respondents (0.4%) answered "Can't recall" to Question 3, and "Can't recall" to Question 4, yet were included in the survey database.  These respondents should be excluded.

    ii.    "No" on key qualification criteria:  A total of 3 respondents (0.5% of the survey database) answered "No" to Question 3, and "Can't recall" to Question 4, yet were included in the survey database anyway.  These respondents should be excluded.

    iii.    Nonsensical or non-responsive verbatim responses:  There were 24 respondents (4.3% of the survey database) who provided nonsensical verbatim responses, or verbatims that were not responsive to the question asked.  These respondents should be excluded from the survey database, as it is likely that they did not understand the questions asked, or were not paying attention.

    iv.    Too much or too little time:  There were 133 respondents (24.0% of the survey database) who took the survey in 2 minutes or less, and 8 respondents (1.4%) who took more than 30 minutes to take the survey.  These respondents should be excluded.

    v.    Duplicate IP addresses:  As described earlier, 10 respondents (1.8% of the survey database) were included despite having the same IP address as other respondents who were screened but failed qualification criteria. This includes 6 respondents from Part 1, and 4 respondents from Part 2.  These respondents should be excluded.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

115.    Exhibit 3 lists all of the respondents who should be removed from the survey database because they exhibited at least one of the problems listed above.  In total, 178 respondents, or 32.1% of the survey database, exhibited at least one of these problems and should be removed from the database.  A number of these respondents exhibited more than one of these problems.[37]

## SUMMARY OF CONCLUSIONS

116.    To summarize, based on my review of materials such as the Maronick report, the Maronick survey, the materials produced by Dr. Maronick, and other materials, as well as my own analysis, I have concluded that Dr. Maronick's survey fails to meet a number of generally-accepted standards for surveys. The problems with his survey include the lack of a control, qualification criteria that do not match the class definition, other problems with respondent qualification, images that are not legible and do not correspond to actual Elations labels, vague or leading questions and responses, and improper display of survey images.

117.    Also, 32.1% of the respondents in the Maronick survey database should be removed due to the problems described earlier in this report.

118.    The flaws and biases in Dr. Maronick's survey and report make the measures provided by his survey not reliable and not valid.  In my opinion, the conclusions Dr. Maronick provides based on the survey lack sufficient basis to be considered reliable or valid.

\>>

\>>

\>>

\>>

\>>

\>>

---

[37] The criteria used to remove respondents are conservative.  For example, I retained responses who completed the survey database in 3 minutes, even though it is unlikely that the survey can be completed thoughtfully in this amount of time.  Similarly, I did not remove a number of respondents who also provided verbatim responses that could be interpreted as nonsensical or non-responsive.

- 35 -

1   I declare under penalty of perjury under the laws of California that the foregoing is true and

2   correct to the best of my belief.

3

4   Executed in Encino, California, on June 12, 2014.

5

6

7   _____

8   Dr. Bruce R. Isaacson

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No.: ED CV 13-00242 JGB (OPx)

**Exhibit 1:**
**Dr. Bruce Isaacson CV and Testimony Experience**

**MMR STRATEGY GROUP**

*Creating growth through customer insight.™*

16501 Ventura Boulevard, Suite 601, Encino, CA 91436 • Phone (818) 464-2400 • Fax (818) 464-2399 • www.mmrstrategy.com

# DR. BRUCE R. ISAACSON, DBA, MBA

<u>**Summary of Qualifications**</u>

- Expertise in surveys, marketing, and strategy.
- Experience in intellectual property matters.
- Doctorate and MBA, Harvard Business School; Bachelor of Science in Engineering, Northwestern University.

---

*MMR Strategy Group, Encino, CA*                              2005 - Present
**PRESIDENT**

MMR provides surveys, analysis, and consulting to measure the attitudes and behaviors of customers and prospective customers.

- MMR helps commercial clients grow by using marketing research and consulting to develop marketing and sales strategies.  **MMR's commercial clients** have included Farmers Insurance Group, Smart & Final, Alberto-Culver, Nestle USA, Sega Entertainment USA, Cigna, Oreck, The Goodyear Tire & Rubber Company, The Coca-Cola Company, and other companies.

- MMR surveys and testimony provide evidence for intellectual property litigation and claim substantiation.  **MMR's legal clients** have included Baker & Hostetler, Munger, Tolles & Olson; Farella, Braun + Martel; Shook, Hardy & Bacon; Baker & McKenzie, and other firms.

- As President, I design studies, manage research projects, and provide consulting for clients. I have conducted hundreds of surveys during my career.

- I regularly provide surveys, testimony, and rebuttals for intellectual property litigation and claim substantiation matters.  I have experience with a wide variety of authorities, including Federal Court, the Trademark Trial and Appeal Board, and other venues as well.

- I frequently speak and write on topics relating to marketing, surveys, and strategy.

---

<u>**Education**</u>

- Doctor of Business Administration in Marketing, **Harvard Business School**, 1995. Awarded Dean's Doctoral Fellowship.

- MBA with High Distinction, **Harvard Business School**, 1991.  Graduated in top 5% of class as a Baker Scholar.

- Bachelor of Science in Engineering with focus on Regional Development, Northwestern University Technological Institute, 1985.

## Prior Professional Experience

*Fairview Company, Calabasas, CA*                                                2002 - 2004
**MANAGING DIRECTOR**

- ▪ **West Coast Practice Leader of Executive Development for Monitor Group.**
  Designed and managed marketing and strategy executive education programs.  Developed curriculum, served as lead faculty on programs for Fortune 100 clients.

- ▪ **Consulted with clients in technology, software, and financial services.**
  Provided consulting services in marketing and strategy.

*Intuit/Digital Insight, Calabasas, CA*                                          2001 - 2002
**SENIOR VICE PRESIDENT FOR PRODUCTS, MARKETING, AND ALLIANCES**

- ▪ **Managed business lines for $130 million provider of outsourced banking services/software.**
  Directed marketing, strategy, alliances, mergers, acquisitions, resellers, and pricing for 9 business lines.  Managed $29 million budget and staff of 40.

- ▪ **Built product management and strategy functions.**
  Set priorities for $22 million R&D budget.  Directed $51 million acquisition and post-merger conversion of 150 new clients.

*Move, Inc., Westlake Village, CA*                                               1999 - 2001
**PRESIDENT, HOME SERVICES**

- ▪ **Founded home services division for software/services provider to real estate industry.**
  Directed business unit for new division.  Built alliances with associations including National Association of Homebuilders and American Institute of Architects.

*PHH Corporation* (NYSE: PHH)*, Mortgage Division, Mount Laurel, NJ*             1997 - 1999
**VICE PRESIDENT, MARKETING**

- ▪ **Directed marketing for $26 billion outsourced mortgage services division.**
  Company provided private label loans and loan servicing for customers and partners, including Wells Fargo, USAA, Coldwell Banker, Century 21.  Served on 14-member Executive Committee.  Managed $14 million budget and 60 people in marketing, research, public relations, advertising, strategic planning, business development and e-commerce.

- ▪ **Created collateral for selling, processing, and closing loans distributed to 750,000 customers annually.**
  Redesigned sales materials used by 150-person sales force.  Created point-of-sale materials and placed in 1,600 real estate offices nationwide.  Negotiated co-marketing deals.

- ▪ **Built online platform to originate, close and service mortgages.**
  Created co-branded system used by 1,400 partners to originate $700 million in mortgages in 2000.  Integrated system with more than 2,000 sales and customer service reps.

**Boston Consulting Group, Chicago, IL**                                    1995 to 1997
CONSULTANT

- **Consulted in marketing, strategy and distribution for $1 billion international strategy consulting firm.**
  Designed and rolled out database marketing program for international supermarket chain.
  Developed purchasing strategy for $3 billion consumer goods company.
  Evaluated market strategy for $800 million division of paper goods company.

**Harvard Business School, Cambridge, MA**                                    1991 to 1995
DEAN'S DOCTORAL FELLOW

- **Developed and implemented multi-year research project analyzing buyer-supplier alliances.**
  Authored 14 publications including best-selling case studies and articles in distribution, sales, supplier management, purchasing, branding, new products.  Taught in Babson College Executive MBA program.

**E&J Gallo Winery, Modesto, CA**                                    1990
MBA INTERN

- Summer intern at global winery.  Developed packaging strategy, distribution and retailer incentive programs for the wine cooler category.

**Long Wharf Trading Company, Danvers, MA**                                    1986 to 1989
PRESIDENT & CO-FOUNDER

- **Co-founded company manufacturing high quality sewn products for advertising premiums.**
  Directed 30 employees.  Clients included banks, universities, corporations, schools and museums.  Company was featured with full-page story in *Inc. Magazine*.

**Parsons Corporation/Barton-Aschman Associates, Evanston, IL**                                    1985 to 1986
ASSOCIATE CONSULTANT

- **Conducted strategic and operations planning for public transportation systems at global construction and regional planning company.**
  Received *President's Award* for outstanding initiative and performance.

**Honors, Appointments, Affiliations**

- Member, American Marketing Association (AMA)

- Member, Counsel of American Survey Research Organizations (CASRO)

- Member, International Trademark Association (INTA)

- Member, Marketing Research Association (MRA)

- Editorial Board, *Journal of Business-to-Business Marketing,* 1994 – present

- Member, *The Trademark Reporter* Committee, International Trademark Association, 2010 - present

- Policy Advisory Board, Joint Center for Housing Studies at Harvard University, 1999 - 2001

- Winner, Doctoral Dissertation, Institute for Study of Business Markets, Penn State, 1994

- George S. Dively Award for Innovative Research, Harvard Business School, 1993

- George F. Baker Scholar*,* Harvard Business School (top 5% of class), 1991

- Dean's Doctoral Fellowship, Harvard Business School, 1993 -1995


**Selected Speaking Engagements**

Frequent speaker at industry conferences and client events on topics relating to marketing and strategy, including:

- Speaker at the "Corporate Researchers Conference," sponsored by the Marketing Research Association, October, 2013.

