UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **EDCV 13-0242 JGB (SPx)** | Date | December 9, 2014 |
| Title | *Robert McCrary v. The Elations Company LLC, et al.* | | |

| | |
|---|---|
| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |

| MAYNOR GALVEZ | ADELE FRAZIER |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| Gillian L. Wade<br>Sara D. Avila | Sascha V. M. Henry |

**Proceedings:** **ORDER (1) GRANTING Defendant's Motion for Partial Summary Judgment (Doc. No. 165); and (2) DENYING Plaintiff's Motion for Summary Judgment (Doc. Nos. 166, 203).**

    Before the Court are two motions for summary judgment. Defendant the Elations Company, LLC, presents the Court with a Motion for Partial Summary Judgment as to Plaintiff's Claim for Injunctive Relief. (Doc. No. 165). Plaintiff Robert McCrary presents the Court with a Motion for Summary Judgment. (Doc. No. 166). After considering the papers timely filed in support of and in opposition to the motions and the arguments presented at the December 8, 2014, hearing, the Court GRANTS Defendant's motion for partial summary judgment and DENIES Plaintiff's motion for summary judgment.

## I. BACKGROUND

### A. Procedural History

    Plaintiff Robert McCrary ("Plaintiff" or "McCrary") filed his putative class action Complaint in state court on December 31, 2012. (Not. of Removal, Ex. A, Doc. No. 1). Defendant the Elations Company, LLC ("Defendant") removed the action to this Court on February 7, 2013. (Not. of Removal).

    Plaintiff filed a First Amended Complaint on February 27, 2013. ("FAC," Doc. No. 10). Pursuant to Defendant's motion to dismiss, the Court dismissed, with leave to amend, Plaintiff's claims based on Defendant's advertising claims of "healthier joints," "joint comfort," "joint flexibility," "joint comfort in 6 days," and "Elations Clinically-Proven Combination." (Doc. No.

21). The Court found that Plaintiff's remaining claims were sufficiently pled. (Id. at 8). On May 3, 2013, Plaintiff filed his Second Amended Complaint, ("SAC," Doc. No. 23), which Defendant thereafter moved to dismiss and strike, (Doc. Nos. 26, 27). The Court granted the motions in part, dismissing some claims with, and others without, leave to amend. (Doc. No. 36). Pursuant to the Court's order, Plaintiff filed a Third Amended Complaint on July 25, 2013. ("TAC," Doc. No. 38). The TAC added named Plaintiff Denzel Doucette. (Id.). Defendant answered the TAC on August 20, 2013. (Doc. No. 44).

On October 14, 2013, Plaintiff filed a motion for class certification, (Doc. No. 48.), and a week later filed a motion for leave to file a Fourth Amended Complaint, (Doc. No. 56). On January 13, 2014, the Court granted the motion to amend, noting that the proposed pleading "deletes Plaintiff Denzel Doucette as a named class member, omits claims from the website as a basis for the UCL and CLRA claims, amends the class definition, and adds facts regarding why Defendant's 'clinically-proven' claims are false." ("Class Order" at 5, Doc. No. 95). In the same order, the Court certified a class of all persons residing in the state of California who purchased Elations for personal use, and not for resale, via methods other than the website, between May 28, 2009, and December 26, 2012, when the following claims were on the packaging and/or labeling of Elations: "clinically-proven combination" and/or "clinically proven formula." (Id. at 9).

Plaintiff filed his Fourth Amended Complaint on January 21, 2014, ("4AC," Doc. No. 99), although it was deemed served on Defendant as of December 30, 2013, (Class Order at 21). Defendant moved to dismiss the 4AC on January 13, 2014. (Doc. No. 94). The Court denied that motion on March 24, 2014. (Doc. No. 117). Defendant answered the 4AC on April 7, 2014. (Doc. No. 118).

On June 3, 2014, the parties stipulated to amend the class definition, expanding the dates between which class members may have purchased Elations to include span of time between May 28, 2009, through September 30, 2013. (Doc. No. 132). The Court granted that stipulation to amend the class definition the following day. (Doc. No. 133).

On August 11, 2014, Defendant moved to decertify the class, (Doc. No. 150), and to exclude Plaintiff's damages expert, David Sharp, (Doc. No. 151). Plaintiffs later moved to exclude two of Defendant's experts: Russell W. Mangum III, (Doc. No. 188), and Bruce R. Isaacson, (Doc. No. 189). In an order dated December 2, 2014, the Court denied Defendant's motions to exclude Sharp and decertify the class, denied Plaintiff's motion to exclude Isaacson, and granted in part Plaintiff's motion to exclude Mangum. ("Order," Doc. No. 210).

On September 8, 2014, Defendant filed a motion for partial summary judgment as to Plaintiff's claim for injunctive relief. ("MPSJ," Doc. No. 165). In support of the MPSJ, Defendant filed the following documents:
- Declaration of Sascha Henry, ("MPSJ Henry Decl.," Doc. No. 165-1), appending Exhibits A through I; and
- Statement of Uncontroverted Facts and Conclusions of Law, ("DSUF," Doc. No. 165-2).

That same day, Plaintiff also moved for summary judgment. (Doc. No. 166). Plaintiff filed the following documents in support of his motion for summary judgment:
- Memorandum of Points and Authorities in Support of Plaintiff's MSJ, ("MSJ" Doc. No. 203);
- Declaration of Gillian L. Wade, ("MSJ Wade Decl.," Doc. No. 203-1), attesting to Exhibits 1 through 30, (Doc. Nos. 203-1 to -6);[1] and
- Statement of Uncontroverted Facts and Conclusions of Law, ("PSUF," Doc. No. 203-8).[2]

Plaintiff opposed Defendant's MPSJ on September 15, 2014, ("Opp'n MPSJ," Doc. No. 204), and filed the following documents[3] in support of his opposition:
- Declaration of Gillian L. Wade, ("MPSJ Wade Decl.," Doc. No. 204-1), appending Exhibits 31 through 34; and
- Statement of Genuine Disputes of Material Fact and Set of Undisputed Facts in Opposition to Defendant's MPSJ, ("PSGD," Doc. No. 204-2).