- Speaker on panel for seminar entitled "Trademark Protection in Cyberspace," sponsored by the Los Angeles County Bar Association (LACBA), May, 2013.

- Moderator for round table discussion entitled, "Using Survey Evidence for Claim Substantiation", International Trademark Association Annual Conference, May, 2013.

- Speaker and panelist for multi-day conference entitled, "Advertising Claims Support: Case Histories and Principles", conference hosted by The Institute for Perception, April, 2013.

- Moderated round table discussion entitled, "Replicating Marketplace Conditions in Trademark Surveys", International Trademark Association Annual Conference, 2011.

- Moderated round table discussion entitled, "The Use of Surveys in Intellectual Property Litigation", International Trademark Association Annual Conference, 2010.

- Faculty on panel at expert forum entitled, "Litigating & Resolving Advertising Disputes", American Conference Institute, June, 2010.

- "The Use of Online Surveys in Intellectual Property Litigation". Presentation to the National Advertising Division (NAD) Annual Conference, October, 2009.

- "The Death of the Focus Group: Non-Traditional Research to Create Deeper Customer Insight." Presentation to American Marketing Association Annual Marketing Research Conference, September, 2008.

- "Understanding Your Customer and Making Tough Strategic Choices," International Restaurant & Foodservice Show of New York, March, 2008.

- "Measuring Consumer Attitudes and Behaviors in Intellectual Property Litigation," Continuing Legal Education (CLE) seminar presented to audiences including:

  - Orange County Bar Association, November 2007.
  - Baker Botts, LLP, March, 2008.
  - Amster, Rothstein & Ebenstein LLP, March, 2008.
  - Fulwider Patton, LLP, March, 2008.

- "Understanding Today's Customers and Making Tough Choices – Lessons Learned From Starbucks," Western Foodservice & Hospitality Expo, August, 2007.

- "What Can We Learn from Customer Satisfaction Studies?" Real Trends Marketing & Technology Expo, September, 2006.

## Publications and Works in Process

**Book Review of *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann.** *The Trademark Reporter*, September, 2013.

**Playing Nice With Legal: How Research Can Help Keep Marketing Claims in Compliance.** *Quirk's Marketing Research Review*, January, 2013.

**The Quantity of Presidential Polls and the Quality of Marketing Research.** *Green Book Blog*, October, 2012.

**Three Critical Questions to Evaluate Intellectual Property Surveys.** *Intellectual Property Today*, September, 2012. Co-authors Professor Jonathan Hibbard and Professor Scott Swain.

**Asking the Right Questions (in Litigation Surveys).** *Intellectual Property Magazine*, October, 2012.

**Conducting Litigation Surveys in an Online World.** Manuscript in process with co-author, planning to submit for publication to *The Trademark Reporter*.

**Why Online Consumer Surveys Can Be a Smart Choice in Intellectual Property Cases** (with Professor Jonathan Hibbard and Professor Scott Swain).  Intellectual Property Law Newsletter of the American Bar Association, Intellectual Property Law Section, May 2008.

**Bose Corporation:  The JIT II Program (A), (B), (C), and (D)** (with Professor Roy Shapiro).  Harvard Business School cases 9-694-001, -002, -003, and –004.

**Bose Corporation:  The JIT II Program Teaching Note.**  Harvard Business School teaching note 5-695-017.

**Buyer-Supplier Relationships:  Antecedents, Management and Consequences.**  Harvard Business School doctoral dissertation, 1996.

**Goodyear:  The Aquatred Launch** (with Professor John Quelch).  Harvard Business School case 9-594-106.  Best seller.

**Goodyear:  The Aquatred Launch Teaching Note** (with Professor John Quelch).  Harvard Business School teaching note 5-595-016.

**Industrial Marketing** (with Professor V. Kasturi Rangan).  In *AMA Management Handbook, Third Edition*, edited by John J. Hampton.  New York:  Amacom Books, 1994, pp. 2-101 to 2-108.

**Managing Buyer-Supplier Relationships.**  Preface to *JIT II:  Revolution in Buying and Selling*, edited by Lance Dixon and Anne Millen Porter.  Newton, MA:  Cahners Publications, Inc., 1994

**Philip Morris:  Marlboro Friday (A) and (B).**  Harvard Business School case 9-596-001 and –002.

**Scope and Challenge of Business-to-Business Marketing** (with V. Kasturi Rangan).  Harvard Business School class note 9-594-125.

**Vistakon:  1 Day Acuvue Disposable Contact Lenses** (with Alvin J. Silk and Marie Bell).  Harvard Business School case 9-596-087.

**What is Industrial Marketing?** (with Professor V. Kasturi Rangan).  Harvard Business School class note 9-592-012.


**Blogging and Commentary**
I regularly write posts and white papers at www.MMRStrategy.com.  Selected materials include:

**Litigation Surveys**
- "How to Measure False Advertising in a Litigation Survey" (November, 2012)

- "Using Surveys to Estimate Damages in Patent Infringement Matters" (October, 2012)

- "Apple vs. Samsung: Litigation Surveys as Evidence" (August, 2012)

- "What is the Theory Behind Your Lanham Act Survey?" (June, 2012)

- "Keyword Infringement Surveys: The New Frontier in Measuring Likelihood of Confusion" (June, 2012)

- "The Challenge of Replicating Marketplace Conditions in Intellectual Property Surveys" (May, 2012)

**Claim Substantiation**
- "When it Comes to 'Up To' Claims, Make Sure You Have the Right Substantiation" (February, 2013)

- "Critical Research Steps and Core Principles of Claim Substantiation" (white paper)

- "How Many Industries are Affected by Claim Substantiation?" (June, 2012)

- "Lessons in Claim Substantiation from the Pom Wonderful Decision" (May, 2012)

- "How Claim Substantiation Differs from Traditional Marketing Research" (May, 2012)

**Marketing and Marketing Research**
- "Lessons in Pricing Strategy from JCPenny" (May, 2013)

- "Why You Should (Almost) Never Use the van Westendorp Pricing Model" (March, 2013)

- "Three Types of Market Segmentation and the 2012 Presidential Election" (October, 2012)

- "Presidential Polls and the Quality of Marketing Research" (October, 2012)

- "Sizing the Potential of a New Market or New Product" (white paper)

- "MaxDiff vs. Conjoint:  Which is Better to Measure Consumer Preferences?" (white paper)

- "Ten Best Practices to Improve Your Concept and Product Tests" (white paper)

- "Using Choice-Base Market Segmentation to Improve Your Marketing Strategy" (white paper)

- "What Your Tracking Study Should Measure About Your Customers" (white paper)

- "Using Customer Journey Maps to Improve Your Customer Experience" (white paper)

- "How to Improve Your Usage and Attitude Study" (June, 2012)

- "Five Pitfalls of Market Segmentation and How to Avoid Them" (May, 2012)

## **Selected Courses Taken in MBA and Doctoral Programs**

- <u>Economics and Finance</u>, including topics such as Managerial Economics;  Financial Reporting and Accounting;  Business, Government, and the International Economy;  Corporate Finance;  Product Costing;  Microeconomic Theory.

- <u>Marketing and Strategy</u>, including topics such as Marketing;  Marketing Foundations Readings;  New Products;  Marketing Implementation;  Service Management;  Research Issues in Marketing;  Buyer Behavior;  Industrial Marketing and Procurement;  Industry and Competitive Analysis;  Communications.

- <u>Sociology and Psychology</u>, including Organizational Behavior;  Human Resources;  Social Behavior in Organizations;  Readings in Administration (two courses);  Management Policy and Practice.

- <u>Statistics</u>, including Statistical Inference;  Social Network Analysis;  Applied Data Analysis;  Analyzing Covariance Structures.

- <u>Research Methods and Research Design</u>, including Doctoral Research Seminar;  Research Design and Measurement;  Design of Field Research in Organizational Behavior;  Intervention Research and Action Science.

## Dr. Bruce Isaacson Litigation Expert Witness Experience
### June 2014

Cases in which Dr. Bruce Isaacson has testified as an expert, including written expert reports or testimony at deposition or trial, in the past four years.

**Philippe Charriol International Limited v. A'lor International Limited**
U.S. District Court, Southern District of California

**LegalZoom.com, Inc. v. Rocket Lawyer Incorporated**
U.S. District Court, Central District of California Western Division

**Benchmark Young Adult School, Inc., dba Benchmark Transitions v. Launchworks Life Services, LLC dba Mark Houston Recovery Center and Benchmark Recovery Center**
U.S. District Court, Southern District of California

**Diageo North America, Inc. v. Mexcor, Inc. and EJMV Investments, LLC**
U.S. District Court, Southern District of Texas, Houston Division

**AbbVie, Inc. v. A-List, Inc. dba Kitson, Brian Lichtenberg, LLC, and Brian Lichtenberg**
U.S. District Court, Central District of California

**Jeffrey Sachs and James Alden v. Toyota Motor North America, Inc., Toyota Motor Corp., and Toyota Motor Sales, U.S.A., Inc.**
Superior Court of California, County of Los Angeles

**Mary O. Rivera v. Toyota Motor North America, Inc., Toyota Motor Corp., and Toyota Motor Sales, U.S.A., Inc.**
**Myrna Socorro and Donato Pastore as Co-Personal Representatives and Co-Executors of the Estate of Ernest Codelia, Jr., deceased v. Toyota Motor Corp., and Toyota Motor Sales, U.S.A., Inc.**
U.S. District Court, Eastern District of New York

**Commission on Human Rights v. Tiv-Tov Stores, Inc., et al**
New York City Office of Administrative Trials and Hearings

**T-Mobile U.S. and Deutche Telekom AG v. Aio Wireless, Inc.**
U.S. District Court, Southern District of Texas, Houston Division

**MOD Super Fast Pizza v. Carl Chang, CMCB Ventures, and Pieology Spectrum**
U.S. District Court, Western District of Washington

**American Security Council Foundation v Center for Security Policy Inc. and Mr. Frank Gaffney**
U.S. District Court, District of Columbia