Also on September 15, 2014, Defendant filed an opposition to Plaintiff's MSJ, ("Opp'n MSJ," Doc. No. 176), along with the following documents:[4]

---

[1] Initially, Plaintiff omitted Exhibits 1 through 30 and applied to seal unredacted versions of those documents, (Doc. No. 166-1); the Court denied that application to seal on November 7, 2014, (Doc. No. 198). On November 14, 2014, Plaintiff refiled the motion documents, including unredacted versions of many of those documents as well as redacted versions of Exhibits 11, 12, 15, 18, 23, 24, 25, 27, & 28. (Doc. No. 203). Plaintiff also reapplied to seal unredacted versions of Exhibits 11, 12, 15, 18, 23, 24, 25, 27, & 28. (Doc. No. 202). As discussed below, that application is GRANTED.

[2] On September 8, 2014, Plaintiff filed a statement of uncontroverted facts and conclusions of law. (Doc. No. 166-2). However, the next day, Plaintiff filed a Notice of Errata, (Doc. No. 170), and a corrected version of the PSUF to replace the version filed the previous day, (Doc. No. 169). Plaintiff redacted parts of both versions of the PSUF and applied to seal unredacted versions of those documents. The Court denied those applications. (Doc. No. 198). On November 14, 2014, Plaintiff publicly filed unredacted versions of those documents. (Doc. Nos. 203-7 & -8).

[3] Plaintiff redacted Exhibits 32 and 33, (Doc. No. 175-1), as well as the PSGD, (Doc. No. 175-2), and applied to seal unredacted versions of those documents. The Court denied that application. (Doc. No. 198). Plaintiff thereafter filed unredacted versions of the opposition brief, exhibits, and PSGD. (Doc. Nos. 204, 204-1 & 204-2).

[4] Defendant redacted several of the supporting documents and applied to seal unredacted versions. The Court denied that application to seal on November 7, 2014. (Doc. No. 198). On November 14, 2014, Defendant filed unredacted versions of all opposition documents and a redacted version of Exhibit S to the Declaration of Sascha Henry. (Doc. Nos. 200, 200-1, 200-3 & 200-5 to -8). Defendant reapplied to seal Exhibit S. (Doc. No. 201). As discussed below, that application is GRANTED.

- Statement of Genuine Disputes, ("DSGD," Doc. No. 200-1);
- Objections to Plaintiff's Evidence, ("OPE," Doc. No. 200-3);
- Declaration of Paul Seeley, ("Seeley Decl." Doc. No. 176-3), attesting to Exhibit A;[5] and
- Declaration of Sascha Henry, ("MSJ Henry Decl.," Doc. No. 200-5), appending Exhibits A through T, (Doc. Nos. 200-5 to -8);

Defendant replied in support of its motion for partial summary judgment on September 22, 2014. ("Reply MPSJ," Doc. No. 180). Defendant also filed the following supporting documents:[6]

- Response to Additional Facts Submitted by Plaintiff in Opposition to Defendant's MPSJ, ("RAF," Doc. No. 200-2); and
- Objections to Plaintiff's Evidence Submitted in Opposition to Defendant's MPSJ, ("MPSJ OPE," Doc. No. 200-4).

Also on September 22, 2014, Plaintiff filed his reply in support of his motion for summary judgment, ("Reply MSJ," Doc. No. 205), and filed the following documents[7] in support of that reply:

- Declaration of Sara D. Avila, ("Avila Decl.," Doc. No. 205-1), attesting to Exhibits 1 through 7;
- Declaration of Thomas J. Maronick, ("Maronick Decl.," Doc. No. 182-2), appending Exhibits 1 through 4;
- Evidentiary Objections to Defendant's Additional Statement of Undisputed Material Facts, ("EOD," Doc. No. 182-3);
- Response to Defendant's Statement of Genuine Disputes, ("Response DSGD," Doc. No. 205-2); and
- Plaintiff's Statement of Genuine Disputes of Material Facts to Defendant's Additional Undisputed Material Facts, ("MSJ PSGD," Doc. No. 205-3).

Plaintiff very belatedly submitted his responses to Defendant's evidentiary objections on December 5, 2014. (Doc. No. 211).

---

[5] The initial filing omitted Exhibit A, which was later filed along with a Notice of Errata. (Doc. No. 178).

[6] Defendant redacted portions of the RAF and objections, (Doc. Nos. 180-1 and -2), and applied to seal unredacted versions of those documents. The Court denied those applications to seal. (Doc. No. 198). Defendant thereafter filed unredacted versions of those documents. (Doc. Nos. 200-2 & -4).

[7] Plaintiff omitted, or filed redacted versions of, several documents and applied to seal unredacted versions of those documents. (Doc. Nos. 182, 182-1, 182-4 & 182-5). The Court denied that application. (Doc. No. 198). Plaintiff thereafter filed unredacted versions of its previously redacted reply documents. (Doc. Nos. 205 & 205-1 to -3)

### B. The Complaint

The 4AC states four claims for relief: (1) violation of the Consumer Legal Remedies Act ("CLRA") under Cal. Civ. Code § 1750; (2) violation of the False Advertising Law ("FAL") under Cal. Bus. Prof. Code § 17500; (3) violation of the unfair and fraudulent prongs of the Unfair Competition Law ("UCL") under Cal. Bus. Prof. Code § 17200; and (4) violation of the unlawful conduct prong of the UCL. (4AC).