**Jason Trabakoolas and Sheila Stetson v. Watts Water Technologies, Inc., Watts Regulator Co., Watts Anderson-Barrows Metal Corp., Watts Plumbing Technologies (Taizho) Co., LTD., Savard Plumbing Company, Wolverine Brass, Inc., and John Does 1-100**
U.S. District Court, Northern District of California

**Tara Bannister v. The Rising Beverage Company**
Superior Court of California, County of Los Angeles

**Akiro LLC v. House of Cheatham, Inc. and Robert H. Bell**
U.S. District Court, Southern District of New York

**Globefill Incorporated v. Elements Spirits, Inc. and Kim Brandi**
U.S. District Court, Central District of California

**Sun Pacific Group v. Paramount Group**
American Arbitration Association, Commercial Arbitration Tribunal

**Nicholas J. Gianino, Arnold Lee, and Lori Risman v. Alacer Corporation**
U.S. District Court, Central District of California

**Bruce Lee Enterprises, LLC v. A.V.E.L.A. Inc. and Leo Valencia, Urban Outfitters, Inc. and Target Corporation**
U.S. District Court, Southern District of New York

**FLIR Systems, Inc. v. Sierra Media, Inc. and Fluke Corporation**
U.S. District Court, District of Oregon, Portland Division

**Brian Graifman v. Trend Micro, Inc.**
U.S. District Court, Northern District of California, San Jose Division

**Chameleon Chair, Inc v Richwood Imports and Hall's Rental Services**
U.S. District Court, Central District of California

**Luxco, Inc. v Consejo Regulador Del Tequila, A.C.**
United States Patent and Trademark Office, Trademark Trial and Appeal Board

**Codonics, Inc. v. Datcard Systems, Inc.**
U.S. District Court, Northern District of Ohio

**Kristin Wells and Kimberly Nguyen v. Abbott Laboratories, Inc., EAS, Inc., et al**
Superior Court of the State of California for the County of Los Angeles

**Wham-O, Inc. v. Manley Toys, Ltd, et al.**
U.S. District Court, Central District of California, Western Division

**Nutro Products, Inc. v. Sergeant's Pet Care Products, Inc.**
U.S. District Court, Middle District of Tennessee, Nashville Division

**Clinique Laboratories, LLC v. Absolute Dental Cheyenne Inc.**
U.S. Patent and Trademark Office, Trademark Trial and Appeal Board

**Hansen Beverage Company, d/b/a Monster Beverage Company v. CytoSport Inc.**
U.S. District Court, Central District of California

**James and Mary Jordan et al v. The Scott Fetzer Company**
U.S. District Court, Middle District of Georgia

**Honestech, Inc., v. Sonic Solutions**
U.S. District Court, Western District of Texas, Austin Division

**Exhibit 2:**
**Verbatim Responses Referencing**
**"Clinical," "Clinically Proven," or a Similar Term**

**Verbatim Responses Referencing "Clinical," "Clinically Proven," or a Similar Term**

**Question 8:** What, if anything, does the package say or suggest about the product? [PLEASE SPECIFY]
**Question 9:** Anything else? [PLEASE SPECIFY]
**Question 18:** What, if anything, does the package say or suggest about the product? [PLEASE SPECIFY]
**Question 19: Anything else? [PLEASE SPECIFY]**

**Verbatim responses referencing "clinical," "clinically proven," or a similar term.**

| ResponseID | Question | Question |
|---|---|---|
| **Part 1** | | |
| | **Q.8** | **Q.9** |
| R_3JKeK9TejQvZw1L | its a drink, that absorbs better than pills and is clinically proven to improve joint comfort in 6 days | |
| R_enhgDDXJv08tyjX | improves joint comfort in 6 days.Clinicallyproven.#o calories per bottle.More absorbable than pills | |
| R_9Rn2fuXfLm58MZv | IT'S CLINICALLY PROVEN TO IMPROVE JOINTS COMFORT IN 6 DAYS. | |
| R_cPbJtL3oOl9FJKR | that it tastes great and clinically proven to improve joint comfort | |
| R_8ekfncINYXA1dzL | It's a clinically proven formula that improves joint comfort in 6 days. | |
| R_3wSBhYV8yxHy0df | | It's clinicaly proven |
| R_0ifB9a0tzrCHgt7 | Wow, you want me to list everything? It says everything about the product ... more absorbable than pills ... great taste, 30 calories ... clinically proven ... improves joint comfort in 6 days, etc. | |
| R_3WTHVo49Qj9DoTb | Improves joint comfort, clinically proven formula, within 6 days | |
| R_d5PSp9ahZgekkIZ | that it is clinically proven to help joint comfort in 6 days | |
| | **Q.18** | **Q.19** |
| R_6mO3owZ9VyNHizX | Has 1500mg of Glucosamine, 1200 mg Chondrotin, has no shellfish , improves joint health., comforts in 6 days clincially proven. 30 calories per bottle, absorobs faster than pills | |
| R_3sEPjpSBqWaQC7H | | clinically proven, works in 6 days, 1 bottle per dose, raspberry grape flavor |
| R_doKcORDo11dLIW1 | | Clinical proven |
| R_0vK4GuXBJSEgZSJ | That the product is clinically proven to be effective, that it's absorbed easier than pills and it's shellfish free | |

Exhibit 2 - Isaacson Expert Report

**Exhibit B**

**Verbatim Responses Referencing "Clinical," Clinically Proven," or a Similar Term**

**Question 8:** What, if anything, does the package say or suggest about the product? [PLEASE SPECIFY]
**Question 9:** Anything else? [PLEASE SPECIFY]
**Question 18:** What, if anything, does the package say or suggest about the product? [PLEASE SPECIFY]
**Question 19:** Anything else? [PLEASE SPECIFY]

Verbatim responses referencing "clinical," "clinically proven," or a similar term.

| ResponseID | Question | Question |
|---|---|---|
| **Part 2** | | |
| | **Q.8** | **Q.9** |
| R_8v8IROax8mhP9MV | clinically proven | |
| R_d5tIgDcXr1dgTZz | Great fruit flavor, only 30 calories per 8 ounce serving, clinically proven to work | |
| R_ba5K8mq8khCzck5 | It definitely says that it's made with 30 calories per bottle it's more absorbable than pills plus it contains no shellfish derived materials,it is clinically proven formula that is great for vegetarians and also has less calories | |

Exhibit 2 - Isaacson Expert Report

**Exhibit B**

Page 2

**Page 104**

**Exhibit 3:**
**Suspicious Responses from the Maronick Survey**

## Suspicious Responses from the Maronick Survey

**Respondents who share IP address with a respondent terminated from the survey.**

| ResponseID | IPAddress | StartDate | EndDate | Complete or Terminate |
|---|---|---|---|---|
| **Part 1** | | | | |
| R_cAbZfCTbi9kB8O1 | 131.191.11.57 | 4/11/2014 12:09 | 4/11/2014 12:13 | Complete |
| R_0TCzODkckMDcsbb | 131.191.11.57 | 4/11/2014 11:58 | 4/11/2014 12:01 | Terminate |
| | | | | |
| R_6tcFGHU6rVDz5hb | 168.97.133.244 | 4/11/2014 13:41 | 4/11/2014 13:44 | Complete |
| R_78PhraR9S6z0mH3 | 168.97.133.244 | 4/11/2014 13:21 | 4/11/2014 13:28 | Terminate |
| | | | | |
| R_e58GgFVCD0ezfPn | 173.185.151.130 | 4/11/2014 13:54 | 4/11/2014 13:57 | Complete |
| R_3QU1iL8pJcCxvtr | 173.185.151.130 | 4/11/2014 13:35 | 4/11/2014 13:49 | Terminate |
| | | | | |
| R_bP1EuMflrUOiKQI | 24.3.219.60 | 4/11/2014 10:42 | 4/11/2014 10:44 | Complete |
| R_3I313PIjLaUO1Gl | 24.3.219.60 | 4/11/2014 10:41 | 4/11/2014 10:42 | Terminate |
| | | | | |
| R_aho7kjwMctjSatD | 68.207.88.247 | 4/11/2014 13:38 | 4/11/2014 13:42 | Complete |
| R_41PgmPwMOjd8wct | 68.207.88.247 | 4/11/2014 13:34 | 4/11/2014 13:37 | Terminate |
| | | | | |
| R_6ifq8dmsYo71P49 | 71.245.4.150 | 4/11/2014 15:52 | 4/11/2014 16:07 | Complete |
| R_6A2pHIhnDZ5XEPz | 71.245.4.150 | 4/11/2014 15:52 | 4/11/2014 15:52 | Terminate |
| | | | | |
| **Part 2** | | | | |
| R_8IF8YMdgmWrI6ax | 204.210.177.168 | 4/15/2014 16:18 | 4/15/2014 16:22 | Complete |
| R_3kFOIYvjeSPJuYJ | 204.210.177.168 | 4/15/2014 16:30 | 4/15/2014 16:31 | Terminate |
| | | | | |
| R_b91SHmwnVhbiEAt | 66.87.149.113 | 4/15/2014 16:33 | 4/15/2014 16:37 | Terminate |
| R_9mKzq0uLAUBOKGh | 66.87.149.113 | 4/15/2014 16:47 | 4/15/2014 16:52 | Complete |
| R_7ZYMROFJRFyhsPP | 66.87.149.113 | 4/15/2014 16:47 | 4/15/2014 16:54 | Terminate |
| | | | | |
| R_7O1oKALdlQDWVXD | 66.87.84.118 | 4/15/2014 16:15 | 4/15/2014 16:16 | Terminate |
| R_9nqPR3pxKm8ti0l | 66.87.84.118 | 4/15/2014 16:16 | 4/15/2014 16:24 | Complete |
| | | | | |
| R_7PTo4a8X7RsyxyB | 69.245.130.248 | 4/15/2014 17:07 | 4/15/2014 17:11 | Complete |
| R_9zyeN9DeLNCmBCt | 69.245.130.248 | 4/15/2014 17:06 | 4/15/2014 17:06 | Terminate |