The 4AC alleges that Defendant markets, distributes, and sells the Elations dietary joint supplement beverage and promotes it as "clinically proven" to have joint health benefits. (4AC ¶ 1). However, Plaintiff contends that Elations is not clinically proven to have any impact on joints and that Elations' label was therefore false. (4AC ¶ 2).

Plaintiff McCrary suffers from arthritic joint pain. (4AC ¶ 74). Plaintiff alleges that, while shopping at CVS in August 2011, he reviewed the packaging of Elations, which included claims that Elations contains a "clinically-proven formula" and a "clinically-proven combination" of ingredients. (4AC ¶ 75). Relying on these claims, he purchased Elations, followed the instructions, and used it as directed; however, he did not experience the advertised benefits. (4AC ¶¶ 76-77). Plaintiff asserts that he would never have purchased the product had he known of its ineffectiveness. (4AC ¶ 76). Plaintiff brought the action on behalf of a purported class of similarly situated persons. (4AC ¶ 17).

## II. LEGAL STANDARD

A motion for summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson, 477 U.S. at 250.

Generally, the burden is on the moving party to demonstrate its entitlement to summary judgment. See Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998); Retail Clerks Union Local 648 v. Hub Pharmacy, Inc., 707 F.2d 1030, 1033 (9th Cir. 1983). The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

When the non-moving party has the burden at trial, however, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. Id. at 325. Instead, the moving party's burden is met by pointing out an absence of evidence supporting the non-moving party's case. Id. The burden then shifts to the non-moving party to show that there is a genuine issue of material fact that must be resolved at trial. Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 256. The non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial. Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 252; see also William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, Federal Civil Procedure Before Trial,

14:144. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Anderson, 477 U.S. at 252). "The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." Id. at 387 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

If the moving party bears the burden of proof at trial, it "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007); see also Torres Vargas v. Santiago Cummings, 149 F.3d 29, 35 (1st Cir. 1998) ("The party who has the burden of proof on a dispositive issue cannot attain summary judgment unless the evidence that he provides on that issue is conclusive."). Instead, Rule 56 requires the moving party to show it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Anderson, 477 U.S. at 250 ("[The summary judgment] standard mirrors the directed verdict standard under Federal Rule of Civil Procedure 50(a).").

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991); T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987).

### III. DISCUSSION

#### A. Applications to Seal

In the November 7, 2014, Order, the Court previously explained the standards that govern applications to seal court filings. (See Doc. No. 198). The Court will not repeat that discussion here, except to briefly reiterate that a party seeking to seal a document attached to a non-dispositive motion need only demonstrate "good cause," see Pintos v. Pac. Creditors Ass'n, 605 F.3d 665, 678 (9th Cir. 2010), whereas a party seeking to seal a judicial record attached to a dispositive motion or presented at trial must articulate "compelling reasons" in favor of sealing, Kamakana v. City & Cnty. of Honolulu, 447 F.3d 1172, 1178 (9th Cir. 2006). Moreover, "[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Clark v. Bunker, 453 F.2d 1006, 1009 (9th Cir. 1972) (quoting Restatement of Torts § 757, cmt. b).

After the Court denied the parties' initial applications to file under seal their sumbissions related to the motions for summary judgment and partial summary judgment, (Doc. No. 198), the parties publicly filed unredacted versions of many of the previously redacted documents, (Doc. Nos. 200, 203, 204 & 205), and renewed their applications to seal with respect to only a few documents, (Doc. Nos. 201 & 202).

Defendant re-applied to seal only one page of supporting documentation — Exhibit S to the Declaration of Sascha Henry in support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment. (MSJ Henry Decl., Ex. S, Doc. No. 200-8). Exhibit S is a single page from

a clinical study, commissioned by Defendant and conducted by Hill Top, a private research service.  (Id.).

Plaintiff re-applied to seal nine exhibits — Exhibits 11, 12, 15, 18, 23, 24, 25, 27, and 28 — that accompanied the Declaration of Gillian L. Wade in support of Plaintiff's Motion for Summary Judgment.  (MSJ Wade Decl., Doc. No. 203-1).  Five of those exhibits — Exhibits 11, 12, 15, 27, and 28 — include the results, protocols, and methods utilized in the same Hill Top study as summarized in Defendant's Exhibit S.  Exhibit 18 includes the results from Defendant's surveys of consumers of Elations.  Exhibits 23 and 24 include summaries of the methodology and findings of another clinical study that was commissioned by Defendant.  Exhibit 25 is an internal business document summarizing Defendant's marketing strategy and business model.

Each of the documents that Plaintiff and Defendant seek to seal are "compilation[s] of information" that is "used in [Defendant]'s business, and which gives [Defendant] an opportunity to obtain an advantage over competitors."  Cf. Clark, 453 F.2d at 1009.  Most of the documents include sensitive product research information that could be used by competitors and negatively impact Defendant's success in the market.  Among other things, competitors could benefit from learning the methodologies and protocols used by Defendant when studying its product.  The remaining two documents summarize Defendant's marketing strategy and divulge information that Defendant collected about its consumers; Defendant's competitors would benefit from such information by learning about Defendant's strategies and by using the consumer information without having to expend any resources to obtain it.  Thus Plaintiff and Defendant have demonstrated compelling reasons for sealing their business documents.

Accordingly, the Court GRANTS Defendant's and Plaintiff's renewed applications to seal documents related to their motions for summary judgment.  (Doc. Nos. 201 & 202).

B. **Defendant's Motion for Partial Summary Judgment**

1. **Undisputed Facts[8]**

Except as noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted.  They are "admitted to exist without controversy" for purposes of the Motion for Summary Judgment.  L.R. 56-3 (facts not "controverted by declaration or other written evidence" are assumed to exist without controversy); Fed. R. Civ. P. 56(e)(2) (stating that where a party fails to address another party's assertion of fact properly, the court may "consider the fact undisputed for purposes of the motion").