Exhibit 3 - Isaacson Expert Report

Page 1

**Exhibit B**

**Page 106**

**Suspicious Responses from the Maronick Survey**

**Respondents who completed the survey in 2 minutes or less**

| ResponseID | IPAddress | StartDate | EndDate | Duration |
|---|---|---|---|---|
| **Part 1: Completed in 1 minute** | | | | |
| R_2faRn14Obdpckzr | 162.97.242.66 | 4/11/2014 13:41 | 4/11/2014 13:42 | **1/0/1900 0:01** |
| R_a495qJ08p5xEsdL | 50.40.121.52 | 4/11/2014 17:09 | 4/11/2014 17:10 | **1/0/1900 0:01** |
| R_0qxrDCP0uEtAWJT | 72.94.37.118 | 4/11/2014 10:35 | 4/11/2014 10:37 | **1/0/1900 0:01** |
| R_6fhpKKeRHrdOrrv | 24.11.147.20 | 4/11/2014 13:28 | 4/11/2014 13:30 | **1/0/1900 0:01** |
| R_cSKME5cRtgjNOVT | 68.46.127.143 | 4/11/2014 13:22 | 4/11/2014 13:23 | **1/0/1900 0:01** |
| R_3wwlWCXdWh22c4t | 71.9.118.163 | 4/11/2014 16:22 | 4/11/2014 16:23 | **1/0/1900 0:01** |
| R_6WHBByLvXA31EYB | 97.87.220.240 | 4/11/2014 13:18 | 4/11/2014 13:20 | **1/0/1900 0:01** |
| R_9ohxB8zAZ4iEQfz | 207.38.249.212 | 4/11/2014 14:11 | 4/11/2014 14:13 | **1/0/1900 0:01** |
| R_3KLn7tQNWFlh8Tr | 97.89.141.30 | 4/11/2014 8:58 | 4/11/2014 8:59 | **1/0/1900 0:01** |
| R_9mcGKxq2taVwohD | 98.161.58.251 | 4/11/2014 13:33 | 4/11/2014 13:34 | **1/0/1900 0:01** |
| R_6KHQRHyaA22ByNn | 68.117.47.37 | 4/11/2014 17:45 | 4/11/2014 17:47 | **1/0/1900 0:01** |
| R_6rFMG9bZ5c8A3Dn | 50.178.138.54 | 4/11/2014 12:00 | 4/11/2014 12:02 | **1/0/1900 0:01** |
| R_bCS3A76E5yllZvn | 107.194.25.134 | 4/11/2014 14:39 | 4/11/2014 14:40 | **1/0/1900 0:01** |
| R_1MtgywGXHbH2qdD | 108.179.22.254 | 4/11/2014 13:32 | 4/11/2014 13:34 | **1/0/1900 0:01** |
| R_bP1EuMflrUOiKQl | 24.3.219.60 | 4/11/2014 10:42 | 4/11/2014 10:44 | **1/0/1900 0:01** |
| R_dg5ebmgThecu3Xf | 66.213.22.193 | 4/11/2014 16:49 | 4/11/2014 16:51 | **1/0/1900 0:01** |
| R_1ZFo3U03igFp2i9 | 86.29.86.15 | 4/11/2014 14:43 | 4/11/2014 14:45 | **1/0/1900 0:01** |
| R_9S4KbWLU1zICQ3X | 67.177.133.19 | 4/11/2014 12:44 | 4/11/2014 12:46 | **1/0/1900 0:01** |
| R_6R0CVFAEUG7ct81 | 68.203.200.200 | 4/11/2014 14:17 | 4/11/2014 14:19 | **1/0/1900 0:01** |
| R_0kBXaWsEEH1vcu9 | 24.234.99.150 | 4/11/2014 15:53 | 4/11/2014 15:55 | **1/0/1900 0:01** |
| R_2gYiq8IXvm6apKt | 24.161.6.128 | 4/11/2014 16:44 | 4/11/2014 16:46 | **1/0/1900 0:01** |
| R_8w9RxKHVpDJCm9L | 99.145.49.72 | 4/11/2014 13:19 | 4/11/2014 13:21 | **1/0/1900 0:01** |
| **Part 1: Completed in 2 minutes** | | | | |
| R_1G48pxCdA9ZP4vb | 68.33.235.54 | 4/11/2014 13:12 | 4/11/2014 13:14 | **1/0/1900 0:02** |
| R_bfiCPv7UeufbkTX | 75.90.76.12 | 4/11/2014 13:09 | 4/11/2014 13:11 | **1/0/1900 0:02** |
| R_1MP2TkKbEJ0d2Id | 74.36.189.128 | 4/11/2014 12:49 | 4/11/2014 12:51 | **1/0/1900 0:02** |
| R_86NppbZjeUFglAp | 71.199.98.15 | 4/11/2014 14:15 | 4/11/2014 14:17 | **1/0/1900 0:02** |
| R_006kTuAFkUU7UmV | 169.130.207.194 | 4/11/2014 15:28 | 4/11/2014 15:30 | **1/0/1900 0:02** |
| R_cNNdXevEt8koCwt | 199.27.255.50 | 4/11/2014 15:12 | 4/11/2014 15:14 | **1/0/1900 0:02** |
| R_eKVyV9LcjkWwAw5 | 71.60.231.132 | 4/11/2014 10:40 | 4/11/2014 10:42 | **1/0/1900 0:02** |
| R_1RCaTN9dlkkYBoN | 98.16.179.31 | 4/11/2014 13:17 | 4/11/2014 13:19 | **1/0/1900 0:02** |
| R_9RWeIGEdscEjX1z | 138.162.0.46 | 4/11/2014 13:11 | 4/11/2014 13:13 | **1/0/1900 0:02** |
| R_0vJxJPXYFnWkRcp | 24.107.210.144 | 4/11/2014 17:30 | 4/11/2014 17:32 | **1/0/1900 0:02** |
| R_bCw9zWdO1ED8zlz | 75.94.228.221 | 4/11/2014 17:16 | 4/11/2014 17:18 | **1/0/1900 0:02** |
| R_eJuDJeaOYxvT2Bv | 173.189.26.68 | 4/11/2014 13:07 | 4/11/2014 13:09 | **1/0/1900 0:02** |
| R_0DHhQKeYyxsR033 | 173.241.68.176 | 4/11/2014 15:07 | 4/11/2014 15:09 | **1/0/1900 0:02** |
| R_41th9PGEM7OhWiV | 71.254.124.58 | 4/11/2014 16:48 | 4/11/2014 16:50 | **1/0/1900 0:02** |
| R_5ij8spsqrO1rzAV | 68.82.18.127 | 4/11/2014 10:35 | 4/11/2014 10:37 | **1/0/1900 0:02** |
| R_56aAKT4ejUGUSMt | 76.100.183.70 | 4/11/2014 13:36 | 4/11/2014 13:38 | **1/0/1900 0:02** |
| R_3UzTs7T3GcKuLVX | 76.91.70.143 | 4/10/2014 23:33 | 4/10/2014 23:35 | **1/0/1900 0:02** |
| R_6Y8ftxFuWXerDa5 | 107.196.184.54 | 4/11/2014 13:50 | 4/11/2014 13:52 | **1/0/1900 0:02** |
| R_81YKNWSUh6lVXpP | 70.169.68.99 | 4/11/2014 13:49 | 4/11/2014 13:51 | **1/0/1900 0:02** |
| R_8BqSueHaEKlinVb | 76.122.24.156 | 4/11/2014 13:22 | 4/11/2014 13:24 | **1/0/1900 0:02** |
| R_5sWYA1SXrDD0ysl | 97.83.15.121 | 4/11/2014 14:57 | 4/11/2014 15:00 | **1/0/1900 0:02** |