Before September 2011, Defendant manufactured and shipped Elations that included on the packaging[9] claims that Elations included a "clinically-proven combination" as well as a

---

[8] Along with its Reply, Defendant attaches Objections to Plaintiff's Evidence.  (OPE, Doc. No. 200-3).  However, because the Court does not rely on the objected to facts set forth by Plaintiff, Defendant's objections are denied as moot.

[9] "Packaging" includes Elations' overwrap and other labeling.

"clinically proven formula" (the "Clinically Proven Claims"). (DSUF ¶¶ 3, 5). Defendant has removed the Clinically Proven Claims from Elations' packaging, marketing, and advertising; September 2011 represents the latest month when Elations bearing the Clinically Proven Claims entered the market. (DSUF ¶ 5). Elations has a two-year shelf-life, and thus the latest Elations containing the Clinically Proven Claims should have been on store shelves was September 30, 2013. (DSUF ¶¶ 6, 7). Elations' overwrap and packaging does not currently include the Clinically Proven Claims. (DSUF ¶¶ 8, 9). Moreover, Plaintiff is unaware of any current marketing by Defendant that uses the Clinically Proven Claims. (DSUF ¶¶ 11, 12). Defendant's removal of the Clinically Proven Claims from Elations' packaging and advertising did not occur as a result of this lawsuit. (DSUF ¶ 25).

Among other relief, Plaintiff seeks an injunction to prevent Defendant from using the Clinically Proven Claims on Elations' packaging and marketing materials. (DSUF ¶¶ 2-3). Plaintiff also argues that it seeks injunctive relief in the form of corrective advertising, (PSGD ¶¶ 2-3), although Defendant disputes whether Plaintiff's request for such relief is procedurally proper because Plaintiff failed to claim such relief in his Fourth Amended Complaint, (Reply MPSJ at 2-4).

### 2. Claim for Injunctive Relief

Defendant seeks partial summary judgment as to Plaintiff's claim for injunctive relief. Largely based upon the fact that Defendant no longer utilizes the Clinically Proven Claims on its packaging or advertising, Defendant argues that Plaintiff lacks Article III standing to seek injunctive relief and, alternatively, that Plaintiff's claim for injunctive relief is moot. (MPSJ at 1).

#### a. Standing

Defendant argues that Plaintiff lacks standing to bring a claim for injunctive relief for two reasons. First, because Defendant no longer displays the Clinically Proven Claims on its packaging or marketing materials, there is no real and immediate threat that Plaintiff will be harmed by those claims. (MPSJ at 6-7). In contrast, Plaintiff maintains that he has standing to seek injunctive relief, arguing that there is no proof that Defendant's removal of the Clinically Proven Claims from its product packaging is permanent. (Opp'n MPSJ at 3, 8). Plaintiff notes that Defendant did not accept Plaintiff's offer to drop his claims for injunctive relief in exchange for Defendant's agreement to permanently refrain from using the Clinically Proven Claims. (Id. at 3).

"[A] plaintiff must demonstrate standing separately for each form of relief sought." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 185 (2000). Even if a claim for injunctive relief might not become moot if a defendant ceases the complained-of activity *after* the plaintiff brings her suit, the same plaintiff may lack standing if the defendant ceases its activity *before* the case is initiated. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 109 (1998). Past wrongs typically allow for standing to claim damages, but they do not necessarily "show a present case or controversy regarding injunctive relief." City of Los Angeles v. Lyons, 461 U.S. 95, 102, 105 (1983). Instead, a plaintiff must demonstrate that he "is

threatened with a 'concrete and particularized' legal harm, coupled with a 'sufficient likelihood that he will again be wronged in a similar way.'" Bates v. United Parcel Serv., Inc., 511 F.3d 974, 985 (9th Cir. 2007) (citations omitted). Demonstrating that likelihood requires a plaintiff to show that "there is a real and immediate threat of repeated injury." Lyons, 461 U.S. at 102. Past exposure to illegal conduct may offer evidence of such a threat. Id.

The parties do not dispute that Defendant did not release onto the market any units of Elations with the Clinically Proven Claims on the packaging after September 2011. (DSUF ¶ 5). As Plaintiff initiated this suit on December 31, 2012, (Not. of Removal), it is undisputed that Defendant had ceased using the Clinically Proven Claims before Plaintiff brought his claims for injunctive relief. Although Plaintiff recognizes that he must establish a real and immediate threat of repeated injury, he fails to point to any facts beyond Defendant's past use of the Clinically Proven Claims to satisfy that burden. Plaintiff merely argues that Defendant voluntarily ceased the use of those claims and could begin using them again at any point.[10] Although Plaintiff may be correct that Defendant is currently free to return to its previous practice of using the Clinically Proven Claims on its advertising, that fact is not enough to demonstrate that Defendant's use of those claims is "real and immediate." If and when Defendant reinitiates its use of those claims, Plaintiff will have the option of attempting to enjoin that practice. Currently, however, Plaintiff lacks standing to seek to enjoin Defendant's use of the Clinically Proven Claims.

Second, Defendant asserts that Plaintiff does not intend to purchase Elations again in the future, which means that no threat of future injury to him will result from Defendant's use of the Clinically Proven Claims. (Id. at 6-7). In response, Plaintiff contends that standing doctrine does not require a named plaintiff to intend to repurchase a product in order for the class to have standing. (Opp'n MPSJ at 5-7). As the Court has already determined that Plaintiff lacks standing because Defendant ceased using the Clinically Proven Claims before Plaintiff brought this action, it matters not that Plaintiff's intent not to repurchase Elations may not have destroyed his standing as class representative.