Exhibit 3 - Isaacson Expert Report     Page 2

**Exhibit B**     **Page 107**

**Suspicious Responses from the Maronick Survey**

**Respondents who completed the survey in 2 minutes or less**

| ResponseID | IPAddress | StartDate | EndDate | Duration |
|---|---|---|---|---|
| **Part 1: Completed in 2 minutes (continued)** | | | | |
| R_6eZLCowRsIDHgbP | 65.33.85.149 | 4/11/2014 12:27 | 4/11/2014 12:30 | **1/0/1900 0:02** |
| R_8H5likQ8Z7Tdkep | 12.218.0.70 | 4/11/2014 11:45 | 4/11/2014 11:48 | **1/0/1900 0:02** |
| R_cD37TMcSFbY6SEZ | 66.161.231.3 | 4/11/2014 13:36 | 4/11/2014 13:38 | **1/0/1900 0:02** |
| R_8hJiwxhCaiHfhD7 | 173.13.6.25 | 4/11/2014 15:24 | 4/11/2014 15:26 | **1/0/1900 0:02** |
| R_1SlkDNCAcU7JgNf | 198.30.75.101 | 4/11/2014 11:35 | 4/11/2014 11:38 | **1/0/1900 0:02** |
| R_9EuUNztzPsKiesB | 64.45.249.166 | 4/11/2014 15:12 | 4/11/2014 15:14 | **1/0/1900 0:02** |
| R_bpBvyhgKw38njuZ | 12.216.84.26 | 4/11/2014 13:35 | 4/11/2014 13:38 | **1/0/1900 0:02** |
| R_6on7QS8CLnGxaeN | 74.236.195.44 | 4/11/2014 15:28 | 4/11/2014 15:31 | **1/0/1900 0:02** |
| R_868qbeRpHPPtZpb | 24.125.93.106 | 4/11/2014 16:51 | 4/11/2014 16:54 | **1/0/1900 0:02** |
| R_9EVPJMsWugmXikd | 99.65.50.59 | 4/11/2014 14:03 | 4/11/2014 14:05 | **1/0/1900 0:02** |
| R_9yHEq0lTooWgMMR | 68.4.166.188 | 4/11/2014 13:33 | 4/11/2014 13:35 | **1/0/1900 0:02** |
| R_cM7ofB5OuKOHPN3 | 24.180.8.70 | 4/11/2014 16:12 | 4/11/2014 16:14 | **1/0/1900 0:02** |
| R_0j2xAmhUxPmtMS9 | 108.234.216.55 | 4/11/2014 14:49 | 4/11/2014 14:51 | **1/0/1900 0:02** |
| R_3dRd4b0ufBUOpYV | 172.14.113.123 | 4/11/2014 15:46 | 4/11/2014 15:49 | **1/0/1900 0:02** |
| R_bNQAPPKZT5d3cvH | 98.144.125.33 | 4/11/2014 13:57 | 4/11/2014 13:59 | **1/0/1900 0:02** |
| R_3L5nq8pfF72qJOR | 68.44.14.52 | 4/11/2014 16:05 | 4/11/2014 16:07 | **1/0/1900 0:02** |
| R_09uZJ5EO7osVeu1 | 71.168.206.235 | 4/11/2014 11:55 | 4/11/2014 11:58 | **1/0/1900 0:02** |
| R_5ihilwcNTPVoehL | 173.51.81.150 | 4/11/2014 14:42 | 4/11/2014 14:44 | **1/0/1900 0:02** |
| R_dgLcBRhnD1SNw7b | 64.253.222.186 | 4/11/2014 12:19 | 4/11/2014 12:22 | **1/0/1900 0:02** |
| R_1NdERMV7CD68knj | 199.127.132.170 | 4/11/2014 10:41 | 4/11/2014 10:44 | **1/0/1900 0:02** |
| R_2mMh0NcrzwBMtYF | 12.182.228.4 | 4/11/2014 13:38 | 4/11/2014 13:40 | **1/0/1900 0:02** |
| R_80aiXfn7vs500pn | 108.84.17.155 | 4/11/2014 13:28 | 4/11/2014 13:31 | **1/0/1900 0:02** |
| R_bBHSrMxyXx2PFGZ | 67.246.109.140 | 4/11/2014 13:56 | 4/11/2014 13:58 | **1/0/1900 0:02** |
| R_5yYfVEGi6iYj2nP | 76.183.3.233 | 4/11/2014 13:25 | 4/11/2014 13:27 | **1/0/1900 0:02** |
| R_9Qy9S2ER6PEOMN7 | 208.38.117.241 | 4/10/2014 23:38 | 4/10/2014 23:41 | **1/0/1900 0:02** |
| R_bC2ZnZT6NlvE0YZ | 68.102.168.24 | 4/11/2014 16:47 | 4/11/2014 16:50 | **1/0/1900 0:02** |
| R_cwF127P9XHf5I7H | 71.71.102.14 | 4/11/2014 13:36 | 4/11/2014 13:38 | **1/0/1900 0:02** |
| R_9zvjQxgqVAHeeJn | 24.176.144.84 | 4/11/2014 11:03 | 4/11/2014 11:05 | **1/0/1900 0:02** |
| R_25Ynca5RRG1Vd53 | 68.172.35.252 | 4/11/2014 13:57 | 4/11/2014 13:59 | **1/0/1900 0:02** |
| R_dh7qXWVGnxKlFmt | 108.57.52.119 | 4/11/2014 15:47 | 4/11/2014 15:50 | **1/0/1900 0:02** |
| R_dmOgS3dblYViyTr | 173.60.105.32 | 4/11/2014 17:26 | 4/11/2014 17:29 | **1/0/1900 0:02** |
| R_55ekvujDYS33XTv | 69.27.151.62 | 4/11/2014 14:13 | 4/11/2014 14:16 | **1/0/1900 0:02** |
| R_23oWpm0E33VzvZr | 66.56.219.147 | 4/11/2014 13:16 | 4/11/2014 13:18 | **1/0/1900 0:02** |
| R_8GrRCNelCP7RB9b | 24.189.52.50 | 4/11/2014 13:53 | 4/11/2014 13:55 | **1/0/1900 0:02** |
| R_1BJqySxVWXkxk4l | 74.137.230.72 | 4/11/2014 15:46 | 4/11/2014 15:48 | **1/0/1900 0:02** |
| R_25lMCTYGoN1EAgl | 142.196.255.54 | 4/11/2014 14:59 | 4/11/2014 15:02 | **1/0/1900 0:02** |
| R_0Cx0jcyEyzw8xAp | 76.29.46.21 | 4/11/2014 13:38 | 4/11/2014 13:40 | **1/0/1900 0:02** |
| R_084DFle1e9YM8gl | 162.17.196.29 | 4/11/2014 11:07 | 4/11/2014 11:09 | **1/0/1900 0:02** |
| R_3Wzi2NdoSq4KN9P | 74.39.74.164 | 4/11/2014 13:31 | 4/11/2014 13:34 | **1/0/1900 0:02** |
| R_6MAL8bu5e69DTnL | 72.239.57.190 | 4/11/2014 15:58 | 4/11/2014 16:01 | **1/0/1900 0:02** |
| R_5cBQ2wdTsYtsWup | 24.158.155.23 | 4/11/2014 13:56 | 4/11/2014 13:58 | **1/0/1900 0:02** |
| R_3yoePJENcVIE84Z | 99.120.10.253 | 4/11/2014 17:08 | 4/11/2014 17:10 | **1/0/1900 0:02** |
| R_8cQkd5iG0iLMICx | 24.63.84.208 | 4/11/2014 14:55 | 4/11/2014 14:58 | **1/0/1900 0:02** |
| R_aWwVHLIqfQWYMLj | 98.200.50.74 | 4/11/2014 17:19 | 4/11/2014 17:22 | **1/0/1900 0:02** |

Exhibit 3 - Isaacson Expert Report

Page 3

**Exhibit B**

**Page 108**

**Suspicious Responses from the Maronick Survey**

**Respondents who completed the survey in 2 minutes or less**

| ResponseID | IPAddress | StartDate | EndDate | Duration |
|---|---|---|---|---|
| **Part 1: Completed in 2 minutes (continued)** | | | | |
| R_bx4LRNECs66IaUZ | 174.100.12.250 | 4/11/2014 14:49 | 4/11/2014 14:51 | **1/0/1900 0:02** |
| R_b89QkwbHsRuxPzT | 98.182.42.254 | 4/11/2014 14:10 | 4/11/2014 14:13 | **1/0/1900 0:02** |
| R_3a9t2mbeNc7fC7P | 174.134.235.3 | 4/11/2014 13:20 | 4/11/2014 13:23 | **1/0/1900 0:02** |
| R_6tcFGHU6rVDz5hb | 168.97.133.244 | 4/11/2014 13:41 | 4/11/2014 13:44 | **1/0/1900 0:02** |
| R_3fkJOBzMi03hjrT | 71.206.195.218 | 4/11/2014 14:18 | 4/11/2014 14:21 | **1/0/1900 0:02** |
| R_b3ZWApD4z7628Zv | 162.200.146.114 | 4/11/2014 13:23 | 4/11/2014 13:26 | **1/0/1900 0:02** |
| R_e58GgFVCD0ezfPn | 173.185.151.130 | 4/11/2014 13:54 | 4/11/2014 13:57 | **1/0/1900 0:02** |
| R_86e084xMSdQtpaJ | 74.211.66.2 | 4/11/2014 17:37 | 4/11/2014 17:40 | **1/0/1900 0:02** |
| R_88S4ileVvIMEo1n | 65.29.186.164 | 4/11/2014 14:09 | 4/11/2014 14:11 | **1/0/1900 0:02** |
| R_6JWO0ok7z14wLpb | 172.8.76.31 | 4/10/2014 22:53 | 4/10/2014 22:56 | **1/0/1900 0:02** |
| R_54QfjPSSyohn80Z | 50.202.234.2 | 4/11/2014 11:14 | 4/11/2014 11:17 | **1/0/1900 0:02** |
| R_0OPwWma5dhhC1b7 | 98.117.249.181 | 4/11/2014 13:02 | 4/11/2014 13:05 | **1/0/1900 0:02** |
| R_8ekfncINYXA1dzL | 24.225.39.166 | 4/11/2014 17:11 | 4/11/2014 17:14 | **1/0/1900 0:02** |
| R_07J2zvdfzG6PgSp | 68.184.155.6 | 4/11/2014 12:37 | 4/11/2014 12:40 | **1/0/1900 0:02** |
| R_6gRiQX4kBPrrq4t | 108.0.32.122 | 4/11/2014 13:55 | 4/11/2014 13:58 | **1/0/1900 0:02** |
| R_0NDkDkYUuN52eGN | 64.121.43.31 | 4/10/2014 22:49 | 4/10/2014 22:52 | **1/0/1900 0:02** |
| R_7OPTH7j2AurYu2N | 198.99.190.232 | 4/11/2014 13:46 | 4/11/2014 13:49 | **1/0/1900 0:02** |
| R_0cbtG35ERulibfD | 50.164.66.26 | 4/11/2014 17:30 | 4/11/2014 17:33 | **1/0/1900 0:02** |
| R_0oVN8aJmW1StRqZ | 69.209.226.173 | 4/11/2014 15:05 | 4/11/2014 15:08 | **1/0/1900 0:02** |
| R_51IMLYpZnMKUxSZ | 24.46.193.41 | 4/11/2014 13:58 | 4/11/2014 14:01 | **1/0/1900 0:02** |
| R_bIvoUvVQi7KOC6V | 67.44.163.164 | 4/11/2014 17:57 | 4/11/2014 18:00 | **1/0/1900 0:02** |
| R_eFhLKwPzpQlqeGh | 76.241.42.233 | 4/11/2014 11:39 | 4/11/2014 11:42 | **1/0/1900 0:02** |
| R_3ggjSC7Lf0HHPjT | 71.47.122.109 | 4/11/2014 6:48 | 4/11/2014 6:51 | **1/0/1900 0:02** |
| R_ddoYY0DvAy4vjql | 76.189.77.17 | 4/11/2014 15:27 | 4/11/2014 15:30 | **1/0/1900 0:02** |
| R_dm7717Hr6l3qJQF | 24.47.159.161 | 4/11/2014 13:31 | 4/11/2014 13:34 | **1/0/1900 0:02** |