Plaintiff also argues that his claims for injunctive relief include claims for corrective advertising and that he has standing to seek injunctive relief because corrective advertising is necessary to ameliorate past harm. (Opp'n MPSJ at 2, 8). Defendant responds that Plaintiff's arguments regarding corrective advertising should be disregarded because the Fourth Amended Complaint did not demand corrective advertising as part of Plaintiff's requested injunctive relief. (Reply MPSJ at 2-3). The prayer for relief in the 4AC included, among other demands, a request for "[a]n order enjoining Defendant from pursuing the policies, acts, and practices complained of herein," as well as a request for "[s]uch other and further relief as the Court may deem necessary or appropriate." (4AC at 35-36). Thus Plaintiff only specifically requested the injunctive relief of an injunction against using the Clinically Proven Claims in the future. His general claim for further relief that the Court deems appropriate cannot now be relied upon as having put

---

[10] Although Plaintiff asserts that Defendant refused his offer to drop his claims for injunctive relief in exchange for Defendant's agreement to permanently refrain from using the Clinically Proven Claims, Defendant may have had a variety of reasons to refuse that offer in the context of this litigation beyond any intent to return to using those claims in the future.

Defendant on notice that he would seek the injunctive relief of corrective advertising. Therefore, the Court concludes that Plaintiff cannot save his claims for injunctive relief by looking to the need for corrective advertising.

### b. Mootness

Defendant alternatively contends that Plaintiff's claim for injunctive relief is moot because Defendant no longer includes the Clinically Proven Claims on its product packaging or marketing. (MPSJ at 9-10). As the Court has already determined that Plaintiff lacks standing to seek injunctive relief, the Court need not address the issue of mootness.

### C. Plaintiff's Motion for Summary Judgment

Plaintiff seeks summary judgment on each of his claims, specifically those for violations of the FAL, UCL, and CLRA. (MSJ at 1-2). If Plaintiff's motion is not granted in its entirety, Plaintiff alternatively seeks partial summary judgment. (MSJ at 25).

### 1. Evidentiary Objections

Defendant raises a variety of evidentiary objections to the evidence presented by Plaintiff in support of Plaintiff's MSJ; most of those objections are plainly without merit: lack of foundation, lack of authentication, irrelevance, lack of probative value, and hearsay. (OPE at 1-7).

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002); see Fed. R. Civ. Proc. 56(e). At the summary judgment stage, district courts consider evidence with content that would be admissible at trial, even if the form of the evidence would not be admissible at trial. See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003); Block v. City of Los Angeles, 253 F.3d 410, 418-19 (9th Cir. 2001). "[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus "redundant" and unnecessary to consider here. Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); see also Anderson, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted."). Thus the Court does not consider any objections on the grounds that the evidence lacks foundation, lacks authentication, is irrelevant, or constitutes hearsay.

Defendant also objects to the fact that one piece of supporting evidence, the GAIT Study, was not attached to Plaintiff's moving papers. (OPE ¶¶ 67-72). However, that assertion is plainly false. Defendant further objects to one piece of evidence because the expert exceeded the scope of his expertise and to another piece of evidence on the basis that the statement was outside of the speaker's personal knowledge. (OPE ¶¶ 32, 46). Because the Court does not rely upon those facts, those objections are denied as moot.

Plaintiff raises numerous objections to Defendant's Additional Statement of Undisputed Material Facts. (EOD, Doc. No. 182-3). However, as the Court does not rely on that statement of facts, Plaintiff's objections are denied as moot.

### 2. Undisputed Facts

Except as noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted. They are "admitted to exist without controversy" for purposes of Plaintiff's Motion for Summary Judgment. See L.R. 56-3 (facts not "controverted by declaration or other written evidence" are assumed to exist without controversy); Fed. R. Civ. P. 56(e)(2) (stating that where a party fails to address another party's assertion of fact properly, the court may "consider the fact undisputed for purposes of the motion").

Defendant is the registered trademark owner of Elations Healthier Joints, a dietary supplement beverage ("Elations"). (PSUF ¶ 1). Defendant launched sales of Elations in October 2007. (PSUF ¶ 2; DSGD ¶ 2). Each bottle of Elations contains four active ingredients: 1500 mg of glucosamine hydrochloride ("glucosamine"), 1200 mg of chondroitin sulfate ("chondroitin"), 6 mg of boron, and calcium citrate malate ("CCM"). (PSUF ¶ 3-4). Elations is available in three flavors, all of which bore the phrases "clinically proven formula" and "clinically-proven combination" at some time before September 2011. (PSUF ¶¶ 5-6; DSUF ¶ 5). Elations has been sold in retail stores in shrink-wrapped 6 packs, 12 packs, and 18 packs, as well as in cases of multiple shrink-wrapped 6 packs. (PSUF ¶ 12; DSGD ¶ 12).

In 2002, the Proctor & Gamble Company commissioned a randomized, placebo-controlled, double-blind study to test the effect of Elations on joint flexibility. ("P&G Study" at 1, Wade Decl., Ex. 3, Doc. No. 203-3 at 97). The early version of Elations that was tested in that study contained glucosamine hydrochloride, CCM, boron, and Vitamin C, (P&G Study at 1), but not chondroitin, (PSUF ¶ 38). The results of the P&G Study demonstrated that both the placebo and Elations users experienced statistically significant improvement in joint flexibility after eight weeks. (P&G Study at 2-3). Moreover, the P&G Study concluded that, among the overall test panel, the use of Elations resulted in no statistically significant advantage over the placebo with regard to flexibility. (Id. at 2-3). However, the P&G Study also concluded that for two subgroups — those with (a) moderate stiffness, representing 60% of the overall test panel, and (b) severe/extreme stiffness, representing an additional 23% of all test subjects — the use of Elations resulted in a statistically significant advantage in flexibility over the use of a placebo. (Id.).