Exhibit 3 - Isaacson Expert Report

**Exhibit B**

**Suspicious Responses from the Maronick Survey**

**Respondents who completed the survey in 2 minutes or less**

| ResponseID | IPAddress | StartDate | EndDate | Duration |
|---|---|---|---|---|
| **Part 2: Completed in 1 minute** | | | | |
| R_42EoP66naAFGjtz | 72.234.145.110 | 4/15/2014 15:53 | 4/15/2014 15:54 | **1/0/1900 0:01** |
| R_3yOqKhxuuDfvLsp | 184.155.171.68 | 4/15/2014 19:06 | 4/15/2014 19:07 | **1/0/1900 0:01** |
| R_1S2WL9qLap8bbVP | 207.170.245.34 | 4/15/2014 16:05 | 4/15/2014 16:07 | **1/0/1900 0:01** |
| R_daIeIMcmejmqeIT | 12.204.183.82 | 4/15/2014 16:09 | 4/15/2014 16:10 | **1/0/1900 0:01** |
| R_07FIWhErrzoVVbf | 65.26.100.98 | 4/15/2014 20:27 | 4/15/2014 20:29 | **1/0/1900 0:01** |
| **Part 2: Completed in 2 minutes** | | | | |
| R_1HVXl5dEfkIutzT | 24.160.159.30 | 4/15/2014 18:33 | 4/15/2014 18:35 | **1/0/1900 0:02** |
| R_2rSCHxHCu2Hdji5 | 68.117.51.33 | 4/15/2014 19:36 | 4/15/2014 19:38 | **1/0/1900 0:02** |
| R_cvCfo2HFPfbiJ49 | 198.136.32.56 | 4/15/2014 16:02 | 4/15/2014 16:04 | **1/0/1900 0:02** |
| R_5nATU1vA03kI6vr | 65.117.151.99 | 4/15/2014 17:30 | 4/15/2014 17:32 | **1/0/1900 0:02** |
| R_eXOLzRDM6Qlhhlj | 174.96.165.44 | 4/15/2014 18:41 | 4/15/2014 18:43 | **1/0/1900 0:02** |
| R_bCIZNlilxsm1ObH | 70.247.164.222 | 4/15/2014 18:38 | 4/15/2014 18:41 | **1/0/1900 0:02** |
| R_cl6IuNRnOXHlOMB | 50.41.54.248 | 4/15/2014 15:55 | 4/15/2014 15:58 | **1/0/1900 0:02** |
| R_b71iSNMZD27SFIF | 24.239.79.220 | 4/15/2014 21:22 | 4/15/2014 21:25 | **1/0/1900 0:02** |
| R_0BVz4KT1bt6v6xn | 71.213.23.122 | 4/15/2014 18:33 | 4/15/2014 18:36 | **1/0/1900 0:02** |
| R_3sM6hujczVifyTj | 75.150.233.218 | 4/15/2014 18:37 | 4/15/2014 18:40 | **1/0/1900 0:02** |
| R_dh5onzGEMEbW8hn | 184.9.202.111 | 4/15/2014 20:48 | 4/15/2014 20:51 | **1/0/1900 0:02** |
| R_8qNspPbxO2RI0Dj | 70.189.198.116 | 4/15/2014 20:25 | 4/15/2014 20:28 | **1/0/1900 0:02** |
| R_0xn4evDO9HKa6zP | 50.177.39.227 | 4/15/2014 16:14 | 4/15/2014 16:17 | **1/0/1900 0:02** |
| R_2o838w77BdO38AR | 69.145.164.211 | 4/15/2014 20:40 | 4/15/2014 20:43 | **1/0/1900 0:02** |
| R_0OMN8qddW7pSs7j | 108.87.174.93 | 4/15/2014 18:06 | 4/15/2014 18:09 | **1/0/1900 0:02** |
| R_88GaFY5SgjRTWJL | 70.168.3.162 | 4/15/2014 17:26 | 4/15/2014 17:28 | **1/0/1900 0:02** |

Exhibit 3 - Isaacson Expert Report

Page 5

**Exhibit B**

**Page 110**

**Suspicious Responses from the Maronick Survey**

**Respondents who completed survey in 31 minutes or longer**

| ResponseID | IPAddress | StartDate | EndDate | Duration |
|---|---|---|---|---|
| **Part 1** | | | | |
| R_dnSZaL1yfjevmU5 | 66.154.183.17 | 4/11/2014 16:52 | 4/11/2014 17:29 | **1/0/1900 0:37** |
| R_8jMiAkxBV7uRQyh | 75.118.210.139 | 4/11/2014 15:44 | 4/11/2014 16:22 | **1/0/1900 0:37** |
| R_cwEUqDABAXKj27j | 173.74.234.185 | 4/11/2014 15:16 | 4/11/2014 15:54 | **1/0/1900 0:37** |
| R_eEhib9XJlZEpelf | 174.131.73.180 | 4/11/2014 14:05 | 4/11/2014 14:52 | **1/0/1900 0:46** |
| R_eK8afTqTBdpZmcJ | 71.176.27.162 | 4/11/2014 16:03 | 4/11/2014 16:58 | **1/0/1900 0:55** |
| R_b7AIDQxm4V6e7Cl | 71.20.255.194 | 4/11/2014 10:47 | 4/11/2014 12:00 | **1/0/1900 1:12** |
| R_5pwL5JyPAN2QF2R | 68.53.67.74 | 4/11/2014 11:20 | 4/11/2014 15:08 | **1/0/1900 3:47** |
| **Part 2** | | | | |
| R_6ihdE7RoQMtYA73 | 166.229.79.244 | 4/15/2014 16:41 | 4/15/2014 17:13 | **1/0/1900 0:31** |

Exhibit 3 - Isaacson Expert Report

**Exhibit B**

**Suspicious Responses from the Maronick Survey**

**Question 2: Have you ever experienced joint discomfort or the symptoms of arthritis?**
**Respondents who responded "Don't Know/Not Sure"**

| ResponseID | IPAddress | StartDate | EndDate | Q2 |
|---|---|---|---|---|
| **Part 1** | | | | |
| R_6R0CVFAEUG7ct81 | 68.203.200.200 | 4/11/2014 14:17 | 4/11/2014 14:19 | 3 |
| R_25Ynca5RRG1Vd53 | 68.172.35.252 | 4/11/2014 13:57 | 4/11/2014 13:59 | 3 |
| R_8GrRCNelCP7RB9b | 24.189.52.50 | 4/11/2014 13:53 | 4/11/2014 13:55 | 3 |
| R_8ekfncINYXA1dzL | 24.225.39.166 | 4/11/2014 17:11 | 4/11/2014 17:14 | 3 |
| R_6htnHVvLi65cf7n | 108.228.158.70 | 4/11/2014 14:27 | 4/11/2014 14:30 | 3 |
| R_1zUCm9jQlY2vssl | 67.253.54.195 | 4/11/2014 14:29 | 4/11/2014 14:32 | 3 |
| R_5vaYLZX0lu1bi3X | 66.56.207.204 | 4/11/2014 13:53 | 4/11/2014 13:56 | 3 |
| R_06zBqZMjPLzgeAR | 96.235.98.71 | 4/11/2014 14:19 | 4/11/2014 14:22 | 3 |
| R_bBiTOaM6jc4GxLv | 184.0.137.156 | 4/11/2014 12:01 | 4/11/2014 12:06 | 3 |
| R_cUgcGjrJ6g19HnL | 98.242.248.4 | 4/11/2014 10:38 | 4/11/2014 10:43 | 3 |
| R_8IWTfKIqnG5mNKJ | 69.130.167.174 | 4/11/2014 14:20 | 4/11/2014 14:25 | 3 |
| R_6gwyIbJZP873bCZ | 50.167.46.231 | 4/11/2014 12:50 | 4/11/2014 12:56 | 3 |
| R_0jHe4kskwNmubjv | 97.73.136.90 | 4/11/2014 13:56 | 4/11/2014 14:03 | 3 |
| R_cXZlUl46vgq7PKt | 24.158.128.82 | 4/11/2014 14:27 | 4/11/2014 14:35 | 3 |
| R_diDUPF2tWauV2yp | 75.132.35.56 | 4/11/2014 16:58 | 4/11/2014 17:06 | 3 |
| R_elZIYglCQFkwnQx | 50.59.198.162 | 4/11/2014 10:43 | 4/11/2014 10:51 | 3 |
| R_en78BEpedjzYl1n | 67.165.62.13 | 4/11/2014 14:04 | 4/11/2014 14:21 | 3 |
| **Part 2** | | | | |
| R_0OMN8qddW7pSs7j | 108.87.174.93 | 4/15/2014 18:06 | 4/15/2014 18:09 | 3 |
| R_6te72TPkWioKwGV | 173.30.224.81 | 4/15/2014 20:48 | 4/15/2014 20:52 | 3 |
| R_bKq9QUe5Osq1Bv7 | 198.0.49.173 | 4/15/2014 19:33 | 4/15/2014 19:49 | 3 |
| R_cPeifq9u9uW8UuN | 108.207.81.14 | 4/15/2014 21:13 | 4/15/2014 21:18 | 3 |

Exhibit 3 - Isaacson Expert Report

Page 7

**Exhibit B**

**Page 112**

**Suspicious Responses from the Maronick Survey**

**Question 3: Have you used an over-the-counter product in the past year to treat joint flexibility problems, joint discomfort, or the symptoms of arthritis?**

**Question 4 In the past year have you considered using an over-the-counter product to treat joint flexibility problems, joint discomfort, or the symptoms or arthritis?**