In 2007 or 2008, Defendant commissioned Hill Top Research to conduct a pilot study (the "Pilot Study") of Elations. (PSUF ¶ 41). The objectives of the Pilot Study included evaluation of the effect of boron as an ingredient in Elations with regard to alleviating joint/muscle pain. (PSUF ¶ 43). The Pilot Study did not utilize an inactive placebo. (PSUF ¶ 45). One test group received a formulation of Elations with boron and the other received a formulation of Elations without boron. (Pilot Study, Wade Decl., Ex. 11). Among its conclusions, the Pilot Study determined that both test groups experienced significant overall reduction in joint/muscle pain during the four-week evaluation period. (Id.).

In 2009, Defendant commissioned Hill Top Research to conduct a second study of Elations, (PSUF ¶ 48), in order to obtain clinical proof for claims about Elations, (id. ¶ 73). The 2009 Hill Top Study was a clinical test. (MSJ PSGD ¶ 18). That study did not utilize an inactive placebo. (Id. ¶ 50). Instead, the 2009 Hill Top Study compared Elations with and without boron. (Id. ¶ 49). The results of the two groups were similar — both produced significant reductions in overall joint and/or muscle pain. (PSUF ¶ 51; DSGD ¶ 51).

Defendant has never tested the efficacy of chondroitin alone. (PSUF ¶ 10).

The National Institute of Health ("NIH") conducted the Glucosamine/chondroitin Arthritis Intervention Trial ("GAIT") in 2006, which was the largest in-depth study of glucosamine hydrochloride and chondroitin sulfate. (PSUF ¶¶ 65-66; "GAIT Study" at 795, MSJ Wade Decl., Ex. 30, Doc. No. 203-6 at 88). That study tested the effectiveness of 1500 mg glucosamine hydrochloride and 1200 mg of chondroitin sulfate against an inactive placebo for 24 weeks. (PSUF ¶ 66). The study found that, although glucosamine and chondroitin "did not reduce pain effectively in the overall group of patients with osteoarthritis of the knee," that combination "may be effective in the subgroup of patients with moderate-to-severe knee pain." (GAIT Study at 795).

In 2008, the NIH released the results of an ancillary GAIT Study ("GAIT II"), which was conducted with a subset of the participants from the original GAIT Study. (PSUF ¶ 69). The results indicated that glucosamine and chondroitin did not slow the loss of knee cartilage due to osteoarthritis any better than a placebo. (Id.).

Plaintiff's pharmacology expert, Dr. Lynn Willis, reviewed the above-described scientific literature with regard to Elations, glucosamine, and chondroitin. ("Willis Decl." at 11, MSJ Wade Decl., Ex. 7, Doc. No. 203-5). During his deposition, Willis indicated that the results of various studies could potentially be combined to support a claim of clinical proof. ("Willis Depo." at 156, Avila Decl., Ex. 3, Doc. 205-1). Willis interpreted the Clinically Proven Claims as meaning that the dietary supplement was more effective than a placebo in at least one adequate and well-controlled human clinical study, (PSUF ¶ 30), and he opined that other biomedical scientists would similarly interpret the disputed claims, (id. ¶ 31). Willis also noted that the Federal Trade Commission's ("FTC") definition of a "clinically proven" claim is one that is shown to be true through the results of a well-controlled clinical study, when those results are considered in light of all relevant and reliable scientific evidence. (PSUF ¶ 33).

Plaintiff's expert, Dr. Thomas J. Maronick, designed and implemented an online survey of individuals who have purchased or considered purchasing an over-the-counter remedy for joint comfort or the symptoms of arthritis. (PSUF ¶ 16). His surveys questioned a total of 554 participants. ("Maronick Report" at 5-6, Wade Decl., Ex. 6). Maronick's conclusions included that "the main message consumers take from [Elations'] label, among others, is that the Elations product promises joint relief and/or healthy joints and that the product is more absorbable than pills." (Id. at 3). Maronick also concluded that "[c]onsumers also take a message that the product 'works' as claimed" and that "most respondents (79%) would be more willing to buy the product if it had a 'clinically proven formula.'" (Id. at 3). Defendant disputes the validity and significance of those survey results, (DSGD ¶¶ 17-25), and the report of its rebuttal expert, Dr.

Bruce Isaacson, criticized Maronick's methods and conclusions, ("Isaacson Report," MSJ Decl., Ex. N, Doc. No. 176-6). Isaacson did not perform his own consumer survey regarding the Clinically Proven Claims. (PSUF ¶ 26).

Plaintiff Robert McCrary expended money when he purchased several packs of Elations that bore the Clinically Proven Claims on the packaging. ("McCrary Depo." at 58-59, 69, MSJ Wade Decl., Ex. 9, Doc. No. 203-5). In deciding to purchase Elations, McCrary relied on the Clinically Proven Claims. (PSUF ¶ 36).

### 3. Plaintiff's Claims

As Plaintiff bears the burden of proof in this case, he "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." Soremekun, 509 F.3d at 984. Plaintiff claims that Defendant has violated three provisions of California law — the CLRA, FAL, and UCL — and, to satisfy his burden of proof, he must establish each element of those claims.

The CLRA prohibits specific "unfair methods of competition and unfair or deceptive acts or practices" that are "intended to result or which result[] in the sale . . . of goods . . . to any consumer." Cal. Civ. Code § 1770(a). The 4AC alleges violations of Sections 1770(a)(7) and (a)(5). (4AC ¶ 84). Those sections prohibit persons from "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that the goods are of a particular style or model, if they are of another," Cal. Civ. Code § 1770(a)(7), and "[a]dvertising goods or services with intent not to sell them as advertised," Cal. Civ. Code § 1770(a)(9). A claim under the CLRA requires the plaintiff to demonstrate actual reliance and that he experienced damages as a result of the prohibited practice. See Tucker v. Pac. Bell Mobile Servs., 208 Cal. App. 4th 201, 221-22 (Cal. Ct. App. 2012). Classwide reliance, and thus causation, can be demonstrated by showing that the misrepresentations made to the class were material. See In re Vioxx Class Cases, 180 Cal. App. 4th 116, 129 (Cal. Ct. App. 2009); Mass. Mut. Life Ins. v. Superior Ct., 97 Cal. App. 4th 1282, 1292-93 (Cal. Ct. App. 2002).