**Respondents who responded "No" or "Can't recall" to Question 3 and "Can't recall" to Question 4**

| ResponseID | IPAddress | StartDate | EndDate | Q3 | Q4 |
|---|---|---|---|---|---|
| **Part 1** | | | | | |
| **Have not used and cannot recall if considered using over-the-counter product** | | | | | |
| R_dgLcBRhnD1SNw7b | 64.253.222.186 | 4/11/2014 12:19 | 4/11/2014 12:22 | 2 | 3 |
| R_cUgcGjrJ6g19HnL | 98.242.248.4 | 4/11/2014 10:38 | 4/11/2014 10:43 | 2 | 3 |
| R_2uDRJOuMz9luhAV | 67.236.46.150 | 4/11/2014 14:09 | 4/11/2014 14:15 | 2 | 3 |
| | | | | | |
| **Cannot recall if used or considered using over-the-counter product** | | | | | |
| R_cYkcrtXRvHeidEx | 70.126.78.128 | 4/11/2014 15:01 | 4/11/2014 15:05 | 3 | 3 |
| R_0Hgbzv0ksKzBRJP | 107.10.44.3 | 4/11/2014 12:48 | 4/11/2014 12:54 | 3 | 3 |

Exhibit 3 - Isaacson Expert Report

Page 8

**Exhibit B**

**Page 113**

**Suspicious Responses from the Maronick Survey**

**Question 8:** What, if anything, does the package say or suggest about the product? [PLEASE SPECIFY]
**Question 9:** Anything else? [PLEASE SPECIFY]
**Question 15:** Based on your review of the label, what does the phrase "Clinically - Proven Formula" mean? [PLEASE SPECIFY]
**Question 18:** What, if anything, does the package say or suggest about the product? [PLEASE SPECIFY]
**Question 19:** Anything else? [PLEASE SPECIFY]
**Question 25:** Based on your review of the label, what does the phrase "Clinically Proven Combination" mean? [PLEASE SPECIFY]
**Question 28:** What, if anything, does the package say or suggest about the product? [PLEASE SPECIFY]
**Question 29:** Anything else? [PLEASE SPECIFY]

**Respondents with non-responsive verbatim responses**

| ResponseID | IPAddress | Question | Question |
|---|---|---|---|
| **Part 1** | | | |
| | | **Q.8** | **Q.9** |
| R_0Cx0jcyEyzw8xAp | 76.29.46.21 | don't know | no |
| R_8pNhMRb26nzAIwl | 24.49.204.235 | none | NEW |
| R_2fSRQXjNqrR4h8N | 97.93.141.83 | nothing | no |
| | | **Q.15** | |
| R_6fhpKKeRHrdOrrv | 24.11.147.20 | awsome | |
| R_55OltAuOVrhVYS9 | 71.205.202.150 | NOT MUCH | |
| R_aho7kjwMctjSatD | 68.207.88.247 | don't know | |
| R_cJ8N8nEpBdtwn3L | 69.246.185.46 | ? | |
| | | **Q.18** | **Q.19** |
| R_9ohxB8zAZ4iEQfz | 207.38.249.212 | na | ok |
| R_0vJxJPXYFnWkRcp | 24.107.210.144 | don't know | na |
| R_868qbeRpHPPtZpb | 24.125.93.106 | good | N/a |
| R_bx4LRNECs66IaUZ | 174.100.12.250 | good | no |
| R_6JWO0ok7z14wLpb | 172.8.76.31 | new | no |
| R_6sxPs810RoO8iwd | 72.228.33.236 | dont know | don't know / |
| | | **Q.25** | |
| R_9ohxB8zAZ4iEQfz | 207.38.249.212 | good | |
| R_0vJxJPXYFnWkRcp | 24.107.210.144 | na | |
| R_868qbeRpHPPtZpb | 24.125.93.106 | good | |
| R_bx4LRNECs66IaUZ | 174.100.12.250 | good | |
| R_1YXV61gFAHHIdHD | 50.104.7.111 | don't see it | |
| R_6sxPs810RoO8iwd | 72.228.33.236 | dont know | |
| R_1HWbO6ttuHlvxYN | 199.119.98.6 | don't know | |
| | | **Q.28** | **Q.29** |
| R_6eZLCowRsIDHgbP | 65.33.85.149 | n/a | n/a |
| R_0OPwWma5dhhC1b7 | 98.117.249.181 | no much | no |
| R_cYkcrtXRvHeidEx | 70.126.78.128 | DO NOT KNOW | NEVER HAVE SEEN IT AT THE STORE |
| R_2gziRxri4Mda22N | 108.76.160.167 | na | no |

Exhibit 3 - Isaacson Expert Report

Page 9

**Exhibit B**

**Page 114**

**Suspicious Responses from the Maronick Survey**

**Question 8:   What, if anything, does the package say or suggest about the product? [PLEASE SPECIFY]**
**Question 9:   Anything else? [PLEASE SPECIFY]**
**Question 15: Based on your review of the label, what does the phrase "Clinically - Proven Formula" mean? [PLEASE SPECIFY]**
**Question 18: What, if anything, does the package say or suggest about the product? [PLEASE SPECIFY]**
**Question 19: Anything else? [PLEASE SPECIFY]**
**Question 25: Based on your review of the label, what does the phrase "Clinically Proven Combination" mean? [PLEASE SPECIFY]**
**Question 28: What, if anything, does the package say or suggest about the product? [PLEASE SPECIFY]**
**Question 29: Anything else? [PLEASE SPECIFY]**

**Respondents with non-responsive verbatim responses**

| ResponseID | IPAddress | Question | Question |
|---|---|---|---|
| **Part 2** | | | |
| | | **Q.8** | **Q.9** |
| R_0OMN8qddW7pSs7j | 108.87.174.93 | I DONT KNOW | I DONT KNOW |
| R_1FZ7rEcFBXVLL8h | 68.15.30.195 | none | none |
| R_42EoP66naAFGjtz | 72.234.145.110 | nonthing | nothing |
| R_7QD7mU9LP6pXtat | 65.78.216.22 | not sure | not sure |
| | | **Q.15** | |
| R_1FZ7rEcFBXVLL8h | 68.15.30.195 | very good | |
| R_42EoP66naAFGjtz | 72.234.145.110 | nothing | |
| R_cLL3dm79rGMYoId | 98.237.119.74 | not really | |

Exhibit 3 - Isaacson Expert Report

**Exhibit B**

Page 10

**Page 115**

PROOF OF SERVICE
STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

*McCrary, et al. v. The Elations Company*
USDC Central District of California, Case No. 5:13-cv-242 JGB(OPx)

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 333 South Hope Street, 43rd Floor, Los Angeles, CA 90071-1422.

On June 12, 2014, I served true copies of the following document(s) described as **EXPERT REBUTTAL REPORT FROM DR. BRUCE ISAACSON IN RESPONSE TO THE REPORT OF DR. THOMAS J. MARONICK** on the interested parties in this action as follows:

Gillian L. Wade
Sara D. Avila
MILSTEIN ADELMAN LLP
2800 Donald Douglas Loop North
Santa Monica, CA 90405

310-396-9600 Telephone
310-396-9635 Fax
gwade@milsteinadelman.com
smazepa@milsteinadelman.com

☐ **BY HAND DELIVERY:** I caused such envelope(s) to be delivered by hand to the office of the addressee(s).

☐ **BY MAIL:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☒ **BY FEDEX:** I enclosed said document(s) in an envelope or package provided by FedEx and addressed to the persons at the addresses listed in the Service List. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of FedEx or delivered such document(s) to a courier or driver authorized by FedEx to receive documents.

☒ **FEDERAL:** I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on June 12, 2014, at Los Angeles, California.

TRACY L. FIELDING

35GA-176688 (USDC – Riverside)

SMRH:408012190.1

-1-

PROOF OF SERVICE

**Exhibit B**

**Page 116**

# Exhibit C

1

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4
   ROBERT MCCRARY, individually    )
5  and on behalf of all others     )
   similarly situated,             )
6                                  )
                 Plaintiff,        )
7                                  )
      v.                           )   Case Number
8                                  ) ED CV 13-00242 JGB(OPx)
   THE ELATIONS COMPANY, LLC, a    )
9  Delaware limited liability      )
   company; and DOES 1 through     )
10 100, inclusive,                 )
                                   )
11               Defendants.       )
   _____)

12

13

14

15        Deposition of THOMAS J. MARONICK, D.B.A.,

16     taken on behalf of Defendant The Elations

17     Company, LLC, at 2800 Donald Douglas Loop

18     North, Second Floor, Santa Monica,

19     California, commencing at 9:44 a.m.,

20     Thursday, May 29, 2014, pursuant to Notice

21     and Subpoena, reported by K.C. Belden,

22     CSR No. 6728, RPR, CRR.

23

24

25

2

1     APPEARANCES OF COUNSEL:

2

3     For Plaintiff:

4             MILSTEIN ADELMAN LLP
              BY:  SARA D. AVILA, ATTORNEY AT LAW
5             2800 Donald Douglas Loop North
              Santa Monica, California  90405
6             (310) 396-9600  Fax (310) 396-9635

7

8     For Defendant The Elations Company, LLC:

9             SHEPPARD MULLIN RICHTER & HAMPTON LLP
              BY:  SASCHA HENRY, ATTORNEY AT LAW
10            333 South Hope Street, 43rd Floor
              Los Angeles, California  90071-1448
11            (213) 620-1780  Fax (213) 620-1398

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maronick, Thomas J. 5/29/2014

3

1                         I N D E X

2

3     DEPONENT:                    EXAMINED BY:            PAGE:

4     THOMAS J. MARONICK, D.B.A.    MS. HENRY               4

5

6

7

8     EXHIBITS FOR IDENTIFICATION:

9        1 - "An Empirical Analysis of Consumers'          5
             Perceptions of 'Clinically Proven'
10            Claim On Elations Dietary Supplement,"
             51 pages
11
         2 - Printout of "TM000002 Elation-2 Data-X.xls,"  48
12            re study one, 153 pages

13       3 - Printout of "My Report, Last Modified:         48
              04/16/2014," 38 pages
14
         4 - Documents re "Frequencies" re main study,     48
15            TM000040 through TM000051, 12 pages

16       5 - Printout of "TM000001-Elation-1X-Data.xls,"    51
              re study two, 35 pages
17
         6 - Documents re "Frequencies" re follow-up,      52
18            TM000038 and TM000039, 2 pages

19       7 - Printout of "My Report, Last Modified:         95
              04/15/2014," 19 pages
20
         8 - "Qualtrics Survey Software," 13 pages          154
21

22

23

24    QUESTIONS NOT ANSWERED
      ON ADVICE OF COUNSEL:  None
25

Maronick, Thomas J. 5/29/2014

73

1    consider it, they're going to take it off and look at

2    it, see what -- whether that's something they want to

3    buy.