The FAL prohibits "any person, firm, corporation or association . . . from induc[ing] the public to enter into any obligation" by making "any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. The 4AC alleges that Defendant's use of the Clinically Proven Claims violated each of the three prongs. (4AC ¶¶ 106-128). Violations of other laws satisfy the "unlawful" prong and thus may be treated as unfair competition pursuant to the UCL. Kasky v. Nike, Inc., 27 Cal. 4th 939, 949 (Cal. 2002). Thus a violation of the CLRA or FAL is, by definition, also a violation of the UCL. Id. at 950. The "unfair" prong has been defined in several ways, including as "offend[ing] an established public policy" or as "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." See Lueras v. BAC Home Loans Servicing, LP, 221 Cal. App. 4th 49, 81 (Cal. Ct. App. 2013) (quotations omitted). The "fraudulent" prong "'require[s] only a showing that members of the public are likely to be

deceived' and 'can be shown even without allegations of actual deception, reasonable reliance and damage.'" Id. (alteration in original) (quoting Daugherty v. Am. Honda Motor Co., 144 Cal. App. 4th 824, 838 (Cal. Ct. App. 2006)).

"[T]o state a claim under either the UCL or [FAL], based on false advertising or promotional practices, 'it is necessary only to show that members of the public are likely to be deceived.'" In re Tobacco II Cases, 46 Cal. 4th 298, 311 (Cal. 2009) (first alteration in original) (internal quotations omitted). Plaintiffs "need not prove that each member of the class relied on the allegedly fraudulent misrepresentation." Algarin v. Maybelline, LLC, 300 F.R.D. 444, 453 (S.D. Cal. 2014). Thus, pursuant to California law, "Plaintiff need only show that the 'reasonable consumer' is likely to have been deceived by the challenged business practice or advertising." Id. at 453.

Claims for violations of the CLRA, FAL, and UCL are "governed by the 'reasonable consumer' test." See Williams v. Gerber Products Co., 552 F.3d 934, 938 (9th Cir. 2008) (quoting Freeman v. Time, Inc., 68 F.3d 285, 289 (9th Cir. 1995)). "A reasonable consumer is 'the ordinary consumer acting reasonably under the circumstances.'" Davis v. HSBC Bank Nevada, N.A., 691 F.3d 1152, 1162 (9th Cir. 2012) (quoting Colgan v. Leatherman Tool Group, Inc., 135 Cal.App.4th 663, 682 (Cal. Ct. App. 2006)). In applying that standard, a plaintiff "must 'show that members of the public are likely to be deceived'" by the defendant's advertisement. Id. (quoting Freeman, 68 F.3d at 289). Thus the CLRA, FAL, and UCL prohibit advertising that is false as well as advertising that is true but "is either actually misleading . . . or has a capacity, likelihood or tendency to deceive or confuse the public." Kasky, 27 Cal. 4th at 951.

### 4. Falsity or Deceptiveness of Clinically Proven Claims

In order to prove that the Clinically Proven Claims were false and/or deceptive, Plaintiff attempts to establish how a reasonable consumer would interpret the term "clinically proven" and that such a definition was not satisfied. In this litigation, the relevant definition of "clinically proven" — and, more specifically, the Clinically Proven Claims — is the meaning that a reasonable consumer would embrace. See Williams, 552 F.3d at 938. In his attempts to establish the definition of "clinically proven," Plaintiff points to the results of Maronick's online consumer surveys and the definitions provided by Willis and the FTC. (MSJ at 7, 16, 21; PSUF ¶¶ 30-31, 33). Defendant responds by arguing that Willis's and the FTC's definitions, as well as the results of Maronick's consumer surveys, do not prove how a reasonable consumer would interpret the Clinically Proven Claims, and that a question of material fact remains as to those issues. (Opp'n MSJ at 16, 20).

The Court agrees that Plaintiff fails to establish that a reasonable consumer's interpretations of the Clinically Proven Claims might not be satisfied. Defendant argues that Willis's and the FTC's definitions do not represent the views of a reasonable consumer, but those of an expert in pharmacology and a government agency. (Opp'n MSJ at 16). This Court agrees that it cannot assume that those interpretations — that to be "clinically proven" a claim must be proven more effective than a placebo in at least one adequate and well-controlled human clinical study or shown to be true through the results of a well-controlled clinical study, when those results are considered in light of all relevant and reliable scientific evidence, (PSUF ¶¶ 30, 33) —

would be shared by the reasonable consumer. Defendant further argues that the conclusion drawn from Maronick's consumer surveys — that "the main message consumers take from [Elations'] label, among others, is that the Elations product promises joint relief and/or healthy joints and that the product is more absorbable than pills," (Maronick Report at 5-6) — are of limited use in determining how the reasonable consumer would define the term. (Opp'n MSJ at 21). The variety of responses were not so dramatic as to defeat class certification, (Order at 23-24), but the results are not strong enough to satisfy the Plaintiff's formidable burden of proof on a motion for summary judgment when Plaintiff bears the burden of proof. Although 46.4% of respondents in Maronick's first survey and 54.1% of respondents in his second survey stated that "clinically proven" means that a product works or is proven to work, (Maronick Report at 9), almost as many respondents stated that "clinically proven" means that the product was studied or tested, and many of the remaining survey participants indicated that they were not sure what it means or provided a wide range of responses, (id.).