4           This is not a -- particularly the first time

5    they'd buy it.  This is not a routine purchase.  I'm not

6    buying another box of Wheaties for my children.  This is

7    something different, so I'm going to look at it.  It's

8    more highly -- it's a more high involved situation than

9    saying, oh, gee, I'll take one of these, because it's

10   not a routine purchase.

11          So they're going to pick it up, particularly

12   the first time, and look at it, look at the back, say,

13   yes, this has benefits that I'm seeking.  So it's more

14   than just what they would see on the front of the

15   package sitting in the store.

16      Q    BY MS. HENRY:  Have you done any studies or

17   analysis to come to the conclusion that a consumer

18   actually pulls the Elations product down and studies the

19   front and back of the package before making the

20   purchasing decision?

21      MS. AVILA:  Vague and ambiguous, outside the scope

22   of his expertise.

23      THE DEPONENT:  As to the Elations product, no.  But,

24   as to other products that are more high involved

25   products, yes.  Numerous studies, both while at the

74

1    Federal Trade Commission, the Bureau of Consumer

2    Protection.  Okay?  But, yes, numerous times.

3           And where it's a more highly involved product,

4    the consumer is going to look at it more carefully.  And

5    these are studies, for example, involving nutrition

6    labels, which is a frequent -- frequent study that we

7    did at the FTC.

8        Q     BY MS. HENRY:  What makes a product a more

9    highly involved product, a high involved product?

10       MS. AVILA:  Vague and ambiguous, outside the scope.

11       THE DEPONENT:  The nature of the purchase, the

12   nature of the benefit being sought, the level of

13   sophistication of the consumer.  All of those are going

14   to play into a determination of the level of

15   involvement.

16       Q     BY MS. HENRY:  Do you have any opinions about

17   the nature of the purchase of those consumers who

18   purchase Elations?

19       MS. AVILA:  Vague and ambiguous.

20       THE DEPONENT:  I have not examined them

21   specifically, no.

22       Q     BY MS. HENRY:  Do you have any opinions about

23   the benefits being sought by purchasers of Elations?

24       MS. AVILA:  Vague and ambiguous.

25       THE DEPONENT:  Yes.  The -- it's a product for --

75

1    I'm going to use a broad term -- joint relief, joint

2    pain relief.  That's what they claim on the package.  So

3    clearly the benefit that people are seeking when they

4    consider this product is a product for -- broadly

5    defined as joint pain relief.

6         Q    BY MS. HENRY:  Did you do any surveys of anyone

7    who had ever purchased Elations to come to that

8    conclusion or is that from your reading of the product

9    label?

10        A    I have no -- I did not do a survey of Elations

11   particularly.  I had looked at two studies that Elations

12   had done and one -- and I don't recall exactly, but one

13   of them basically said why do you buy this product.

14   This was of patients who -- people who had bought

15   Elations.  And by far the dominant reason was for

16   benefits, the effectiveness of it.  Why do you buy it,

17   because of its effectiveness.  So there were --

18   there's -- I saw some data from Elations that said that

19   was their reason.

20        Q    Did you identify which document you were just

21   talking about in your report?

22        A    No, I did not.  I mean, I looked at -- in my

23   report on page 3 of my report, in the first paragraph,

24   "I also reviewed documents associated with this matter

25   including marketing surveys and analysis undertaken by

Maronick, Thomas J. 5/29/2014

76

1    Elations Company."

2           But now I did not include that in my -- in my

3    list of documents because I didn't rely on it.

4       Q    Ah, I see.  Okay.

5           Because, when I look at Exhibit 3, it's just

6    the survey that we had gone over, the printout from

7    Qualtrics.

8       A    Yes, that's -- this -- that's the survey.

9    This -- that's the surveys that I did.

10      Q    Okay.  So what are the documents that you

11   considered?

12      A    Exhibit 5 is the documents that I considered.

13   Considered/relied on.  That's how I looked at that.

14      Q    Okay.  So the documents that you're talking

15   about here, the marketing surveys and analysis

16   undertaken by The Elations Company, these are the

17   documents that were Bates stamped as EC6817 to 6823.  Is

18   that right?

19      A    It may be.  I don't recall.  I don't remember

20   the numbers.

21      Q    Is Exhibit 5 a complete list of all of the

22   documents you considered as part of your work for this

23   matter?

24      A    To the best of my knowledge, yes.

25      Q    So --

77

1       A      Again, I don't recall the Bates numbers of. . .

2              I'm inclined to think that this is not those

3       documents because those reports were a lot longer than

4       five pages.

5       Q      Okay.  But, in terms of these marketing survey

6       and analysis undertaken by Elations, they're within --

7       somewhere on this list --

8       A      I don't know that they are.

9       Q      Okay.

10      A      Again, as I said, I make a distinction -- or

11      made a distinction between things I looked at and things

12      that I relied on.  And I looked at these documents -- at

13      those reports, but I did not rely on them in terms of

14      designing my study and writing this report.

15      Q      Okay.

16      A      So that's a distinction I'm making here.  Did I

17      look at it?  Yes.  Did I rely on them?  No.

18      Q      What does "considered" mean?  Look at or rely

19      on?

20      A      I think of it as relied on, considered and --

21      it's probably unartfully drafted -- or worded rather.

22      But I think of it as -- I think what did I rely on when

23      I was looking at this thing.

24      Q      So Exhibit 5 is a list of documents upon which

25      you relied?

Maronick, Thomas J. 5/29/2014

78

1        A     That's correct.  First of all, either

2    understanding the study, understanding the issue, and

3    then crafting my report, my survey.

4        Q     And you don't know whether the marketing

5    surveys and analysis undertaken by The Elations Company

6    is among the list in Exhibit 5?

7        MS. AVILA:  Asked and answered.

8        THE DEPONENT:  My inclination is that it is not,

9    because they were much longer than this.

10        Q     BY MS. HENRY:  And it was your understanding

11    that the studies that Elations had done showed that the

12    dominant reason that Elations customers bought the

13    product was because of the effectiveness of it?

14        A     That's my recollection.  I don't -- the

15    specifics I don't recall at this point, but that was my

16    recollection, that that was the reason that they -- that

17    they gave.  But, again, these were their studies.

18        Q     Okay.  And do you have any opinions about the

19    level of sophistication of the Elations purchasers?

20        A     No, I do not.

21        Q     Do you have an understanding of who is in the

22    class in this case?

23        MS. AVILA:  Vague and ambiguous, calls for a legal

24    conclusion.

25        THE DEPONENT:  No, I don't.  I don't know who.  I

Maronick, Thomas J. 5/29/2014

79

1   don't recall.  I mean, clearly that was in the complaint

2   or whatever, but I don't recall it as I sit here right

3   now.

4        Q    BY MS. HENRY:  Were you told that the class

5   included only people in California?

6        MS. AVILA:  Vague and ambiguous.

7        THE DEPONENT:  Subsequent to doing the study, I was

8   told that.  I didn't realize that when I was designing

9   the study.

10       Q    BY MS. HENRY:  Okay.  And is your -- does your

11  study pull from nationwide or California only?

12       A    Nationwide.

13       Q    Does that make a difference in your mind as to

14  whether it pulls from California only to match the class

15  or nationwide?

16       A    No, it doesn't.

17       Q    Why is that?

18       A    Two reasons.  First of all, because the product

19  is marketed nationwide.  A matter of fact, again, in the

20  Elations documents, that survey, I think -- I forgot

21  what the number was.  It was like two-thirds, if I

22  recall the number now, two-thirds of the product are

23  sold through Wal-Mart, Wal-Mart nationwide.  So there's

24  no reason to think that people in any part of the

25  country is going to be different as to this kind of an

173

DEPONENT'S DECLARATION

1

2

3      I, THOMAS J. MARONICK, D.B.A., hereby declare:

4      I have read the foregoing deposition transcript,

5  I identify it as my own, and I have made any

6  corrections, additions or deletions that I was

7  desirous of making in order to render the within

8  transcript true and correct.

9      I declare under penalty of perjury, under the

10  laws of the State of California, that the foregoing

11  is true and correct.

12

13  _____, _____
                            
14      (Date)                    (City and State)

15              _____

16                          (Signature)

17

18

19

20

21

22

23

24

25

Maronick, Thomas J. 5/29/2014

174

```
1    STATE OF CALIFORNIA     )
                             ) SS.
2    COUNTY OF LOS ANGELES   )

3

4         I, K.C. Belden, Certified Shorthand Reporter,

5    Certificate No. 6728 in the State of California, duly

6    empowered to administer oaths, do hereby certify:

7         I am the deposition officer that stenographically

8    recorded the testimony in the foregoing deposition;

9         Prior to being examined, the deponent was by me

10   first duly placed under oath;

11        The foregoing transcript is a true record of the

12   testimony given;

13        Pursuant to Rule 30(e) of the Federal Rules of Civil

14   Procedure, it was requested that the deponent shall have

15   30 days to review the transcript; therefore, any changes

16   made by the deponent or whether or not the deponent

17   signed the transcript cannot at this time be set forth.

18

19

20   Dated _____.

21

22              _____
                          K.C. Belden
23              Certified Shorthand Reporter No. 6728

24

25
```

Maronick, Thomas J. 5/29/2014