A reasonable trier of fact could certainly find that a reasonable consumer's definition of "clinically proven" is not satisfied through the tests that have been conducted on Elations and other glucosamine supplements. For example, a reasonable trier of fact could conclude that the claims are not satisfied because, to a reasonable consumer, "clinically proven" means that a double blind, inactive placebo-controlled, human study produced statistically significant results demonstrating that the product achieves its stated purpose. However, the standard for granting summary judgment to a plaintiff differs from that which must be satisfied at trial, and Plaintiff has not "affirmatively demonstrate[d] that no reasonable trier of fact could find other[wise]." Cf. Soremekun, 509 F.3d at 984. For example, a trier of fact could conclude that "clinically proven" means that clinical tests were conducted and that the test subjects experienced some relief after using the product. Such a definition would be satisfied by the Pilot Study and the 2009 Hill Top Study. (Pilot Study, Wade Decl., Ex. 11; PSUF ¶ 51; DSGD ¶ 51). Moreover, the trier of fact could potentially interpret "clinically proven" as not requiring that the exact, current formulation of Elations must have been tested and that clinical tests of an earlier formulation of Elations would suffice. Such a definition would be satisfied by the P&G Study. (P&G Study at 2-3). Furthermore, given that Willis apparently conceded that the results of various studies could potentially be combined to support a claim of clinical proof, (Willis Depo. at 156), the trier of fact might conclude that the results of the GAIT Study — which tested glucosamine and chondroitin supplements against an inactive placebo and found significant results for two large subgroups of the test population — could be combined with a study of Elations to satisfy the Clinically Proven Claims. Thus "the question of whether a reasonable consumer would likely have been deceived by [the Clinically Proven Claims] is most appropriately answered by the trier of fact." Miletak v. Allstate Ins. Co., No. C 06–03778 JW, 2010 WL 809579, at *7 (N.D. Cal. March 5, 2010).

A reasonable trier of fact could potentially find that the Clinically Proven Claims were not false or deceptive. Therefore, the Court concludes that an issue of material fact remains as to how the reasonable consumer would interpret Clinically Proven Claims and whether that definition has been satisfied.

### 5. Reliance Upon, or Materiality of, the Clinically Proven Claims

As noted above, demonstrating classwide reliance requires that the statements at issue in UCL and FAL claims must be "likely to deceive" the reasonable consumer. In re Tobacco II Cases, 46 Cal. 4th at 311; Algarin, 300 F.R.D. at 453. Moreover, actual reliance must be demonstrated for claims under the CLRA; however, that requirement can be satisfied by demonstrating that the misrepresentations made to the class were material. See Tucker, 208 Cal. App. 4th at 221-22; In re Vioxx, 180 Cal. App. 4th at 129. "Materiality is generally a question of fact for the jury." Johnson v. General Mills, Inc., 275 F.R.D. 282, 287 (C.D. Cal. 2011). Similarly, "whether a statement is likely to deceive a reasonable consumer is generally a question of fact." Hypertouch, Inc. v. ValueCheck, Inc., 192 Cal. App. 4th 805, 839 (Cal. Ct. App. 2011).

Plaintiff asserts that whether the Clinically Proven Claims are material should be decided on summary judgment. (MSJ at 20-24). First, Plaintiff essentially argues that false efficacy claims are material as a matter of law. (MSJ at 21-22). As support, Plaintiff cites to four cases applying the FTC Act and Lanham Act — not the CRLA, UCL, or FAL — and involving somewhat different standards. Cf. Pizza Hut, Inc. v. Papa John's Int'l, Inc., 227 F.3d 489 (5th Cir. 2000); FTC v. Pantron I Corp., 33 F.3d 1088, 1095 (9th Cir. 1994); FTC v. Wellness Support Network, Inc., No. 10-cv-04879-JCS, 2014 WL 644749 (N.D. Cal. Feb. 19, 2014); Hansen Beverage Co. v. Vital Pharm., Inc., No. 08–CV–1545–IEG (POR), 2010 WL 1734960, at *3-4 (S.D. Cal. Apr. 27. 2010). Plaintiff's argument that "express claims are presumed to be material" and that "materiality is also presumed as to 'claims that significantly involve health [or] safety,'" (MSJ at 21-22), are not drawn from precedent that is applicable to this case. Those arguments are thus unconvincing.

Second, Plaintiff argues that the evidence demonstrates that the Clinically Proven Claims were important to consumers when making their purchasing decisions. (MSJ at 22-23). Plaintiff looks to Maronick's consumer surveys to support that argument as well as what he terms "circumstantial evidence." (Id. at 22-24). While Maronick's report offers support that consumers consider the Clinically Proven Claims to be material, it does not adequately "demonstrate that no reasonable trier of fact could find other than for [Plaintiff]." Cf. Soremekun, 509 F.3d at 984. For example, although 62% of respondents selected "clinically proven" as one of the top three reasons to purchase Elations, only 32 of 302 respondents selected "clinically proven formula" as the most important reason to purchase Elations. (Maronick Report at 4). Plaintiff also relies on "circumstantial evidence" that consumers purchased Elations for the only reason for which it is sold: joint comfort. (MSJ at 23). Even if Elations is sold solely for joint comfort, the Clinically Proven Claims are not the only statements on the packaging that indicate that joint comfort might be achieved through use of Elations, (Wade Decl., Exs. 20-22), and thus a reasonable juror could find that consumers did not rely on the Clinically Proven Claims. Furthermore, Defendant points out that the Clinically Proven Claims appeared on the back and top — not the front — of Elations packaging. (MSJ at 18-20; id.).

Overall, Plaintiff has not demonstrated that no material fact exists as to whether the Clinically Proven Claims were material to reasonable consumers. As the above arguments also apply to the UCL and FAL claims, the Court similarly concludes that Plaintiff has failed to

establish the lack of a material fact with regard to whether the Clinically Proven Claims were likely to deceive the reasonable consumer.

Accordingly, the Court DENIES Plaintiff's motion for summary judgment.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion for partial summary judgment and DENIES Plaintiff's motion for summary judgment. The parties' renewed applications to seal documents related to the motions for summary judgment are GRANTED.

**IT IS SO ORDERED.**